Mary Helen Beatificato, Esq. (SBN 220936)
Insight Psychology and Addiction, Inc.
4000 Birch Street, Suite 112
Newport Beach, CA
Telephone: (949) 216-3851
Facsimile: (949) 467-9945

Attorneys for PLAINTIFF INSIGHT
PSYCHOLOGY AND ADDICTION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INSIGHT PSYCHOLOGY AND ADDICTION, INC., a California corporation, | Case No. |
| | Judge: |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MONETARY RELIEF** |
| vs. | |
| CITY OF COSTA MESA, a municipal corporation; and DOES 1-10, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## I. INTRODUCTION

1.    Plaintiff INSIGHT PSYCHOLOGY AND ADDICTION, INC. ("Plaintiff") provides housing for adults with mental health and cognitive disabilities (such as post-traumatic stress disorder ["PTSD"], bipolar disorder, anxiety, sexual trauma and depression).  Defendant the City of Costa Mesa ("City") has adopted and is enforcing land use regulations that overtly discriminate against and have an unjustified disparate impact on people with disabilities (and, specifically, Plaintiff) in violation of the Equal Protection and Due Process Clauses of the United States

Constitution and a number of disability rights and fair housing laws, including without limitation, the Federal Fair Housing Act, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794, et seq.), Fair Employment and Housing Act (Cal. Gov. Code § 12900, et seq.), Planning and Zoning Law (Cal. Gov. Code § 65000, et seq.), Community Care Facilities Act (Cal. Health & Saf. Code § 1500, et seq.), and the Vested Rights Doctrine.

2.    The City's "group home" regulations have the overt purpose and effect of excluding and/or limiting housing for residents based on disability and have prevented or will prevent Plaintiff from providing such housing.  The City also improperly and unlawfully denied Plaintiff's request for a reasonable accommodation for relief from aspects of the City's regulations that unlawfully interfere with Plaintiff's ability to provide supportive housing for persons recovering from mental illnesses.  As a result, Plaintiff seeks monetary, declaratory, and injunctive relief.

## II.  <u>JURISDICTION AND VENUE</u>

3.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 3613, 42 U.S.C. § 1983, and 42 U.S.C. § 12133. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's additional claims under state law because Plaintiff's state law claims relate to Plaintiff's federal law claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

4.    Venue is proper because Plaintiff's claims arise from unlawful conduct occurring in Orange County, California, and because the property that is the subject to this action is located in Orange County, California.

## III.  <u>PARTIES</u>

5.    Plaintiff is a California corporation, with its principal place of business in the City of Newport Beach, California.

6.      Plaintiff rents a six-unit multifamily apartment building located at 2641 Santa Ana Avenue in the City of Costa Mesa (the "Property") that Plaintiff intends to continue to use for supportive housing (as that term is defined in Section 50675.14(b)(2) of the California Health and Safety Code and Section 13-6 of the City's Zoning Code) for adults with mental health and cognitive disabilities (such as PTSD, bipolar disorder, anxiety, sexual trauma, and depression).  Although there are no limits on the length of a resident's stay, the goal for Plaintiff's residents is to eventually transition to independent living.  Plaintiff has two awake staff members on-site around the clock to assist Plaintiff's residents with the activities of daily living and emotional regulation.  No medical or psychiatric services are provided at the Property.

7.      The City is a general law, municipal corporation, established and organized under the laws of the State of California.

8.      The City is a "public entity" under Title II of the Americans with Disabilities Act. (42 U.S.C. § 12131.)

9.      The City is a "person" under 42 U.S.C. §§ 1983, 1985(3) and 1986, the Fair Housing Act (42 U.S.C. § 3602(d)), and the California Fair Employment and Housing Act (Cal. Gov. Code § 12917(f)).

10.     The City is a "city" under California's Planning and Zoning Law. (Gov. Code § 65000, *et seq.*)

11.     The City is responsible for the acts of its agents and employees, including enactment and enforcement of its zoning code.

12.     Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will seek leave of this Court to amend this Complaint to include their proper names and capacities when they have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named defendants participated in and is in some

manner responsible or liable for the acts and omissions described in this Complaint and the damage resulting therefrom.

13.     Plaintiff is informed and believes, and based thereon alleges, that each of the defendants named as Does 1 through 10, inclusive, performed, participated in, aided or abetted, authorized, ratified, and/or acquiesced in some manner, the acts and omissions alleged in this Complaint, proximately caused the damages alleged below, benefited from such acts and omissions, and is liable to Plaintiff for the damages and relief sought in this Complaint.

14.     Plaintiff is informed and believes, and based thereon alleges, that in participating in and/or performing the acts and omissions alleged in the Complaint, the defendants, including the Doe defendants, and each of them, were acting as the agents, servants, employees, alter egos, successors or predecessors in interest, and/or contractors of each other or the defendants, and were acting within the course and scope of such relationship, with the knowledge, express or implied, of each such other defendants, at all times relevant to this Complaint.

## IV.   FACTUAL ALLEGATIONS

### A.   City of Costa Mesa

15.     The City of Costa Mesa, home of the Orange County Fairgrounds and South Coast Plaza, is located 40 miles south of Los Angeles and adjacent to the coastal cities of Newport Beach and Huntington Beach.  Since its incorporation in 1953, Costa Mesa has grown rapidly from a small, semi-rural farming community of 16,840 to a suburban community of approximately 114,000.

16.     The City is a recipient of state and federal funds.  Pursuant to 42 U.S.C. § 5304(b)(2), the City – as a recipient of federal community development funds – must certify to the Secretary of the United States Department of Housing and Urban Development that it "will affirmatively further fair housing."  Pursuant to California Government Code § 11135, the City — as a recipient of state funds — must provide "full and equal access to the benefits" of its programs or activities.

17.    Of the City's 42,120 dwelling units, just under 10% are occupied by persons with disabilities and more than 60% are rental units.

18.    The City has acknowledged it has insufficient supportive housing for adults with mental disabilities.  This housing deficit has exacerbated homelessness amongst adults with mental illness.

19.    According to the City's website, "[t]here are approximately 120-150 homeless individuals who are residents of Costa Mesa" and one of the primary reasons "Costa Mesa residents become homeless" is "mental illness."[1]

20.    The City's Network for Homeless Solutions ("NHS") provides annual reports on its efforts to refer unsheltered individuals in the City to various supportive services (like substance abuse, mental health, social services, etc.), which NHS refers to as "linkages."  According to NHS's 2018 Annual Report, NHS's numbers of "mental health" related "linkages" were: 203 in 2016, 88 in 2017, and 338 in 2018. In 2018, 43% of NHS's "linkages" were related to mental health.[2]

21.    One of the goals of the City's Homeless Task Force is to "[c]reate permanent supportive housing."[3]

**B.  The City's Zoning Regulations Overtly Discriminate Against People with Disabilities**

22.    The Zoning Code of the City of Costa Mesa (the "Zoning Code"), Title 13 of Costa Mesa Municipal Code ("CMMC"), classifies and regulates land uses and structures within the City.  The Zoning Map establishes geographic districts within the City, and the Zoning Code's corresponding zoning designations restrict the nature and intensity of the land uses that may lawfully exist within each district.  The Zoning Code establishes several types of residential districts, which include single-family

---

[1]  *See* https://www.costamesaca.gov/city-hall/city-departments/city-manager-s-office/network-for-homeless-solutions/about-homelessness/about-costa-mesa-s-homeless-and-definition-of-a-costa-mesa-homeless-resident (last visited Feb. 19, 2020).
[2]  *See* https://www.costamesaca.gov/home/showdocument?id=40437 (last visited Feb. 19, 2020) (See table of fourth page of Report).
[3]  *See* https://www.costamesaca.gov/city-hall/city-departments/city-manager-s-office/network-for-homeless-solutions/addressing-homelessness (last visited Feb. 19, 2020).

(R1) and multiple-family districts for medium density (R2-MD), high density (R2-HD), and its highest density (R3). (CMMC § 13-20.)

23.  Within these residential zoning districts, the Zoning Code differentiates between "single housekeeping units" (whose occupants generally do not have disabilities that require supportive living services) versus "group homes," which the City's Code specifically defines as "a supportive living environment for persons who are considered handicapped under state or federal law." (CMMC § 13-6.)  (Note: Although Plaintiff's use of the Property meets the City's definition of a "group home," the group home regulations are clearly designed to regulate sober living homes. For example, § 13-311(a)(vii) requires an operator to submit a relapse policy as part of the special permit process. Further, subsections (a)14(i)-(vii) and (b)(6)(i)-(iii) spell out additional requirements only applicable to sober living homes.)

24.  While the City's Zoning Code treats all "single housekeeping units" as "single-family dwellings" and permits them as a matter of right in all of its residential zoning districts (*see* CMMC § 13-30, Table 13-30), it imposes heightened restrictions and burdensome permitting requirements for "group homes" in those same residential districts (*see* CMMC, Title 13, Chapters XV and XVI).

25.  For example, once deemed a "group home," a household in multi-family districts (such as the R2-MD district at issue here) must obtain either a "special use permit" (if the household has six occupants or less) or a "conditional use permit" (if the household has more than six occupants).  (CMMC, Title 13, Chapter XVI.) Additionally, "group homes" may *only* continue to operate if the operator of the group home obtains an operator's permit pursuant to section 9-372 et seq. – i.e. within one hundred and twenty (120) days from the effective date of CMMC, Title 13, Chapter XVI, section 13-324.  In contrast, the City does not impose any special restrictions or permitting requirements on "single housekeeping units" based on occupancy or any other factor.

///

26.     As another example, the City's Zoning Code prohibits a "group home" in multi-family districts from being located within "six hundred fifty (650) feet from any other property, as defined in section 13-321, that contains a group home, sober living home [defined as a "a group home for persons who are recovering from a drug and/or alcohol addiction"] or state-licensed drug and alcohol treatment facility, as measured from the property line."    (CMMC §§ 13-322(a)(3) & 13-323(b).) (Interestingly, in contrast, the *only* type of group home in an R1 zone that must comply with the 650-foot separation requirement is a sober living home). (CMMC § 13-311(b)(6).)

27.     Although the Zoning Code's current regulations for "group homes" in multi-family districts (adopted November 17, 2015 through the adoption of Ordinance Nos. 15-11 and 15-13, and amended May 2, 2017 through the adoption of Ordinance Nos. 17-05 and 17-06) did not go into effect until December 17, 2015 (for the original regulations) and June 1, 2017 (for the amended regulations), they purport to require lawful, pre-existing "group homes" in those districts to comply with the new and amended regulations (including obtaining a special use permit, conditional use permit, and/or operator's permit, depending on the size of the facility) within one year (*i.e.*, by December 17, 2016).  (CMMC § 13-324.)

**C.  The City Intended To Discriminate Against Individuals with Disabilities When It Adopted Its Zoning Regulations**

28.     The invidious and discriminatory intent for the City's Zoning regulations for "group homes" became clear in the administrative history of Ordinances 14-13, 15-11, 15-13, 17-05, and 17-06.

29.     The Ordinances by which the City adopted its regulations for "group homes" (Ordinance No. 14-13, adopted Oct. 21, 2014, Ordinances 15-11 and 15-13, adopted Nov. 17, 2015, and Ordinance Nos. 17-05 and 17-06, adopted May 2, 2017) make clear that the City's purpose was to target a very specific type of "group home" — that is — "sober living homes."  The administrative history of these ordinances is

replete with examples of the City's animosity toward individuals with disabilities, including but not limited to recovering addicts. However, the City's "group home" regulations are broad enough to apply to all supportive housing for adults with disabilities (like the housing Plaintiff provides), regardless of whether the residents of such housing are recovering from addiction. (*See* CMMC, Title 13, Chapters XV and XVI.)

30.    The concerns about "sober living homes" that the City cited in its Ordinances for its "group home" regulations (such as "overcrowding, inordinate amounts of second-hand smoke, and noise" [*see, e.g.,* Ordinance No. 14-13, thirteenth recital, adopted Oct. 21, 2014 and Ordinance No. 17-05, ninth recital, adopted May 2, 2017]) could be addressed through other regulations in the City's Municipal Code that do not single out people with disabilities for different and adverse treatment, such as regulations relating to noise control (CMMC § 13-280), public drinking (CMMC § 20-4(g)), parking and storage of vehicles (CMMC § 20-6(c)), parking inoperable vehicles in driveways (CMMC § 20-4 (k)), rubbish in driveways (CMMC § 20-3(e)), keeping a messy yard (CMMC § 20-12(aa)), or having too many visitors (CMMC § 12-20(gg)). To the extent "group homes" are interfering with their neighbors' use and enjoyment of their property, the City exercises plenary power to abate every conceivable type of nuisance and Zoning Code violation that arises in its residential districts. It authorizes a wide variety of officials to issue notices of violation or citations for every possible impingement on municipal tranquility. The remedies at the disposal of the City range from administrative procedures to criminal penalties, including punishment by fine or imprisonment. (CMMC § 1-33.)

31.    However, the City chose not to enforce these non-discriminatory regulations, and instead develop new regulations targeted at (and discriminating against) all group homes. including but not limited to sober living homes and Plaintiff's supportive housing.

///

32. For instance, and with this context in mind, when facing a tough re-election, City Mayor Jim Righeimer responded in 2013 to a small but vocal citizens group seeking to rid Costa Mesa's neighborhoods of "sober living homes" (a narrow subset of the "group homes" at issue here), by launching a City-funded campaign to drive "sober living homes" and their residents with disabilities (recovering addicts) from Costa Mesa. Righeimer executed a four-part attack on persons in recovery.

33. First, he encouraged voters to spy on their neighbors, to detect if the neighbors were persons in recovery, and if so, to report to the City if voters observed them smoking cigarettes in their backyard, walking in groups along the City's public streets, or making noise. Righeimer encouraged voters to feed their complaints to the City's code enforcement office, which had established a special task force, headed by a group home czar, who's mission was to target dwellings occupied by persons in recovery.

34. Second, in September 2013, Righeimer pushed through an ordinance broadening the definition of nuisance and stiffening penalties for nuisance violations. Armed with these new powers, the City's group home task force started a campaign of targeted inspections and raids against suspected sober living homes.

35. Third, in November 2013, Righeimer co-opted the voter campaign against disabled persons (and in particular, recovering addicts) by forming the Mayor's Preserve Our Neighborhoods Task Force in order to harness voter prejudice against persons in recovery in service of his re-election bid.

36. Finally, in October 2014, Righeimer shepherded the City's first group home ordinance (addressing group homes in the City's single-family [R1] district) through the City Council. The City approved Ordinance 14-13 on October 21, 2014. (A few weeks later, on November 4, 2014, Righeimer won re-election, beating his challenger, Jay Humphrey, by only 47 votes, 7,524 to 7,477.)

37. Instead of utilizing the City's police powers to address nuisance complaints against sober living home operators in the same way other nuisance

complaints are addressed, Mayor Righeimer set out on a mission to identify, target, and eliminate sober living homes from the City. The City even created and published a map which publicly identified the location of every sober living home the City became aware of through its task force.

38.   As noted above, in November of 2015, the City Council adopted its second set of group home ordinances (addressing group homes in the City's various multi-family districts).   The City approved Ordinances No. 15-11 and 15-13 on November 17, 2015.  The City Council amended its regulations for group homes in multi-family districts in May of 2017 through the adoption of Ordinances Nos. 17-05 and 17-06.

39.   It is the overt, explicit, official policy of the City to reduce the number of households comprised of persons with disabilities from all of the City's residential districts, including R2-MD (the district at issue in this litigation).  The intent and effect of this policy both displaces people with disabilities from their existing supportive housing and discourages or outright prohibits new supportive housing for people with disabilities.  This policy overtly subjects those who want to provide housing for people with disabilities (including Plaintiff) to different and adverse treatment, and has had an unjustifiable disparate impact on people with disabilities' ability to find suitable housing in the City.

40.   The City's official policy of discrimination is embodied in the legislative enactments of the Costa Mesa City Council, including Ordinance Numbers 14-13, 15-11, 15-13, 17-05, and 17-06, the City Council's establishment and direction to the Neighborhood Improvement Task Force, the City Council's appropriation and funding for a City program established to target and harass dwellings occupied by persons with disabilities in supportive housing, and the City Council's instruction to City employees, officers and officials to commit discriminatory acts in conformity with the City's official policy of discrimination against persons with disabilities.

///

41.    It is the deliberate practice and custom of the City to engage in discrimination against persons with disabilities (and in particular, persons in recovery from mental health disorders) and those, like Plaintiff, who would provide supportive housing for them. This practice and custom are directed, encouraged, condoned and ratified by the City Council.  The City Council charged the City Manager with the authority and responsibility for execution of this official policy.  Pursuant to the City's official policy of discrimination, the City converted the Neighborhood Improvement Task Force into a governmental body whose principal purpose is identifying and targeting households comprised of people with disabilities for harassment by City employees and officers.

42.    As a group, the City's policy-makers — i.e. the City Council, City Manager, and employees acting under their direction — conspired for the purpose of depriving, either directly or indirectly, a class of person, identified as persons with disabilities who rely on a supportive living environment, of the equal protection of the laws, as further described below.  Each had knowledge of the wrongs conspired to be done and had the power to aid in the prevention of those wrongs but neglected or refused to act.

43.    Each discriminatory or unconstitutional practice or action alleged in this Complaint is and was committed pursuant to and in conformity with the City's official policy of discrimination against persons in recovery.

### D.  The City Discriminated Against Plaintiff

44.    As noted above, Plaintiff rents a six-unit multifamily apartment building on the Property.  Plaintiff intends to continue to use the Property to provide supportive housing for adults with mental health and cognitive disabilities (such as PTSD, bipolar disorder, anxiety, sexual trauma, and depression).  Plaintiff's residents include veterans, victims of domestic violence, victims of childhood neglect, physical and sexual abuse, firefighters, law enforcement, doctors and nurses, and victims of rape and assault.

45.     The Property is located in the City's R2-MD zone — one of the City's multi-family zoning districts.

46.     In February of 2015 — *i.e.*, prior to the City's enactment of regulations for "group homes" (including "sober living homes") in multi-family zoning districts — Plaintiff began operating supportive housing for recovering addicts in each of the six dwelling units on the Property.  None of the dwelling units have ever served more than six occupants at any given time.  Prior to December 17, 2015, there were no local, state, or federal regulations prohibiting such housing on the Property.  To the contrary, because none of Plaintiff's dwelling units served more than six persons, California's Community Care Facilities Act (Cal. Health & Saf. Code § 1500, *et seq.*) and similar state laws require the City to treat each of the supportive housing units as if it were a single family dwelling.  (*See, e.g.*, Cal. Health & Saf. Code §§ 1566.2 & 11834.23.)

47.     After the City Council's adoption of Ordinances 15-11 and 15-13 in November of 2015 (which purport to require lawful, pre-existing group homes, including sober living homes, to obtain permits and bring their operations into compliance with the City's new regulations), Plaintiff submitted an application to the City for a conditional use permit (Application No. PA-16-63) for the lawful, pre-existing sober living homes in the six units on the Property.

48.     Around the same time period, Plaintiff saw a rise in the need for mental health services and, in particular, for providers whose primary focus was on mental health, rather than addiction treatment.  As a result, starting in late 2016 (while Plaintiff's application for a conditional use permit was still pending), Plaintiff transitioned the use of the Property from a sober living home (for recovering addicts) to supportive housing for adults with mental disabilities.  Plaintiff revised its application for a conditional use permit to reflect this change.

49.     Plaintiff's six supportive housing units on the Property are not intended to treat individuals whose primary issue is recovering from drug or alcohol addiction

and are not considered "sober living homes," despite having operated in this capacity for a short period between 2015 and 2016. Today, approximately ninety-nine percent of Plaintiff's residents have a serious, but non-chronic, mental illness (defined as a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities). Virtually all of its residents have completed an inpatient psychiatric stay or at least 30 days of residential treatment before coming to reside at the subject property. As noted above, resident diagnoses typically include PTSD, anxiety, depression, bipolar disorder, and/or ADHD. Residents must be between the ages of 18 and 80 and must come to reside at the Property voluntarily, rather than as a part of a court-ordered program.

50.     The six dwelling units on the Property are each fully independent homes, and each has its own garage, patio (in some cases units have 2-3 patios) and laundry facility. In total, the six units have 30 beds. The supportive housing units provide an ideal environment to help individuals with disabilities anticipate and overcome the obstacles encountered in everyday living, while at the same time fostering the greatest possible degree of autonomy in the least restrictive environment possible. This supportive housing is ideal for persons discharging from a psychiatric inpatient or residential stay who are either not well organized enough for fully independent living, or who are faced with returning to unstable living environments. For most of the population served by Plaintiff, supportive housing is not only recommended, but essential.

51.     Since opening its supportive housing units on the Property in February 2015, Plaintiff has taken conservative measures to ensure a safe and supportive environment for its residents as well as its surrounding neighbors. Specifically, Plaintiff has instituted resident rules which address smoking, noise, and loitering. Residents are only allowed to smoke on their own back patios and only with the residents who reside in that house. At no time is smoking allowed in the driveway or

1  in the front of the houses.  Thus, neighbors do not see groups of individuals loitering

2  on Applicant's property, let alone neighboring properties or the street.

3      52.    With respect to noise, residents are required to be inside their homes at

4  curfew (i.e. 10:00 p.m. Sunday-Thursday and 11:00 p.m. Friday-Saturday) and are

5  prohibited from making loud noise and using profanity or obscene language at any

6  time.  While the presence of around-the-clock (awake) staff helps to ensure that

7  residents comply with these rules, Plaintiff also has a Good Neighbor policy.  Said

8  policy makes a staff member available 24 hours a day to receive complaints about

9  rule violations.  In order to ensure that neighbor complaints will be addressed quickly,

10  contact information for one of the owners is provided to the public.

11      53.    Plaintiff is one of the *only* housing providers in all of Orange County that

12  offers graduated levels of care for individuals with mental disabilities.  Plaintiff offers

13  in-patient and out-patient treatment (outside the City) and supportive housing on the

14  Property.  Plaintiff's supportive housing helps individuals learn social skills and

15  coping mechanisms to enable them to eventually resume their education, live

16  independently and/or go back to work.  Its primary objective is to integrate persons

17  with mental illness back into the community, with most being able to live

18  independently upon leaving.  Without such programs, the number of homeless

19  individuals in all of Orange County's surrounding cities continues to grow at an

20  alarming and exponential rate.

21      54.    On July 2, 2018 — *over 21 months after Plaintiff submitted its original*

22  *application for a conditional use permit* — Plaintiff received a letter from the City

23  indicating that while "at the time, it was thought that the subject property was not

24  within 650-feet of other group homes," it "had come to the City's attention during the

25  preparation of its report, that there were in fact four group homes within 650 feet of

26  Plaintiff's facility."  (Notably, at the time Plaintiff submitted its original application,

27  there were no group homes *within the City* that were within 650-feet of the Property.

28  The two group homes the City referenced in its letter are located *outside* the City, in

an unincorporated area east of Santa Ana Avenue.)  Nevertheless, according to the City, the location of Plaintiff's supportive housing did not comply with the City's new-adopted separation requirements for such facilities outlined in the CMMC. (*See* Ordinance No. 15-11.)  The City's letter stated it "may recommend denial of Plaintiff's CUP to the Planning Commission, unless Plaintiff would be able to obtain approval of a Reasonable Accommodation by the Director of Economic and Development Services."

55.   Consistent with the City's direction, on August 3, 2018, Plaintiff requested a reasonable accommodation from the City (Application No. RA-19-06) to address the alleged conflict with the City's Zoning Code's separation requirements. Specifically, Plaintiff requested the City allow Plaintiff's pre-existing supportive housing units to be located within 650 feet of the two other properties that contained a total of four state-licensed drug and alcohol treatment facilities (which, again, are not located within the City), or to otherwise exempt Plaintiff's households from the City's group home regulations, thereby allowing them to continue to be permitted by right.  Although Title II to the Americans with Disabilities Act and the Fair Housing Act place the burden *on the City* to demonstrate a valid basis *to deny* a request for a reasonable accommodation (*see, e.g.*, 28 C.F.R. § 35.150(a)(3)), the City's Zoning Code (specifically CMMC § 13-200.62) unlawfully purports to shift the burden *to the applicant* to prove up the City's list of eight (8) necessary findings needed *to grant* the request.

56.   Although Plaintiff had no legal obligation to do so, Plaintiff's RA-16-06 provided ample evidence supporting its request for a reasonable accommodation, including the following:

> a.   While at full capacity, the six units can collectively house a maximum of 30 individuals, the average number of residents at any one time is 23, with less than five having their own vehicle;
>
> b.   The property is under 24-hour surveillance and has around-the-

1   clock awake staff, though residents are permitted to come and go

2   from the Property so long as they observe rules relating to curfew,

3   noise, loitering, and behavior;

4   c.   No treatment is provided at the Property;

5   d.   There is a substantial lack of transitional living facilities for the

6   mentally disabled in Orange County, evidenced by the serious

7   shortage of psychiatric hospital beds, tight space at longer-term

8   residential facilities, and reduced mental health capacity at

9   community clinics, citing an October 2014 Orange County

10  Register article and July 27, 2018 article from

11  housingtaskforce.org; and

12  e.   ***There are no other facilities in Costa Mesa or Orange County***

13  ***providing short-term supportive housing for the mentally***

14  ***disabled***.

15  57.   However, despite the reasons listed above, on April 5, 2019, the City's

16  Director of Development Services denied Plaintiff's request for Reasonable

17  Accommodation RA-19-06.

18  58.   On April 12, 2019, Plaintiff timely appealed the Director's denial to the

19  City's Planning Commission, providing several additional articles with its appeal

20  detailing the complete lack of available supporting housing for adults with mental

21  disabilities.

22  59.   Thereafter, on August 12, 2019, the City's Planning Commission

23  conducted a public hearing, at which time Plaintiff and several former and/or current

24  residents of Plaintiff testified in support of Plaintiff's reasonable accommodation

25  request and conditional use permit application.  One of Plaintiff's residents, a former

26  USA gymnast who had suffered from prior sexual trauma, testified that when

27  recommended by her doctors to a supportive living facility, she was faced "with only

28  two options in America – option number one was in the same city where her abuser

lived, and the other was Insight." She went on to explain "Insight gave her her life back" and "there are no options for women like her who are not battling addiction." This former resident now works full-time at an adoption agency, volunteers at her church and with the homeless, works with refugees, and is finishing her Master's degree. She has been able to successfully integrate back into society. Additionally, the Property's owner and landlord testified that Insight had been a "very, very good tenant." He further explained that Plaintiff had always complied with the City's requests and/or quickly responded to any neighboring complaints. He reiterated the absolute need for facilities like Plaintiff's to be a part of the community while also maintaining a good relationship with its neighbors.

60. In connection with the Planning Commission's August 12, 2019 hearing, Plaintiff also submitted a written letter in rebuttal to the Director's denial of Plaintiff's requested accommodation, addressing each of the City's concerns and offering to correct each of the items the City alleged to be non-conforming. Of note, Plaintiff highlighted and reiterated the ample evidence provided in its request demonstrating there was inadequate transitional housing for the mentally disabled, which the City blatantly ignored. Importantly, the City failed to point to a single facility in in its jurisdiction (or elsewhere in Orange County) that could qualify as the type of supportive housing provided by Plaintiff for people with mentally disabilities who are not seeking addiction treatment.

61. Additionally, Plaintiff agreed to limit its 30 available beds to 25, to alleviate any concerns of overcrowding. With this change, Plaintiff's households would be below the Federal HUD occupancy standards, which recommend less than 1.01 person per room.

62. Plaintiff also agreed to limit the number of vehicles at the Property to ten (10) for residents and two (2) for staff (total of 12 parking spaces), to address the City's parking concerns.

///

63.     As part of its rationale to deny Plaintiff's request, the City claimed it had received 12 complaints related to the Property.  However the City acknowledged it received the complaints *prior to 2016*.  Even if the complaints had merit, they were made before Plaintiff transitioned its services from operating a sober living home to a group home.  Having no prior knowledge of these alleged complaints, Plaintiff issued a Public Records Act ("PRA") request to both the City Clerk and the Costa Mesa Police Department seeking information relating to these alleged complaints and/or service calls.  The City responded by advising Plaintiff to seek the information directly from the police department and then closing the PRA request.  Even though Plaintiff had already explicitly requested a copy of the complaints from the City, which the City was required to provide under the California Public Records Act, Government Code § 6250, et seq., the Costa Mesa Police Department responded by telling Plaintiff that it should do a PRA request or seek the information via subpoena. Eventually, Plaintiff was provided with redacted incident reports which revealed that the majority of these complaints were related to *other* properties, some not even remotely close to Plaintiff's Property.

64.     Finally, Plaintiff addressed the inherent inequity and irrationality of applying the City's newly-adopted 650-feet separation requirement in this circumstance.  As discussed above, the City claimed it could not recommend approval of Plaintiff's conditional use permit because there were "four group homes" within 650 feet of Plaintiff's Property.  Those "four group homes" consist of two state-licensed drug and alcohol treatment facilities (each of the two facilities is in a duplex, so the City counted them as four group homes instead of two) that are located ***outside the City of Costa Mesa, in an unincorporated area of Orange County***.  Moreover, those drug and alcohol treatment facilities received their state licenses in May 2016, ***after*** Plaintiff began operating (in February of 2015) and ***after*** the passage of the City's group home regulations for multi-family districts (in November of 2015).  As applied, the City's boarding house regulations retroactively deprive Plaintiff of a

vested property right as a result of a third party's actions that are completely outside Plaintiff's and the City's control (i.e., another jurisdiction allowing another entity to operate sober living homes within 650 feet of Plaintiff's preexisting group home).

65. Despite the overwhelming evidence supporting Plaintiff's request for reasonable accommodation, the Planning Commission denied Plaintiff's request and application.

66. On August 13, 2019, Plaintiff timely appealed the decision of the Planning Commission to the City Council.

67. Thereafter, on November 5, 2019, the City Council held a public hearing to consider Plaintiff's appeal. During this hearing, the City's Zoning Administrator, Ms. Willa Bouwens-Killeen, continued to cite to issues allegedly supporting the Planning Commission's denial of Plaintiff's reasonable accommodation request that were accurate or supported by evidence. For example, Ms. Bouwens-Killeen claimed "between January 2015 and the preparation of this report, there have been 16 calls of service to the Police Department with one additional call of service received since then after the preparation of the Council Report . . . for disturbances and noise, suspicious male, medical aid, annoying calls made to a resident as the victim, and missing adult, *all attributable to the property*."

68. However, the City failed to provide any evidence during the November 5, 2019 City Council hearing that specifically linked these calls or complaints to Plaintiff's Property. On the contrary, once Plaintiff finally received the corresponding records from the City's Police Department, the documents showed the calls belonged to *other* properties (i.e. 2515 Santa Ana Avenue, 99 Fair Drive, etc.) and *not* Plaintiff's. Yet, the City never withdrew these erroneous accusations as a basis for its denial.

69. As to the other reasons allegedly supporting the Planning Commission's denial, during the November 5, 2019 City Council hearing, Plaintiff once again agreed to stipulate to limit the number of cars at the Property and to limit the number of

occupants to fall below the maximum capacity permitted in the City's code.   In response to the 650-feet separation requirement, Plaintiff emphasized that its Property had been operating since February 2015, **before** the four licensed drug and alcohol treatment facilities went in to the unincorporated area of the county.

70.    Moreover, Plaintiff explained that while the Planning Commission had referenced other "sober living homes" in the community (which notably cannot accommodate the needs of the mentally disabled), it had yet to provide Plaintiff with a single property elsewhere in the City that could serve the needs of its mentally disabled residents.   Ignoring one of the crucial criteria for granting a reasonable accommodation request – i.e. "the request is necessary to provide one (1) or more disabled individuals with an equal opportunity to housing" – Councilmember Genis characterized Plaintiff's request as follows: "[T]his is a land use matter. It doesn't matter if you're really nice people or if you're not so nice people, whether you wear a nice suit, whether you wear a ratty suit. It's a land use matter. Is it an appropriate land use at this location under our ordinances? Under our ordinances the answer is clearly no. It doesn't meet the separation requirement. Plain and simple it does not meet the land use criteria."

71.    In response, Plaintiff asked the City at the hearing to identify **at least one** alternate housing facility in a residential neighborhood within the City that could meet the needs of the mentally disabled.   However, the City failed to provide a single example.   In fact, the City's complete lack of available housing for the mentally disabled was again referenced during public comment: (Mr. Derrick Backus): "There has not been a shred of evidence that there's a single additional mental health facility in Costa Mesa."   The City never addressed or otherwise refuted this comment.

72.    At the conclusion of the hearing, despite Plaintiff's repeated offer to go above and beyond what the law requires of legal nonconforming uses and correct all issues identified by the City with the Property, the City Council upheld the Planning

1  Commission's decision, and denied Plaintiff's reasonable accommodation request
2  (RA-19-06) and conditional use permit (PA-16-63).

3  73.   On November 14, 2019, Plaintiff was notified that the City Council had
4  adopted Resolution No. 19-73 by a vote a 7-0, following the public hearing that
5  occurred on November 5, 2019, entitled: "A RESOLUTION OF THE CITY
6  COUNCIL OF THE CITY OF COSTA MESA, CALIFORNIA TO UPHOLD THE
7  DECISION OF THE PLANNING COMMISSION AND DENY REASONABLE
8  ACCOMMODATION   RA-19-06   TO   DEVIATE   FROM   VARIOUS
9  REQUIREMENTS OF THE ZONING CODE; AND TO DENY CONDITIONAL
10  USE PERMIT PA-16-63 TO ALLOW A GROUP HOME WITH SEVEN OR MORE
11  OCCUPANTS   OPERATED   BY   NSIGHT   PSYCHOLOGY   &   ADDICTION
12  HOUSING UP TO 30 OCCUPANTS AT 2641 SANTA ANA AVENUE, UNITS A
13  THROUGH F. (A copy of the City's November 14, 2019 Notice and Resolution No.
14  19-73 is attached hereto as Exhibit **"A"**.)  Plaintiff has thus exhausted all possible
15  administrative remedies and appeals, to no avail.

16  74.   After denying Plaintiff's final appeal, the City demanded Plaintiff cease
17  all operations of the subject group home by December 14, 2019 (i.e. within 30 days),
18  or else face "appropriate code enforcement action" which "may result in civil
19  citation(s), criminal prosecution and/or civil action" to abate violations of the CMMC.

20  75.   The effect of the City's actions is to prevent the Plaintiff and its residents
21  with disabilities from residing in the dwelling of their choice or in any other home
22  zoned for multifamily use in the City of Costa Mesa.

23  **E.  The City Has Engaged in a Pattern or Practice of Discrimination**

24  76.   The City, acting alone and in concert with others, directly and through
25  agents, officers, and employees, is engaging in a pattern or practice of discrimination
26  on the basis of disability in connection with the enactment and enforcement of zoning
27  regulations.  The City has engaged in this pattern or practice for the purpose and with
28  the effect of discrimination against persons with disabilities.  This pattern or practice

includes, but is not limited to, the commission of the following discriminatory practices:

    a. Adopting "group home" regulations that overtly subject people with disabilities (and applicants who serve clients with disabilities, including Plaintiff) to different and adverse treatment, such as numerous heightened restrictions and burdensome permit requirements that do not apply to households comprised of individuals that do not require supportive housing;

    b. Retroactively applying its "boarding house" regulations to Plaintiff's lawful, preexisting use (supportive housing for adults with disabilities), which was established and operating before the enactment and effective date of the City's regulations for "group homes" in multifamily zones;

    c. Infringing on Plaintiff's vested right to continue a lawful, preexisting use;

    d. Applying its "boarding house" regulations to Plaintiff's use in a manner that is inconsistent with and preempted by California's Community Care Facilities Act (Cal. Health & Saf. Code § 1500, *et seq.*) and similar state laws require the City to treat each of Plaintiff's six supportive housing units as if it were a single family dwelling. *See, e.g.*, Cal. Health & Saf. Code §§ 1566.2 & 11834.23.

    e. Failing to provide reasonable accommodations;

    f. Denying Plaintiff's request for a reasonable accommodation without legally adequate process or justification;

    g. Requiring applicants with disabilities (or applicants who serve residents with disabilities, including Plaintiff) to seek a reasonable accommodation to obtain relief from regulations that overtly and unlawfully subject the disabled to different and adverse treatment;

h. Putting the onus of the applicant to establish a right to a reasonable accommodation when Federal and State fair housing and disability discrimination laws clearly put the onus on the public entity to provide a legitimate basis to deny such a request;

i. Failing to take action to cure or mitigate the disparate impact its "boarding house" regulations have had and will continue to have on individuals with disabilities;

j. Denying or otherwise making unavailable housing to disabled persons, including those for whom Plaintiffs provide or seek to provide housing, because of disability;

k. Discriminating in the terms, conditions, or privileges of sale or rental of housing by disabled persons, including those for whom Plaintiff provides or seeks to provide housing, or in the provision of services in connection with housing, because of disability;

l. Making, printing or publishing, or causing to be made, printed or published a statement in connection with the sale or rental of housing that indicates a limitation, preference or discrimination on the basis of disability;

m. Restricting or attempting to restrict housing choice of disabled persons, including those for home Plaintiff provides or seeks to provide housing, because of disability;

n. Assigning disabled persons, including those for whom Plaintiff provides or seeks to provide housing, to certain neighborhoods because of disability;

o. Denying or limiting disabled persons, including those for whom Plaintiff provides or seeks to provide housing, the opportunity to participate in or benefit from the supportive housing program offered by transitional living homes, including the Plaintiff's transitional

1     living facilities;

2     p.  Using land use regulations with the purpose of subjecting disabled

3         persons, including those for whom Plaintiff provides or seeks to

4         provide housing, to discrimination on the basis of disability;

5     q.  Denying disabled persons in supportive housing, including those for

6         whom Plaintiff provides or seeks to provide housing, an opportunity

7         to participate in a program in the most integrated setting appropriate

8         to their needs;

9     r.  Denying disabled persons, including those for whom Plaintiff

10        provides or seeks to provide housing, an equal opportunity to

11        participate in or benefit from services and programs equal to those of

12        people without disabilities;

13    s.  Utilizing licensing and permit requirements to provide municipal

14        code enforcement services that are not equal as applied to disabled

15        and non-disabled persons;

16    t.  Utilizing unequal licensing and permit requirements to deny disabled

17        persons, including those for whom Plaintiff provides or seeks to

18        provide housing, enjoyment of any rights, privileges, advantages, or

19        opportunities enjoyed by others receiving the aid, benefit, or service;

20    u.  Aiding, abetting, inciting, compelling or coercing the doing of acts or

21        practices in violation of fair housing laws;

22    v.  Discriminating through public land use practices, decisions and

23        authorizations because of disability, including the use of zoning laws

24        that make housing opportunities unavailable or difficult to use, both

25        in practice and on the face of the laws;

26    77.  Plaintiff has been and will be injured by the commission of this pattern

27    or practice of discrimination by the City.  As such, Plaintiff is an aggrieved person

28    within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(i), the California Fair

Employment and Housing Act, and California Government Code § 12927(g), and Plaintiff's residents are "disabled" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and the Rehabilitation Act, 29 U.S.C. § 794.

78.    By shuttering or prohibiting supportive housing for people with disabilities, the City renders them homeless and displaced, forcing them to search for alternative housing in a market that already under serves persons in recovery. An official policy with that effect does not benefit disabled persons.

### F.  Injuries

79.    By reason of the City's unlawful acts and practices, Plaintiff has suffered violations of its federal statutory and constitutional rights, loss of the value, use, and enjoyment of their properties, frustration and loss of current and future income, and been subjected to enforcement of invalid ordinances and to unreasonable and unlawful regulation.  Plaintiff's residents have suffered a violation of their federal and state civil rights and rights to privacy, which has injured Plaintiff.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

80.    There now exists an actual controversy between the parties regarding the City's duties under federal and state civil rights laws.  Accordingly, Plaintiff is entitled to declaratory relief under its federal and state law claims including, but not limited to, 42 U.S.C. § 3613(c), 42 U.S.C. § 1983, 42 U.S.C. § 12133, California Government Code § 12989.2, the United States Constitution, the California Constitution, as well as Rule 57 of the Federal Rules of Civil Procedure.

81.    Unless enjoined, the City will continue to engage in the unlawful acts and the pattern or practice of discrimination described above.  Plaintiff has no adequate remedy at law.  Plaintiff is now suffering and will continue to suffer irreparable injury from the City's acts and the pattern or practice of discrimination unless relief is provided by this Court.  Accordingly, Plaintiff is entitled to injunctive relief under their federal and state law claims including, but not limited to, 42 U.S.C.

§ 3613(c), 42 U.S.C. § 1983, 42 U.S.C. § 12133, California Government Code § 12989.2, the United States Constitution, the California Constitution, as well as Rule 57 of the Federal Rules of Civil Procedure.

## VI.   CLAIMS FOR RELIEF

### A.  FIRST CLAIM

### [Federal Fair Housing Act]

82.     Plaintiff realleges and incorporates herein by reference each preceding paragraph.

83.     "The Fair Housing Act renders it unlawful '[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap[.]'" *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013) ("*Pac. Shores*"), quoting 42 U.S.C. § 3604(f)(1).

84.     "... [Z]oning practices that discriminate against disabled individuals can be discriminatory, and therefore violate § 3604, if they contribute to 'mak[ing] unavailable or deny[ing]' housing to those persons." *Id.*, at 1157, quoting *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803, 805 (9th Cir.1994), citing *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 257 n. 6 (1st Cir.1993) (collecting cases and discussing legislative history); H.R.Rep. No. 100–711, at 24 (1988), 1988 U.S.C.C.A.N. 2173, 2185 (stating that amendments to the FHA to include protections against disability discrimination "also apply to state or local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps").

85.     The FHA prohibits at least three types of discrimination.

86.     First, it "prohibits intentional discrimination — that is, disparate treatment." *Avenue 6E Investments, LLC v. City of Yuma, Ariz.* (9th Cir. 2016) 818 F.3d 493, 502 ("*Avenue 6E*").  A government cannot "zone land or refuse to zone land out of concern that minorities [such as people with disabilities] would enter a neighborhood." *Id.*

87.     Second, the FHA prohibits "disparate impact" discrimination — that is, "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Avenue 6E*, at 503, citing *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522.  A disparate impact claim "'permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification'" and target "'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities." *Id.*, quoting *Texas Dep't of Hous. & Cmty. Affairs*, 2522.

88.     Finally, FHA discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

89.     The group homes in the six units on the Property that Plaintiff seeks to operate are each a "dwelling" under the FHA.  42 U.S.C. § 3602(b); *Pac. Shores*, *supra*, 730 F.3d 1142, 1157.

90.     Plaintiff's residents have a "handicap" as defined in the FHA, and therefore, are members of a protected class.  42 U.S.C. § 3602(h); *id.*, at § 3604(f). The City knew the residents of Plaintiffs proposed group home would be adults with disabilities.

91.     Plaintiff is an "aggrieved person" as defined in the FHA.  42 U.S.C. § 3602(d) & (i); *Pac. Shores*, *supra*, 730 F.3d 1142, 1157, n. 16.

92.     The City's conduct as set forth above injured Plaintiff by committing discriminatory housing practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of the FHA.  42 U.S.C. § 3601 *et seq.*

93.     The City's conduct was intentional, willful, and made in disregard of the rights of others.  At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

## B. SECOND CLAIM

**[Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.]**

94.     Plaintiff realleges and incorporates herein by reference each preceding paragraph.

95.     Title II of the Americans with Disabilities Act ("ADA") "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) ("*Pac. Shores*"), quoting 42 U.S.C. § 12132.

96.     The ADA "prohibits governmental entities from discriminating against disabled persons through zoning."  *Pac. Shores*, *supra*, at 1157.

97.     Like the FHA, the ADA prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate.  42 U.S.C. § 12132; 28 C.F.R. § 35.130; *see, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

98.     The City is a "public entity" as defined in Title II of the ADA.  42 U.S.C. § 12131; 28 C.F.R. § 35.104.

99.     Plaintiff's residents are "qualified individuals with a disability" as defined in Title II of the ADA, and therefore, are members of a protected class.  42 U.S.C. § 12131; 28 C.F.R. § 35.104; 28 C.F.R. § 35.108.

100.    The ADA provides Plaintiff with a cause of action, even though Plaintiff is not itself an individual with a disability. *Pac. Shores*, *supra*, 730 F.3d 1142, 1157, n. 17, citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir.2002); 42 U.S.C. § 12133.

101.   The City's conduct as set forth above injured Plaintiff by committing discriminatory zoning practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of Title II of the ADA.  42 U.S.C. § 3601 *et seq.*

102.   The City's conduct was intentional, willful, and made in disregard of the rights of others.  At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

## C.  THIRD CLAIM

### [Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq.]

103.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

104.   Section 504 of the Rehabilitation Act ("Section 504") provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."  29 U.S.C. § 794(a).

105.   Like the ADA, Section 504 applies to zoning "because zoning 'is a normal function of a governmental entity.'"  *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) ("*BAART*"), quoting *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir.1997); 29 U.S.C. § 794(b)(1)(A).

106.   Like the FHA and ADA, Section 504 prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. 29 U.S.C. § 794(a); *Alexander v. Choate*, 469 U.S. 287, 300-301, (1985) (disparate impact claims cognizable under Section 504); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (failure to accommodate claims cognizable under Section 504).

107.   Plaintiff is informed and believes and based thereon, alleges that at all times relevant herein, the City received Federal financial assistance.  For example, the City's 2019-2020 budget indicates the City received Federal Community Development Block Grant ("CDBG") and HOME Investment Partnership Program grant funds.

108.   Plaintiff's residents are "qualified individuals with a disability" as defined in Section 504, and therefore, are members of a protected class.   29 U.S.C. § 705(20).

109.   Section 504 provides Plaintiff with a cause of action, even though Plaintiff is not itself an individual with a disability.  29 U.S.C. § 794a(a)(2); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333-336 (6th Cir. 2002) ("Because Plaintiff has presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities, Plaintiff has standing to bring this suit on its own behalf. ").

110.   The City's conduct as set forth above intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.  The City injured Plaintiff by committing discriminatory zoning practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of Section 504. 29 U.S.C. § 794, *et seq.*

111.   The City's conduct was intentional, willful, and made in disregard of the rights of others.  At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

### D.  FOURTH CLAIM
### [Equal Protection, 42 U.S.C. § 1983]

112.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs of the complaint herein.

113.   The Fourteenth Amendment to the United States Constitution's equal protection clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

114.   A government violates the Equal Protection Clause if it "zone[s] land or refuse[s] to zone land out of concern that minorities would enter a neighborhood." *Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 502 (9th Cir. 2016) ("*Avenue 6E*").

115.   "When there is a proof that a discriminatory purpose has been a motivating factor in [a] decision, ... judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("*Arlington Heights*").

116.   The City's conduct as set forth above injured Plaintiff by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Equal Protection Clause.

117.   Plaintiff has been injured by the City's discriminatory and unconstitutional conduct and has suffered damages as a result.

118.   The City's conduct was intentional, willful, and made in disregard of the rights of others.  At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

### E.  FIFTH CLAIM

### [Substantive Due Process, 42 U.S.C. § 1983]

119.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs of the complaint herein.

120.   The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

121. "Constitutional scrutiny of zoning regulations is heightened ... when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126, 1128 (9th Cir.1983).

122. The United States Supreme Court "'has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment'" and "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977), quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974).

123. A zoning decision must also be set aside if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395(1926)

124. The City's decisions to deny Plaintiff's requested conditional use permit and request for a reasonable accommodation were not related to any substantial zoning interest.

125. The City's conduct as set forth above injured Plaintiff by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Due Process Clause.

126. Plaintiff has been injured by the City's discriminatory and unconstitutional conduct and has suffered damages as a result.

127. The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

///

///

## F. SIXTH CLAIM

**[Fair Employment and Housing Act, Cal. Gov. Code § 12900, *et seq.*]**

128.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

129.   The California Fair Employment and Housing Act ("FEHA") makes it unlawful to, *inter alia*, "discriminate through public or private land use practices, decisions, and authorizations because of ... disability" and specifies that "[d]iscrimination includes, but is not limited to, ... zoning laws, denials of use permits, and other actions authorized under the Planning and Zoning Law (Title 7 (commencing with Section 65000)), that make housing opportunities unavailable." Cal. Gov. Code § 12955(*l*).

130.   Like the FHA, ADA, and Section 504, the FEHA prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. Cal. Gov. Code § 12927(c)(1) (discrimination includes "refusal to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling"); *id.*, at 12955.8(b); *Sisemore v. Master Fin., Inc.*, 151 Cal. App. 4th 1386, 1418 (2007).

131.   Plaintiff's residents have a "disability" as defined in the FEHA, and therefore, are members of a protected class.   Cal. Gov. Code § 12955.3.

132.   The FEHA provides Plaintiff with a cause of action, even though Plaintiff is not itself an individual with a disability.   *Urban Habitat Program v. City of Pleasanton*, 164 Cal. App. 4th 1561, 1581 (2008).

133.   The City's conduct as set forth above injured Plaintiff by committing discriminatory housing practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of the FEHA.   Cal. Gov. Code § 12900, *et seq.*

1   134.   The City's conduct was intentional, willful, and made in disregard of the

2   rights of others.   At a minimum, the City acted with deliberate indifference to the

3   rights of Plaintiff and its residents.

4                              **G.  SEVENTH CLAIM**

5           **[Planning and Zoning Law, Cal. Gov. Code § 65000, *et seq.*]**

6   135.   Plaintiff realleges and incorporates herein by reference each preceding

7   paragraph.

8   136.   California's Planning and Zoning Law makes it unlawful for a city to "in

9   the enactment or administration of ordinances ... prohibit or discriminate against any

10  residential development or emergency shelter ... [b]ecause of ... any characteristic

11  listed in subdivision (a) or (d) of Section 12955 [which include "disability"], as those

12  characteristics are defined in Sections 12926, 12926.1, subdivision (m) and paragraph

13  (1) of subdivision (p) of Section 12955, and Section 12955.2 of the owners or intended

14  occupants of the residential development or emergency shelter."   Cal. Gov. Code §

15  65008(b)(1)(B)(i).

16  137.   California's Planning and Zoning Law also provides that "[a]ny action"

17  of a city "is null and void if it denies to any individual or group of individuals the

18  enjoyment of residence, landownership, tenancy, or any other land use in this state

19  because of [disability]." Cal. Gov. Code § 65008(a).

20  138.   The residents of Plaintiff's housing are adults with disabilities.

21  139.   The City's conduct as set forth above injured Plaintiff by committing

22  discriminatory housing practices and failing to grant Plaintiff's request for a

23  reasonable accommodation with the purpose or effect of discriminating on the basis

24  of disability and perpetuating segregation in violation of California's Planning and

25  Zoning Law.   Cal. Gov. Code § 65008.

26  140.   The City's conduct was intentional, willful, and made in disregard of the

27  rights of others.   At a minimum, the City acted with deliberate indifference to the

28  rights of Plaintiff and its residents.

## H.  EIGHTH CLAIM

### [California Government Code § 11135]

141.  Plaintiff realleges and incorporates herein by reference each preceding paragraph.

142.  California Government Code Section 11135 ("Section 11135") prohibits public entities that receive "any financial assistance from the state" from discriminating against any person "on the basis of ... disability" or otherwise unlawfully denying a person with a disability "full and equal access" to the benefits of its programs and activities."  Cal. Gov. Code § 11135(a).

143.  A violation of Title II of the ADA is also a violation of Section 11135. Cal. Gov. Code § 11135(b).

144.  Plaintiff is informed and believes and based thereon, alleges that at all times relevant herein, the City received financial assistance from the State of California.

145.  Plaintiff's residents have a "disability" as defined in Section 11135, and therefore, are members of a protected class.  Cal. Gov. Code § 11135(c).

146.  Section 11135 provides Plaintiff with a cause of action because, as a housing provider for people with disabilities, Plaintiff is associated with a person who has a disability.  Cal. Gov. Code § 11135(d).

147.  The City's conduct as set forth above injured Plaintiff by committing discriminatory housing practices and failing to grant Plaintiff's request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of Section 11135.

148.  The City's conduct was intentional, willful, and made in disregard of the rights of others.  At a minimum, the City acted with deliberate indifference to the rights of Plaintiff and its residents.

///

///

# I. NINTH CLAIM

**[Community Care Facilities Act, Cal. Health & Saf. Code § 1500, et seq.]**

149.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

150.   The Community Care Facilities Act ("CCFA") was enacted by the Legislature in 1973, after finding and declaring there was an "urgent need to establish a coordinated and comprehensive service system of quality community care for mentally ill, developmentally and physically disabled, and children and adults who require care or services by a facility or organization issued a license or special permit, pursuant to Health & Saf. Code Div. II, Ch. 3."

151.   Under the CCFA, a "residential facility" is defined to mean "any family home, group care facility, or similar facility determined by the department, for 24-hour nonmedical care of persons in needs of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual. (Health & Saf. Code § 1502(a)(1).)

152.   Plaintiff's Property qualifies as a "residential facility" within the meaning of the CCFA. (Health & Saf. Code § 1502(a)(1).)

153.   Pursuant to § 1566 of the CCFA, the Legislature has declared "it is the policy of this state that each county and city shall permit and encourage the development of sufficient numbers of residential care facilities as are commensurate with local need." Moreover, the City of Costa Mesa is subject to the provisions of the CCFA.

154.   Pursuant to § 1566.3(a) of the CCFA, "[W]hether or not unrelated persons are living together, a residential facility that serves six or fewer persons shall be considered a residential use of property for the purposes of this article. In addition, the residents and operators of such a facility shall be considered a family for the purposes of any law or zoning ordinance that relates to the residential use of property pursuant to this article."

155.  Pursuant to § 1566.2 of the CCFA, "[A] residential facility, which serves six or fewer persons shall not be subject to any business taxes, local registration fees, use permit fees, or other fees to which other family dwellings of the same type in the same zone are not likewise subject." Additionally, § 1566.2 provides "family dwellings" includes, but is not limited to, single-family dwellings, ***units in multifamily dwellings***, including units in duplexes and ***units in apartment dwellings*** . . . units in cooperatives, units in condominiums, units in townhouses, and units in planned unit developments." (Emphasis added.)

156.  Pursuant to § 1566.3(e) of the CCFA, "[N]o conditional use permit, zoning variance, or other zoning clearance shall be required of a residential facility that serves six or fewer persons that is not required of a family dwelling of the same type in the same zone."

157.  The City has explicitly violated the provisions of the CCFA, including but not limited to § 1566.3(e), by requiring Plaintiff's residential facility to obtain a Conditional Use Permit ("CUP") as a precondition to its continued operation in the City's R2-MD residential zone.

158.  As a direct and proximate result of the City's violation of the CCFA, Plaintiff has suffered monetary damages, including, but not limited to, all costs and fees incurred in conjunction with applying for a CUP, and all costs and fees associated with any subsequent appeals of the City's unlawful denial of Plaintiff's application.

159.  Additionally, as a direct and proximate result of the City's violation of the CCFA, Plaintiff and its residents will be unlawfully displaced and evicted from their community.  As a result, Plaintiff requests injunctive relief to enjoin the City from evicting Plaintiff and its residents from their lawful use and operation of the Property, pursuant to the provisions of the CCFA.

///

///

///

## J.  TENTH CLAIM

### [Vested Rights]

160.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

161.   Under the doctrine of vested rights, a property owner has a vested right to continue lawful uses of its property and is not required to obtain a special use (or other) permit in order to continue lawful preexisting uses. (*City of Ukiah v. County of Mendocino* (1987) 196 Cal.App.3d 47, 56, citing *McCaslin v. City of Monterey Park* (1958) 163 Cal.App.2d 339, 348-49; *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1529-31; *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 565-566.)

162.   Plaintiff is, and was at all times relevant herein, lawfully operating the Property since its inception on February 21, 2015, in full compliance with all state and local laws.

163.   Prior to November 17, 2015 (when the City adopted new zoning regulations via enactment of Ordinance Nos. 15-11 and 15-13), the City had never required Plaintiff to obtain a Conditional Use Permit ("CUP") or other special permit as a precondition to continued lawful operation of the Property.  Nor had the City previously imposed a 650-feet separation requirement on Plaintiff's Property, for the purpose of restricting its geographical location in relation to the location of other "group homes."  In reliance on this, Plaintiff invested substantial financial resources to continue its lawful operations of the Property, as it had successfully done so in the past.

164.   However, as of November 17, 2015, after Plaintiff had been lawfully operating the Property for over ten (10) months, the City adopted new zoning regulations applicable to all "group homes," whereby continued future operation of any "group home" imposed additional permitting requirements (i.e. special use permit, conditional use permit, and/or operator's permit), and mandated each property

be outside a 650-feet radius from any other "group homes" – irrespective of whether properties, like Plaintiff's, existed prior to the development/installation of other "group homes" in the area, or whether other "group homes" were located outside the City.

165. Because Plaintiff's past operation of the Property constituted a lawful use, the City cannot now demand Plaintiff obtain a permit for continued operation. Nor can the City mandate Plaintiff vacate the Property on the basis that the Property now violates the City's newly imposed 650-foot separation requirement. The City's unlawful requirement that Plaintiff obtain a permit and satisfy the 650-foot separation requirement is a blatant violation of Plaintiff's vested right.

166. Plaintiff has a vested right to continue its lawful operation of the Property, irrespective of the City's new zoning regulations – which overtly discriminate against "group homes," such as Plaintiff's, and prevent people with disabilities from being a continued and integral part of the community.

167. As a direct and proximate result of the City's violation of Plaintiff's vested right, Plaintiff has incurred monetary damages, including, but not limited to, any and all costs and fees incurred to comply with the City's new zoning regulations (i.e. permit fees, application fees, etc.), and any and all costs and fees incurred to appeal the City's wrongful denial of Plaintiff's permit application and request for reasonable accommodation.

168. Additionally, as a direct and proximate result of the City's actions, Plaintiff and its residents will be forced to abandon the Property and their homes, leaving many of these mentally disabled individuals homeless. As such, Plaintiff seeks injunctive relief to enjoin the City from enforcing its new zoning regulations against Plaintiff and the Property, since Plaintiff has a vested right to continue its lawful operation of the Property and its preexisting use.

///

///

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court awards it the following relief:

1.     Declare that the City acted unlawfully under the Fair Housing Act, the Americans with Disabilities Act, Rehabilitation Act, and other federal and state laws as alleged herein;

2.     Declare that the City's enactment, administration, application, and enforcement of its zoning regulations violate the rights of Plaintiff and its residents under the Fair Housing Act, the Americans with Disabilities Act, Fourteenth Amendment, and other federal and state laws alleged herein;

3.     Enter a temporary restraining order, preliminary and permanent injunctions enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any one of them from enforcing unlawful or discriminatory zoning regulations, and from taking actions that either directly or indirectly interfere in any way with Plaintiff's abilities to provide housing to groups of unrelated, disabled persons who are in recovery;

4.     Enter a temporary restraining order, preliminary and permanent injunctions enjoining the City from harassing Plaintiff, including the institution of any abatement or enforcement proceedings against Plaintiff;

5.     Enter a temporary restraining order, preliminary and permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them from interfering with the operation of any dwelling owned or operated by Plaintiff as a dwelling for persons in recovery, and interfering in any way with the right of Plaintiff's residents to reside in those dwellings;

6.     Award of punitive damages;

7.     Grant an award of reasonable costs and attorneys' fees; and,

8.     Order other such relief as the Court deems just and proper.

1    Dated:  March 12, 2020                    INSIGHT PSYCHOLOGY AND
2                                              ADDICTION, INC.
                                               MARY HELEN BEATIFICATO
3
                                               By:_____s/ Mary Helen Beatificato
4                                                  Mary Helen Beatificato
                                                   Attorneys for Plaintiff
5                                                  INSIGHT PSYCHOLOGY AND
                                                   ADDICTION, INC.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>JURY DEMAND</u>

2

3      Plaintiff  Insight Psychology and Addiction, Inc. hereby demands a jury trial.

4

Dated:  March 12, 2020                    INSIGHT PSYCHOLOGY AND
5                                          ADDICTION, INC.
                                           MARY HELEN BEATIFICATO
6

7                                          By:_____s/ Mary Helen Beatificato_____

8                                          Mary Helen Beatificato
                                           Attorneys for Plaintiff INSIGHT
9                                          PSYCHOLOGY AND ADDICTION,
                                           INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28