1   Mary Helen Beatificato, Esq. (State Bar No. 220936)
    Insight Psychology and Addiction, Inc.
2   4000 Birch Street, Suite 112
    Newport Beach, CA 92660
3   Telephone:   (949) 216-3851
    Facsimile:   (949) 467-9945
4
    Alisha Patterson (State Bar No. 274630)
5   apatterson@rutan.com
    RUTAN & TUCKER, LLP
6   18575 Jamboree Road, 9th Floor
    Irvine, CA  92612
7   Telephone:   714-641-5100
    Facsimile:   714-546-9035
8
    Attorneys for Plaintiff and Counter-Defendant
9   INSIGHT PSYCHOLOGY AND ADDICTION,
    INC. and Counter-Defendants MARY HELEN
10  BEATIFICATO and GERALD GROSSO

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

13  INSIGHT PSYCHOLOGY AND              Case No. 8:20−cv−00504−MEMF−JDE
    ADDICTION, INC., a California
14  corporation, and JANE DOE, an       Judge:   Honorable Maame Ewusimensah
    individual,                         Frimpong
15                                      Ctrm:    8B
                Plaintiffs,
16                                      **INSIGHT PSYCHOLOGY AND
         vs.                            ADDICTION, INC.'S NOTICE OF
17                                      THREE NEWLY-ISSUED
    CITY OF COSTA MESA, a municipal     SUPPLEMENTAL LEGAL
18  corporation; and DOES 1-10, inclusive,  AUTHORITIES IN SUPPORT OF
                                        INSIGHT'S MOTION FOR PARTIAL
19              Defendants.             SUMMARY JUDGMENT AND ITS
                                        OPPOSITION TO THE CITY OF
20                                      COSTA MESA'S MOTION FOR
    CITY OF COSTA MESA, a municipal     SUMMARY JUDGMENT AND
21  corporation,                        REQUEST FOR JUDICIAL NOTICE
                                        OF TWO OF THE AUTHORITIES**
22              Counter-Plaintiff,
                                        Date Action Filed:  March 12, 2020
23       vs.                            Trial Date:         To Be Determined

24  INSIGHT PSYCHOLOGY AND              Motions Filed:      December 6, 2021
    ADDICTION, INC., a California       Motions Argued:     May 22, 2022
25  corporation; MARY HELEN
    BEATIFICATO, an individual;
26  GERALD GROSSO, an individual; and
    ROES 1-50,
27
                Counter-Defendants.
28  / / /

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff and Cross-Defendant Insight Psychology and Addiction, Inc. ("Insight") respectfully submits this Notice and Request for Judicial Notice to apprise the Court of three supplemental authorities that the parties could not address in their papers or at oral argument because the authorities did not exist until after briefing and oral argument was complete:

1. *Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802 (9th Cir. 2023), cert. denied sub nom. *Costa Mesa, CA v. SoCAL Recovery, LLC*, No. 23-71, 2023 WL 8007356 (U.S. Nov. 20, 2023) (the "*SoCal Recovery* Opinion"), a copy of which is available on the Ninth Circuit Court of Appeal's website at https://cdn.ca9.uscourts.gov/datastore/opinions/2023/01/03/20-55820.pdf and is attached hereto as Attachment 1.

2. The California Department of Housing and Community Development's ("HCD") Group Home Technical Advisory, dated December 2022 (the "HCD Technical Advisory"), a copy of which is available on HCD's website at https://www.hcd.ca.gov/sites/default/files/docs/planning-and-community/group-home-technical-advisory-2022.pdf and is attached hereto as Attachment 2.

3. HCD's Letter of Technical Assistance to the City of Costa Mesa, dated November 29, 2023 (the "HCD Letter of Technical Assistance"), a copy of which is available on HCD's website at https://www.hcd.ca.gov/sites/default/files/docs/planning-and-community/HAU/costa-mesa-group-home-ta-112923.pdf and is attached hereto as Attachment 3.

The ***SoCal Recovery* Opinion** (Attachment 1) is binding legal precedent that addresses the legal standard on the questions of what evidence is required to establish

actual or perceived disability in a discrimination claim brought by the operator of a group home. With respect to the **"actual disability" prong**, the *SoCal Recovery* Opinion holds that "sober living homes and other dwellings intended for occupancy by persons recovering from alcoholism and drug addiction are protected from illegal discrimination against the disabled without the need for [the operator] to present individualized evidence of the 'actual disability' of their residents." *SoCal Recovery*, 56 F.4th 802, 814. Instead, "sober living home operators can satisfy the 'actual disability' prong *on a collective basis* by demonstrating that they serve or intend to serve individuals with actual disabilities." *Id.* (italics in original). With regard to the **"regarded as disabled" prong**, the *SoCal Recovery* Opinion holds that the operators do not need "to show that the City subjectively believed that [the operators] (or those they served) were substantially limited in a major life activity or disabled." *Id.*, at 817. Instead, "[t]o establish disability under the 'regarded as disabled' prong, [operators] need to show that the City perceived their 'clients as being disabled and discriminated against them on that basis.'" *Id.*

The California Department of Housing and Community Development ("HCD") is the executive department responsible for providing guidance about the State of California's housing laws and policies. Its technical advisories and letters of technical assistance provide guidance that is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("*Chevron*"). **HCD's Technical Advisory** (Attachment 2) and **Letter of Technical Assistance** (Attachment 3) are "administrative interpretations" of how the State of California's fair housing laws, including California's Fair Employment and Housing Act (FEHA), impact local regulation of group homes. HCD's Technical Advisory addresses group home regulations in general and HCD's Letter of Technical Assistance specifically addresses the City of Costa Mesa's group home regulations. Although these administrative interpretations are not binding legal precedent, under *Chevron*, "considerable weight should be accorded to an executive department's construction

of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Id.*, at 844; *see also Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1029, fn. 11 ("The DSLE is the state agency empowered to enforced California's labor laws" . . . "The DLSE's opinion letters, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

Pursuant to Rule 201 of the Federal Rules of Evidence ("Rule 201"), Insight requests that the Court take judicial notice of HCD's Technical Advisory (Attachment 2) and Letter of Technical Assistance (Attachment 3). Each of these documents constitutes a matter of public record. Courts "can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *Gerristen v. Warner Bros. Ent. Inc.*, 112 F.Supp.3d 1011, 1033 (C.D. Cal. 2015); *see also Michery v. Ford Motor Co.*, 650 Fed.App'x 338, 342 n.2 (9th Cir. 2016) (granting a request for judicial notice of the existence of documents that were available on a government website). As noted above, the Court may look to HCD's positions for guidance. *See, e.g.*, *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1029, fn. 11. Given that their authenticity cannot be reasonably questioned, judicial notice of HCD's administrative interpretations is proper.

Dated:  December 29, 2023

RUTAN & TUCKER, LLP
ALISHA PATTERSON


By:_____*/s/ Alisha Patterson*_____
Alisha Patterson
Attorneys for Plaintiff and Counter-Defendant, INSIGHT PSYCHOLOGY AND ADDICTION, INC. and Counter-Defendants MARY HELEN BEATIFICATO and GERALD GROSSO

2979/035905-0001
18680433.2 a12/29/23

-3-

Case No. 8:20-cv-00504 JVS (JDEx)
NOTICE OF NEWLY-ISSUED SUPP. LEGAL
AUTHORITIES & REQ. FOR JUD. NOT.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOCAL RECOVERY, LLC, a California limited liability company; ROGER LAWSON, | No. 20-55820 |
| | D.C. No. 8:18-cv-01304-JVS-PJW |
| *Plaintiffs-Appellants,* | |
| v. | OPINION |
| CITY OF COSTA MESA, a municipal corporation; DOES, 1-100, | |
| *Defendants-Appellees.* | |

| | |
|---|---|
| RAW RECOVERY, LLC, a California limited liability company, | No. 20-55870 |
| | D.C. No. 8:18-cv-01080-JVS-PJW |
| *Plaintiff-Appellant,* | |
| v. | |
| CITY OF COSTA MESA, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted July 12, 2022
Pasadena, California

Filed January 3, 2023

Before:  Kim McLane Wardlaw and Mark J. Bennett,
Circuit Judges, and Gary S. Katzmann,[*] Judge.

Opinion by Judge Bennett

---

## SUMMARY[**]

---

### Disability / Housing

The panel reversed the district court's summary
judgment in favor of the City of Costa Mesa in cases in
which plaintiffs-appellants ("Appellants"), operators of
sober living homes for persons recovering from drug and
alcohol addiction, alleged that two new City ordinances and
the City's enforcement practices discriminated against them
on the basis of disability under the Fair Housing Act (FHA),

---

[*] The Honorable Gary S. Katzmann, Judge for the United States Court
of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

the Americans with Disabilities Act (ADA), and the California Fair Employment and Housing Act (FEHA).

The ordinances, which made it unlawful to operate sober living homes without a permit, define sober living homes as group homes serving those who are "recovering from a drug and/or alcohol addiction and who are considered handicapped under state or federal law," and define group homes as "facilit[ies] that [are] being used as a supportive living environment for persons who are considered handicapped under state or federal law." Until the ordinances were adopted, the City did not regulate sober living homes differently from other residences. The ordinances required all sober living homes, including established homes, to be located more than 650 feet away from any other sober living home or any state-licensed drug and alcohol treatment center. No existing homes were grandfathered—i.e., if two operating sober living homes were within 650 feet of each other, one would have to cease operating as a sober living home. The ordinances did not address the criteria used to determine which home could remain, but provided that applicants could request reasonable accommodations from permit conditions and requirements, like the 650-foot requirement.

Appellants submitted both permit applications and reasonable accommodation requests to the City so they could continue to operate their sober living homes, even those that were operating within 650 feet of other sober living homes or state-licensed drug and alcohol treatment centers. The City found that Appellants were operating sober living homes but denied some permits and reasonable accommodation requests because the homes were operating in violation of the new separation requirement. The City issued citations to Appellants for operating the sober living

homes without approval, and filed state court abatement actions against Appellants.

Granting the City's motions for summary judgment, the district court found that Appellants did not establish that residents in their sober living homes were actually disabled, or that the City regarded their residents as disabled.

The panel held that Appellants and other sober living home operators can satisfy the "actual disability" prong of the ADA, FHA, or FEHA *on a collective basis* by demonstrating that they serve or intend to serve individuals with actual disabilities; they need not provide individualized evidence of the actual disability of their residents. Rather, they can meet their burden by proffering admissible evidence that they have policies and procedures to ensure that they serve or will serve those with actual disabilities and that they adhere or will adhere to such policies and procedures. The panel held that in each action, the district court therefore erred by finding that an individualized assessment of resident disability was necessary under the "actually disabled" prong of the disability definition.

The panel held that in determining whether Appellants can establish disability under the "regarded as disabled" prong of the disability definition, the district court erred by finding that Appellants must prove the City's "subjective belief" that their residents were disabled. The panel explained that under this prong, the analysis turns on how an individual is perceived by others.

The panel noted that Appellants provided the district court with evidence of (1) admissions criteria and house rules, (2) employee and former resident testimony, (3) public fears and stereotypes of their residents that may have influenced the City's perception, and (4) the actual content

of City ordinances, denial letters, resolutions, citations, and abatement actions that acknowledged the residents in Appellants' homes were disabled.  The panel wrote that this type of evidence, if it satisfied the requirements of Federal Rule of Civil Procedure 56(c), should have been considered by the district court in evaluating whether Appellants established triable issues of fact under either or both of the "actually disabled" or "regarded as disabled" prongs.  The panel therefore reversed each of the district court's grants of summary judgment and remanded for the court to consider whether the record contains evidence sufficient to establish a genuine dispute of material fact on the "actually disabled" or "regarded as disabled" prongs of the disability definition.

---

## COUNSEL

Christopher Brancart (argued) and Elizabeth Brancart, Brancart & Brancart, Pescadero, California; Steven G. Polin, Law Offices of Steven G. Polin, Washington, D.C.; Garrett Prybylo, Seyfnia & Prybylo LLP, Los Angeles, California; Isaac Zyfaty, Much Shelist PC, Newport Beach, California; for Plaintiffs-Appellants.

Mary-Christine Sungaila (argued) and Efrat M. Cogan, Buchalter APC, Irvine, California; Seymour B. Everett, Samantha E. Dorey, and Christopher D. Lee, Everett Dorey LLP, Irvine, California; Kimberly Hall Barlow and James Touchstone, Jones & Mayer, Fullerton, California; for Defendants-Appellees.

Brant S. Levine (argued) and Nicolas Y. Riley, Attorneys; Pamela S. Karlan, Principal Deputy Assistant Attorney General; Kristen Clarke, Assistant Attorney General United

States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C.; Heather Nodler and Shira E. Gordon, Trial Attorneys; Jeanine Worden, Associate General Counsel for Fair Housing; Sasha Samberg-Champion, Deputy General Counsel for Enforcement and Fair Housing; Damon Smith, General Counsel; Department of Housing and Urban Development, Office of General Counsel, Office of Fair Housing, Washington, D.C.; for Amicus Curiae United States of America.

---

**OPINION**

BENNETT, Circuit Judge:

In 2014, the City of Costa Mesa ("City") began amending its zoning code to reduce the number and concentration of sober living homes in its residential neighborhoods. Two of its new ordinances—Ordinances 14-13 and 15-11 ("Ordinances")—made it unlawful to operate sober living homes without a permit. The Ordinances define sober living homes as group homes serving those who are "recovering from a drug and/or alcohol addiction and who are considered handicapped under state or federal law," and define group homes as "facilit[ies] that [are] being used as a supportive living environment for persons who are considered handicapped under state or federal law." Costa Mesa, Cal., Mun. Code § 13-6. Unlike addiction treatment facilities, sober living homes do not require a license from the state of California. Until the Ordinances were adopted, the City did not regulate sober living homes differently from other residences.

The Ordinances required all sober living homes, including established homes, to be located more than 650 feet away from any other sober living home or any state-licensed drug and alcohol treatment center. No existing homes were grandfathered under the Ordinances—i.e., if two operating sober living homes were within 650 feet of each other, one would have to cease operating as a sober living home. The Ordinances did not address the criteria used to determine which home could remain. They provided, however, that applicants could request reasonable accommodations from permit conditions and requirements, like the 650-foot requirement.

Plaintiffs-Appellants SoCal Recovery, LLC ("SoCal") and RAW Recovery, LLC ("RAW") (together, "Appellants") operate sober living homes in Costa Mesa, California, for persons recovering from drug and alcohol addiction. Appellants submitted both permit applications and reasonable accommodation requests to the City so they could continue to operate their sober living homes, even those that were operating within 650 feet of other sober living homes or state-licensed drug and alcohol treatment centers.[1] The City found that Appellants were operating sober living homes but denied some permits and reasonable accommodation requests because the homes were operating in violation of the new separation requirement.[2] The City issued citations to Appellants for operating the sober living homes without approval. The City also filed state court

---

[1] Four sober living homes at issue in this appeal were opened or acquired after 2014, but before the applicable Ordinances went into effect.

[2] Two other reasonable accommodation requests were denied because they were not submitted in writing, as required by the Ordinances.

abatement actions against Appellants.

Appellants sued the City, arguing that the Ordinances and the City's enforcement practices discriminated against them on the basis of disability under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq., and the California Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12900 et seq.[3]  The City moved for summary judgment against Appellants.  The district court granted the City's motions, finding that Appellants did not establish that residents in their sober living homes were actually disabled,[4] or that the City regarded their residents as disabled.[5]

---

[3] Appellants withdrew other claims they brought under 42 U.S.C. §§ 1985–1986 and California Government Code §§ 11135, 65008. Appellants also brought a retaliation claim under the FHA and a claim under 42 U.S.C. § 1983.  The district court granted summary judgment to the City on both.  The district court awarded the City attorneys' fees on all these claims, which it found "were asserted in a frivolous fashion." Using a rough estimate, the district court found 10% of the City's total requested fees were related to the frivolous claims and awarded the City $21,935.84 in fees in RAW's case and $20,923.01 in fees in SoCal's case.

[4] The district court held that Appellants must prove their "clients have a substantial impairment to a major life activity, on a case-by-case basis." *SoCal Recovery, LLC v. City of Costa Mesa et al.*, No. SACV 18-1304, 2020 WL 2528002, at *5 (C.D. Cal. Apr. 10, 2020), *reconsideration denied*, No. SACV 18-1304, 2020 WL 4668145 (C.D. Cal. July 20, 2020).

[5] We grant RAW's motion to take judicial notice of the City Council resolution upholding the denial of the Knox Street home and the state court judgment and order in the City's abatement action against that home.  We deny as unnecessary Appellants' motions to take judicial notice of City Council and Planning Commission resolutions that are already in the record.

Because the district court erred by requiring Appellants to adduce individualized evidence of actual disability and failing to consider evidence that the City regarded the residents of the sober living homes as disabled, we reverse the district court's grant of summary judgment in both cases.

# I. BACKGROUND

## A. Sober Living Home Zoning Regulations

Through its 2014 and 2015 Ordinances, the City imposed new zoning regulations regarding group housing for persons with disabilities.   Before the Ordinances, about 94 unlicensed sober living homes were legally operating in residential zones.   Appellants argue that between 2014 and 2017, 73 sober living homes had closed.[6]   The City's website indicates that there are 16 approved sober living homes today.[7]   The City adopted the 650-foot separation restriction and other restrictions in an explicit effort to reduce the number of sober living homes operating within the City.  The City was concerned about the "overconcentration" of sober living homes in some neighborhoods, which the City

---

[6] The source in the record cited by Appellants lists 68 closures, assuming each entry is a different property.

[7] *See    City    Approved    Sober    Living/Group    Homes*, https://app.smartsheet.com/b/publish?EQBCT=f6f1941be3624556ab1b 03e829df4639 (last visited Aug. 31, 2022); *see also Group Homes/Sober Living    Information    and    Application*,    Costa    Mesa, https://www.costamesaca.gov/city-hall/city-departments/development-services/community-improvement-division/group-homes-sober-living-information (last visited Aug. 31, 2022) (providing information on "City approved sober living/group homes," "Operators that have closed," and "Group homes cited").

believed was "deleterious" to those neighborhoods' residential character.

The 2014 Ordinance, Ordinance 14-13, regulates group housing for persons with disabilities in single-family districts. Costa Mesa Mun. Code §§ 13-310–312. It defined "[s]ober living home" as: "a group home for persons who are recovering from a drug and/or alcohol addiction and who are considered handicapped under state or federal law." *Id.* § 13-6. "Group home[s]," in turn, are defined as "facilit[ies] that [are] being used as a supportive living environment for persons who are considered handicapped under state or federal law." *Id.*

Ordinance 14-13 made it unlawful to operate a sober living home in a single-family district without obtaining a special use permit. *Id.* § 13-311. Group homes in single-family districts were limited to six occupants and needed to have a "house manager" residing in the home and present on a 24-hour basis. *Id.* § 13-311(a)(2), (a)(4).

In addition to the group home requirements, sober living homes needed to meet certain additional conditions. Relevant here, a sober living home could not be "located within six hundred fifty (650) feet, as measured from the closest property lines, of any other sober living home or a state licensed alcoholism or drug abuse recovery or treatment facility" ("separation requirement"). *Id.* § 13-311(a)(14)(i).[8]   An applicant could seek relief from the

[8] Other requirements include that all occupants other than the house manager are "actively participating in legitimate recovery programs." § 13-311(a)(14)(ii). Additionally, "[t]he sober living home's rules and regulations must prohibit the use of any alcohol or any non-prescription drugs at the sober living home or by any recovering addict either on or off site." § 13-311(a)(14)(iii).

"strict application" of the permit requirements by requesting a reasonable accommodation. *Id.* § 13-311(a)(15).[9]

The 2015 Ordinance, Ordinance 15-11, applied similar zoning regulations as Ordinance 14-13 but to multi-family residential districts. *Id.* §§ 13-322 to 324. The same conditions for a special use permit under Ordinance 14-13 applied to existing group homes with six or fewer residents, including the 650-foot separation requirement for sober

---

[9] Permit applications are first submitted to the Director of Economic and Development Services ("Development Director"), who may make an initial determination, or designate another official to do so. Costa Mesa, Cal., Mun. Code §§ 13-311, 322; *see id.* § 13-6 (defining "director" as "[t]he director of [economic and] development services of the City of Costa Mesa, or his or her designee"). In this case, the Development Director designated the City's Zoning Administrator to make an initial decision regarding a subset of sober home applications. An unfavorable decision by the Development Director or Zoning Administrator is appealable to the City Planning Commission and then to the City Council. *Id.* §§ 13-8 to -11. The application shall include, inter alia, a copy of the group home rules and regulations, the relapse policy, and "[a]n affirmation by the owner/operator that only residents (other than the house manager) who are handicapped as defined by state and federal law shall reside at the group home." *Id.* § 13-311(a)(1)(viii).

Reasonable accommodation requests must be filed in writing with the Planning Division. *Id.* § 13-200.62(a)–(b). Applicants shall state "[t]he basis for the claim that the individuals are considered disabled under state or federal law, and why the accommodation is necessary to provide equal opportunity for housing and to make the specific housing available to the individuals." *Id.* § 13-200.62(b)(2). And the application shall include documentation that the applicant is "an individual with a disability," "applying on behalf of one or more individuals with a disability," or "a developer or provider of housing for one or more individuals with a disability." *Id.* § 13-200.62(b)(4). The Development Director's decision on the request for reasonable accommodation can be appealed to the Planning Commission, and then the City Council. *Id.* §§ 13-7, -8, -10(i)(2)(c), -11(b).

living homes. *Id.* §§ 13-322, -324(a). Existing group homes and sober living homes with seven or more residents needed to obtain a conditional use permit within one year, and to apply for an operator's permit within 120 days. *Id.* §§ 13-323, -324(b). A 650-foot separation requirement also applied to sober living homes with seven or more residents. *Id.* § 13-323(b). As with Ordinance 14-13, under Ordinance 15-11, a group home could seek relief from the "strict application" of the permit requirements by submitting a request for reasonable accommodation exempting it from a requirement. *Id.* §§ 13-322(c), -200.62. Permit applications would be reviewed by the Development Director and could be appealed to the Planning Commission and City Council. *Id.* §§ 13-7 to -11.

All permitting requirements in the Ordinances applied to both existing sober living homes and proposed sober living homes. Since the Ordinances passed, the City has received fifty-two reasonable accommodation requests from group homes and has granted three, none to Appellants.

### B. SoCal Recovery, LLC

SoCal operates three sober living homes relevant to this appeal. Two of the homes, located on Hudson Avenue and Cecil Place, both opened before November 2014, are in single-family districts, and provide housing to six or fewer residents in recovery. One property, on East 21st Street, is in a multi-family residential district, providing housing for up to thirty-two residents in recovery. The East 21st Street home opened prior to December 2015, before the multi-family residential district Ordinance took effect. Each of the homes is within 650 feet of another facility covered by the Ordinances.

SoCal submitted permit applications for all three homes and applied for a reasonable accommodation from the 650-foot requirement for the 21st Street property. The City's Development Director denied the reasonable accommodation request, citing the 650-foot separation requirement and concerns about the overconcentration of sober living residences in the area. At a 2016 public hearing, SoCal verbally requested reasonable accommodations for the Hudson Avenue and Cecil Place homes. The Zoning Administrator denied the permit applications because the houses violated the 650-foot separation requirement and denied the reasonable accommodation requests because they were not made in writing.

SoCal appealed. The Planning Commission upheld the denial of the reasonable accommodation request and permit application for the 21st Street property. The Planning Commission upheld the denials of the permit applications for the Hudson Avenue and Cecil Place homes without discussing the reasonable accommodations requests.[10] The City Council adopted resolutions upholding the decisions of the Planning Commission, finding that each of the homes violated the separation requirement. The City Council "determined that a separation requirement for such facilities will still allow for a reasonable market for the purchase and operation of sober living homes within the City and still result in preferential treatment for sober living homes."

Like the Planning Commission, the City Council denied the reasonable accommodation request for the 21st Street

[10] SoCal did not appeal the reasonable accommodation denial for the Hudson Avenue and Cecil Place homes to the City Council.

home, finding that waiver of the 650-foot separation requirement was "not necessary to allow one or more individuals who are recovering from drug and alcohol abuse to enjoy the use of <u>a</u> dwelling within the City" even if, "[i]n theory, [waiving the requirement] would allow [them] to enjoy the use of <u>these</u> dwellings."

The City then issued notices of violation to all three homes, informing SoCal that they were operating unlicensed homes in violation of the Zoning Code and ordering them to cease operations within sixty days.  The City also brought an abatement action in state court, targeting one of the homes.

SoCal then brought this suit.  SoCal alleged that its sober living homes were illegally "subject to the discriminatory limitation" in the zoning code—the "separation requirement limiting the number of Sober Living Homes that may exist" in the residential zones.[11]

During discovery, the City requested from SoCal documents related to the "disability" status of every one of its clients.  The records the City requested included "all medical records from all health care providers which provided any of [SoCal's] clients any treatment [starting from] January 1, 2014," "all documents that relate to clients' medical and health information and histories, and information and histories regarding clients' drug use," and records of all drug tests performed at the facilities.  SoCal refused to produce those documents, or to have any of its employees testify about them, asserting that they were

---

[11] SoCal also filed a motion for a preliminary injunction, which the district court denied.  We previously affirmed the district court's decision.

privileged under HIPAA.**[12]**   The City moved for summary judgment, arguing that without individualized evidence, SoCal's statutory disability discrimination claims failed because SoCal had not demonstrated a genuine dispute of material fact as to whether any of its residents were "disabled" under the ADA and FEHA, or "handicapped" under the FHA.

On summary judgment, two relevant issues were whether Appellants' residents had an actual disability or were regarded as disabled by the City.  First, SoCal argued that a triable issue of fact existed as to whether any of its residents had an "actual disability" based on evidence about its admissions policies, rules, and daily operations, as well as deposition testimony from SoCal staff.  To argue that their residents were regarded as disabled by the City, SoCal also cited assertions by the City, including in the language of the Ordinances, the City's administrative rulings on the sober living homes' zoning requests, and the state court abatement action.

Second, SoCal argued that a disputed factual issue existed as to whether the City regarded its residents as disabled, pointing to the City's statements throughout the permit application and reasonable accommodation process, as well as the residents' testimony to the City Council. SoCal cited the City's admission that SoCal "made a showing that the [reasonable accommodation] application is on behalf of disabled individuals in recovery from drug and alcohol substance abuse."  Thus, under the definitions in the Ordinances, SoCal stated that it was "required to prove that

---

**[12]** The City did not seek to compel production of the medical records SoCal refused to produce.

it was making a reasonable accommodation request on behalf of disabled individuals." SoCal argued that the Ordinances classified "a disabled household . . . as a Sober Living Home" and then subjected it to "discriminatory limitation[s] . . . that are not imposed on other groups of unrelated non-disabled persons or other groups of disabled persons."

## C. RAW Recovery, LLC

RAW provides "housing to disabled individuals in recovery from drug and alcohol abuse." Before the 2015 Ordinance went into effect, RAW provided sober living at three homes in multi-family zoning districts in Costa Mesa. Two were on adjacent parcels on Jeffrey Drive and one was on Knox Street.

Pursuant to Ordinance 15-11, RAW submitted timely conditional use permit applications and reasonable accommodation requests for the three homes. In its reasonable accommodation requests, RAW sought "waiver of the spacing requirements," so that its contiguous locations on Jeffrey Drive could remain open and its Knox Street home could be treated as a "single housekeeping unit" and thereby be exempted from the Ordinances' requirements for group homes.[13] RAW's applications and requests were

[13] The Ordinances specifically exempt "any group home that operates as a single housekeeping unit" from regulations concerning group homes. Costa Mesa, Cal., Mun. Code § 13-6. Designation as a single housekeeping unit "means that the occupants of a dwelling unit have established ties and familiarity with each other, jointly use common areas, interact with each other, share meals, household activities, and expenses and responsibilities; membership in the single housekeeping unit is fairly stable as opposed to transient, members have some control

denied; the contiguous Jeffrey Drive homes were denied at
each stage of the process, whereas the Knox Street home's
application denial was more complicated.[14]

RAW joined a federal court action seeking monetary,
declaratory, and injunctive relief for zoning discrimination

over who becomes a member of the household, and the residential
activities of the household are conducted on a nonprofit basis." *Id.* Such
designation exempts a dwelling from, inter alia, the 650-foot
requirement. *See id.* § 13-311.

Notably, the City Council provided in the 2014 Ordinance that "sober
living homes do not function as a single-family unit nor do they fit the
City's zoning definition of a single-family for the following reasons: (1)
they house extremely transient populations . . .; (2) the residents
generally have no established ties to each other . . .; (3) neighbors
generally do not know who or who does not reside in the home; (4) the
residents have little to no say about who lives or doesn't live in the
home," among others.

RAW did not specifically argue that its Knox Street home met the
definition of a "single housekeeping unit," but did state in its reasonable
accommodation application that "residents of RAW are not 'transient'
by nature and function and interact with each other much in the same
way as 'the functional equivalent of a traditional family.'"

[14] RAW's Knox Street conditional use permit application, was initially
denied by the Development Director, then approved by the Planning
Commission on appeal.  Two City Councilmembers called for review
because they believed the home was within 650 feet of a state-licensed
facility.  Though a City attorney advised that Ordinance 15-11 "would
not permit the City Council to take into consideration state licensed
homes that had not applied for use permits, as a basis for finding a 650
foot separation conflict," the City Council reviewed the application,
overturned the Planning Commission, and revoked the permit.  The City
Council cited maintenance and secondary concerns of smoking and
noise.  The City Council passed a resolution reflecting the revocation of
the permit, citing the separation requirement.

on the basis of disability.[15] RAW primarily argued that the City's "draconian permitting requirements" for group homes and sober living homes "are discriminatory on [their] face, and as applied to Plaintiffs, as well as other applicants similarly situated." RAW asserted that "Ordinance 15-11, which requires that all group homes be at least 650 feet apart," is a "tool[] the City uses to enforce its policy of discrimination" against people in recovery.

The City moved for summary judgment, arguing that "Plaintiffs' discrimination claims fail because Plaintiffs cannot meet their burden to prove that they are associated with individuals that qualify as disabled." The City alleged that RAW "must prove on a case-by-case basis" that all its residents are disabled or regarded as disabled and are no longer using illegal drugs.[16] Because RAW did not do so, the City argued, "all of [its] claims fail." RAW argued that it could prove the disability of its residents through the City's admissions and witness testimony. It argued that "[t]here should be no doubt that [RAW's] patients are statutorily handicapped" given they are recovering from drug and/or alcohol addiction and they must be sober to live in RAW's homes. RAW also argued that "[t]here is no question that the City of Costa Mesa regarded the individuals residing in

[15] Northbound Treatment Services, which is no longer a party to this case, filed the initial complaint, and added RAW as a plaintiff in its first amended complaint.

[16] As with SoCal, the City requested "all medical records from all health care providers which provided any of [RAW's] clients any treatment at any time [starting from January 1, 2014] to present," as well as "all documents that relate to clients' medical and mental health information and histories, and information and histories regarding clients' drug use." RAW refused to produce the records, and the City never sought to compel their production.

[RAW's] group homes and sober living homes as disabled" because "[i]t is memorialized in every step of the use permit application process and reasonable accommodation requests."   RAW argued that the City's permit and reasonable accommodation processes required RAW "to put forward proof of the disability of the residents," stating that the "City in processing the applications has admitted and accepted that Plaintiffs provided housing to a class of disabled persons."   Finally, RAW argued that the City regarded their residents as disabled because of City resident testimony at the City Council hearing indicating "fear of the influx of felons coming into the neighborhood, and the violence and damage" they would bring.

### D. District Court Proceedings

The district court issued substantively similar rulings in each case, granting summary judgment to the City on Appellants' ADA, FHA, and FEHA claims because Appellants had failed to create a genuine dispute of material fact as to whether their clients have a "handicap" or "disability" under the statutory definition. *SoCal*, 2020 WL 2528002, at \*4–6; *Nat'l Therapeutic Servs., Inc. v. City of Costa Mesa*, No. SACV 18-1080, 2020 WL 5005550, at \*6 (C.D. Cal. July 17, 2020).   Under the FHA and the ADA, "disability" is defined as "(1) a physical or mental impairment which substantially limits one or more . . . major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment."   42 U.S.C. § 3602(h); *see also id.* § 12102(1).   Though the FHA uses the word "handicap" instead of "disability," "handicap" is defined using the same three alternative definitional prongs as "disability" under the ADA. Thus, the words "handicap" and "disability" are construed to have the same meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

FEHA defines "mental disability" and "physical disability" more specifically and incorporates the ADA's definition of disability if it provides "broader protection or coverage." *See* Cal. Gov't Code § 12926(j), (m), (n).  Federal courts analyze FEHA claims under the same standard as FHA claims.  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 n.14 (9th Cir. 2013).

On the "actual disability" prong of the disability definition, the district court concluded in each case that Appellants were required to provide individualized evidence that "their clients," *Nat'l Therapeutic Servs.*, 2020 WL 5005550, at *6, "have a physical or mental impairment that substantially limits one or more major life activities." *SoCal*, 2020 WL 2528002, at *5.  In each case, the court agreed with the City that there is no "per se rule that all individuals in a drug rehabilitation program qualify as disabled or protected." *Id.* at *4; *see also Nat'l Therapeutic Servs.*, 2020 WL 5005550, at *4.  According to the district court in *SoCal*, "[t]hat [Appellants] require[] sobriety for [their] residents does not change that [they] must prove [their] clients have a substantial impairment to a major life activity, on a case-by-case basis." *SoCal*, 2020 WL 2528002, at *5.

In both actions, the district court held that Appellants did not meet the "record of disability" prong of the definition because they did not produce their residents' medical records and asserted privilege when the City requested those records during discovery.[17]  *Id.* at *5; *Nat'l Therapeutic Servs.*, 2020

---

[17] Appellants did not rely on this prong below to establish that their clients were disabled.

WL 5005550, at *5.  As to the "regarded as" prong of the definition, the court's only proffered reason for granting summary judgment was that Appellants' evidence was "either inadmissible, mischaracterize[d] what the City required from [Appellants] in the application process, and/or [did] not establish the City's subjective belief of the clients' impairments."[18]   *Nat'l Therapeutic Servs.*, 2020 WL 5005550, at *5; *see also SoCal*, 2020 WL 2528002, at *6.

Appellants timely appealed the grants of summary judgment.[19]

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo.  *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).  Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.  *Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 922 (9th Cir. 2004).

[18] The district court did not discuss in either case which evidence was inadmissible or why any of the evidence was inadmissible.  And it did not discuss how Appellants had mischaracterized what the City had required of Appellants in the application process.

[19] SoCal filed a motion for partial reconsideration asking the court to reconsider its holding that SoCal had failed to create a material dispute of fact as to whether the City "regarded" its residents as disabled.  *SoCal*, 2020 WL 4668145, at *1–2.  The court denied that motion, reiterating that the evidence SoCal presented "did not establish a triable issue of fact as to whether the City regarded Plaintiff's *specific clients* as disabled." *Id.* at *2.

# III. DISCUSSION

Appellants argue that the district court applied the wrong legal standard on the questions of what evidence is required to establish actual or perceived disability. They contend that they should not have been required to provide individualized evidence of their clients' disabilities. Appellants also argue that a genuine dispute of material fact exists as to whether their residents are "regarded as" disabled by the City. We agree that the district court applied incorrect legal standards and did not properly consider the summary judgment evidence Appellants presented. We therefore reverse the district court's grants of summary judgment on the FHA, ADA, and FEHA claims.

## A. Statutory Background

Under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling" because of a handicap of that person, a resident or intended resident, or any person associated with that person. 42 U.S.C. § 3604(f)(2). The statute gives any "aggrieved person" the right to sue, and broadly defines an "aggrieved person" as anyone who "claims to have been injured by a discriminatory housing practice." *Id.* §§ 3602(i)(1), 3613.

FEHA makes it unlawful "[t]o discriminate [because of disability] through public or private land use practices, decisions, and authorizations." Cal. Gov't Code § 12955(*l*). Any "aggrieved person" can sue. *Id.* § 12989.1. An "aggrieved person" is "any person who claims to have been injured by a discriminatory housing practice or believes that the person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 12927(g). The FHA and FEHA invalidate any state or local law that "purports to

require or permit" an action that would be a discriminatory housing practice.   42 U.S.C. § 3615; Cal. Gov't Code § 12955.6.

Title II of the ADA makes it unlawful for a public entity to discriminate through its zoning laws against (1) a person with a "disability," 42 U.S.C. § 12132, or (2) a person who has a "relationship or association" with a person with a "disability," 28 C.F.R. § 35.130(g).   The ADA gives "any person alleging discrimination" under the provision the right to sue.   42 U.S.C. § 12133; *see also Barker v. Riverside Cnty. Off. of Educ.*, 584 F.3d 821, 827 (9th Cir. 2009).

"Disability" in the ADA (and therefore FEHA) and "handicap" in the FHA are defined as: (1) a "physical or mental impairment which substantially limits one or more of [a] person's major life activities," (2) "a record of having such an impairment," or (3) "being regarded as having such an impairment."   42 U.S.C. §§ 3602(h), 12102(1).[20]   The first definition is often referred to as the "actual disability" prong, and the third as the "regarded as" prong.

### B. Actual Disability

To establish a disability under the "actual disability" prong of the ADA, FHA, or FEHA, a plaintiff must show "a physical or mental impairment" that "substantially limits" their ability to engage in one or more "major life activities." 42 U.S.C. §§ 3602(h), 12102(1); *Pac. Shores Props.*, 730 F.3d at 1156 n.14 (applying FHA standards to FEHA claims).   Alcoholism and drug addiction are "impairments"

---

[20] Recall that although FEHA defines "mental disability" and "physical disability" more specifically than the ADA, it incorporates the ADA's definition of "disability" if the ADA would provide broader protection. *See* Cal. Gov't Code § 12926(n).

under the FHA, 24 C.F.R. § 100.201(a)(2), and the ADA, 28 C.F.R. § 35.108(b)(2). *See also Pac. Shores Props.*, 730 F.3d at 1156 ("It is well established that persons recovering from drug and/or alcohol addiction are disabled under the FHA and therefore protected from housing discrimination."). The impairment cannot include "current, illegal use of or addiction to a controlled substance." 42 U.S.C. § 3602(h); *see also id.* § 12114(a).

The district court concluded in both actions that Appellants could not establish that *any* of their residents had an "actual disability" because the evidence they adduced, including testimony about the admissions policies, house rules, and general day-to-day operations of their homes, was not sufficiently "individualized" under *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*. 534 U.S. 184, 199 (2002), *superseded on other grounds by* the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553; *see Nat'l Therapeutic Servs.*, 2020 WL 5005550, at *5; *SoCal*, 2020 WL 2528002, at *5. In *Toyota*, the Supreme Court held that "the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." 534 U.S. at 198 (cleaned up). Thus, a plaintiff must prove the relevant person's disability status in a "case-by-case manner." *Id.*

Appellants contend that an "individualized assessment" of every resident's disability status was unnecessary for their zoning discrimination claims to survive summary judgment or prevail at trial. We agree. At the outset, Appellants had standing to sue. Appellants are not disabled or handicapped, but they stated a claim under the FHA because they claimed they were "'aggrieved' by housing discrimination against

the disabled." *Pac. Shores Props.*, 730 F.3d at 1157 n.16.[21]
They stated a claim under the ADA because they were
"alleging discrimination on the basis of disability." *Id.* at
1157 n.17 (parenthetically quoting 42 U.S.C. § 12133).[22]
They stated a claim under FEHA because they claim to
"have been injured by a discriminatory housing practice."
Cal. Gov't Code §§ 12927(g), 12989.1(a).[23]

The separation requirement prevented Appellants from
conducting their normal business operations.  Thus, they

[21] "The sole requirement for standing to sue under the FHA is the Article
III minima of injury in fact: that the plaintiff allege that as a result of the
defendant's actions he has suffered a distinct and palpable injury."
*Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001)
(cleaned up and citation omitted). For purposes of "the FHA. . . a plaintiff
need not be among the class discriminated against in order to have
standing.  In particular, an organization may have standing to bring suit
on its own behalf, without relying in a representative capacity on the
standing of any third parties." *El Dorado Ests. v. City of Fillmore*, 765
F.3d 1118, 1121 (9th Cir. 2014) (citation omitted).

[22] An organization has standing to sue under the ADA on its own behalf
by establishing an "injury in fact if it can demonstrate: (1) frustration of
its organizational mission; and (2) diversion of its resources to combat
the particular conduct in question." *Am. Diabetes Ass'n v. U.S. Dep't of
the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (brackets omitted)
(quoting *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th
Cir. 2004)).  Thus, a plaintiff that "has presented evidence that it was
denied a zoning permit because it cares for and/or associates with
individuals who have disabilities . . . has standing to bring . . . suit on its
own behalf." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th
Cir. 2002).

[23] Both this court and California courts assess FEHA standing under
FHA standards.  *See, e.g.*, *Sisemore v. Master Fin., Inc.*, 151 Cal. App.
4th 1386, 1424–26 (2007) (applying FHA standing analysis to FEHA
claims); *Walker*, 272 F.3d at 1124–25 (Plaintiff had standing under
FEHA because it had standing under the FHA).

were aggrieved by the zoning policies.  That every resident may not have been disabled does not mean Appellants were not aggrieved by discrimination against the disabled. Appellants should not have been required to prove the actual disability of their residents, in "a case-by-case manner," to meet the actual disability prong for their sober living homes. *Toyota Motor Mfg.*, 534 U.S. at 198.

Appellants' sober living homes and other dwellings intended for occupancy by persons recovering from alcoholism and drug addiction are protected from illegal discrimination against the disabled without the need for Appellants to present individualized evidence of the "actual disability" of their residents.  The district court therefore applied the incorrect legal standard in both actions when it concluded that Appellants could not establish "actual disability" because they failed to present evidence of their residents' disability status.

The panel finds persuasive the United States' amicus brief, which argues that sober living homes need not provide individualized evidence of their residents' disabilities to establish a cause of action for disability discrimination under the FHA or the ADA.  Under the FHA, as the United States argued, state and local governments are prohibited from discriminating *on the basis of disability* through zoning and land use practices.  *See Pac. Shores Props.*, 730 F.3d at 1157.  In discussing amendments to the FHA, the House Judiciary Committee explained that the FHA ban "is intended to prohibit the application of special requirements through . . . conditional or special use permits that have the effect of limiting the ability of [people with disabilities] to live in the residence of their choice in the community." H.R. Rep. No. 100-711, at 24 (1988).  And Title II of the ADA prohibits local governments from enacting zoning laws that

discriminate based on disability.  *See Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir. 1999).[24]

We now hold that Appellants and other sober living home operators can satisfy the "actual disability" prong *on a collective basis* by demonstrating that they serve or intend to serve individuals with actual disabilities.  As discussed above, Appellants need not provide individualized evidence of the "actual disability" of their residents.  Rather, they can meet their burden by proffering admissible evidence that they have policies and procedures to ensure that they serve or will serve those with actual disabilities and that they adhere or will adhere to such policies and procedures.  We have held that plaintiffs may establish an actual disability through non-medical evidence.  *See Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 858–59 (9th Cir. 2009) ("At the summary judgment stage, 'precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity. . . . Rather, . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact.'" (alterations in original) (citation omitted)).[25]  Indeed, the City conceded at oral argument that

[24] As the United States aptly pointed out, the City's argument, taken to its logical conclusion, would preclude the owner or operator of *any* proposed facility from surviving summary judgment.  By definition, a *proposed* facility has no residents.  So no matter how egregious the zoning discrimination, under the City's standard requiring individualized proof of disability, no suit by the owner or operator of a proposed home for people with disabilities would survive summary judgment.

[25] When a plaintiff is an organization that serves the disabled, rather than a person who is disabled, there is no reason similar evidence should not suffice, at least at the summary judgment stage.

new homes could satisfy the actual disability standard using this type of evidence, i.e., evidence of policies and procedures that the group home has a zero-tolerance policy, produced through declarations of individuals related to the group home. Oral Arg. at 29:45–30:30. There is no reason to hold existing homes to a higher standard.

Thus, Appellants can prove the "actual disability" of their current residents and any residents they seek to serve in the future through admissions criteria and house rules, testimony by employees and current residents, and testimony by former residents.[26] Because the district court applied an incorrect standard, it failed to consider evidence in the record that might support a finding that Appellants served or intended to serve individuals with "actual disabilities."

First, Appellants could show their residents were "actually disabled" and their future residents would be "actually disabled" using admissions criteria and house rules. We have stated that "[p]articipation in a supervised drug rehabilitation program, coupled with non-use, meets the definition of handicapped," under the FHA. *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 804 (9th Cir. 1994) (citing 42 U.S.C. § 3602(h) and *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 922 (4th Cir. 1992)). Other circuits have reached the same conclusion. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown* ("*RECAP*"), 294 F.3d 35, 47–48 (2d Cir. 2002) (holding that a group home's admissions policies demonstrated that "[a]ll of the halfway house's residents must be substantially

---

[26] This list is not exclusive, and Appellants could provide other types of evidence demonstrating "actual disability."

impaired in a major life activity to continue residing there"); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir. 2002) (holding methadone clinic's admissions policy supported a finding that individual clients were disabled); *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1010 (3d Cir. 1995) (observing that "no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care").

Appellants provided this type of evidence to the district court in each action. RAW provided its house rules and requirements for living in its homes, including its drug testing requirements, to the City. RAW requires residents to attend a twelve-step program or a "peer recovery group," such as Narcotics Anonymous. Further, "RAW drug tests the residents to ensure they are not currently using drugs, two to three times per week, administered by the house manager." RAW also submitted evidence in its use-permit application that drug use is prohibited at all its properties.[27] Finally, RAW stated in its reasonable accommodation request that its residents are "individuals in recovery from alcoholism and substance abuse . . . who cannot live independently without the fear or threat of relapse into active alcoholism and substance abuse."[28] The district court did

---

[27] RAW submitted the permit application, including its house rules, relapse policy, and intake paperwork, as well as its reasonable accommodation application, as exhibits in its compendium of evidence filed with its memorandum in opposition to the City's motion for summary judgment.

[28] This statement is corroborated by deposition testimony, taken under oath, from RAW personnel, and by the public comments of former

not reach the City's evidentiary objections under Federal Rule of Civil Procedure 56(c). We express no view on whether RAW's proffered evidence complied with this rule.[29]

SoCal says that it houses only persons in recovery who are considered disabled under federal and state laws. SoCal proffers evidence of a zero drug and alcohol tolerance policy, says that it demands mandatory involvement in recovery programs, performs randomized drug tests, and requires residents to leave if they relapse. The district court could have relied on admissions criteria that satisfied Rule 56(c) and other relevant evidence to find, in the light most favorable to SoCal, that SoCal's residents are in recovery from alcohol or drug addiction. *See RECAP*, 294 F.3d at 47.

Courts may also consider employee testimony when determining whether a sober living facility houses people with actual disabilities. *See MX Grp.*, 293 F.3d at 331, 337. One RAW employee testified on personal knowledge that the residents stay at the sober living home "until they're about a year sober," after which they're able to "reintegrate[] back into society." RAW's owner testified in his deposition that when a resident's "mother called concerned" that her son had relapsed, the management of the sober living home "confronted him," and when "he admitted to drinking," the owner referred him to detox. He testified that most residents are referred to RAW's homes from treatment centers, where

residents at a City Planning Commission meeting regarding RAW's permit applications.

[29] We similarly express no view regarding whether Appellants' other proffered evidence satisfied Rule 56(c).

they had resided for 30 to 90 days (after spending one to two weeks in detox). SoCal provided evidence that none of its current residents were currently using drugs based on the personal knowledge deposition testimony of three staff members who testified that: residents move into a SoCal residence after completing a 30-, 60-, or 90-day rehab program; the average resident stays for six to eight months; residents are required to stay sober; the sobriety requirement is enforced via regular drug and alcohol testing; and if residents break their sobriety, they are immediately sent back to rehab.

Finally, the operators of sober living homes can show residents' disability with former resident testimony. At a public hearing for RAW's permit applications, a former resident of a RAW facility who was "in recovery" stated that RAW "helped [him] put [his] life back together" after he arrived there "broken," having "lost everything that had mattered to [him—] job, house, family." This statement could show that his addiction substantially limited his ability to work, maintain housing, and maintain relationships under FEHA's definition of disability. *See RECAP*, 294 F.3d at 47; Cal. Gov't Code §§ 12955.3, 12926(j), (m). The former resident also spoke about how he and his roommates "had a target on [their] backs and . . . wanted to show [this] communit[y] that [they] could be a part of it." A former SoCal resident testified that without sober living, he was certain he would relapse. It was therefore "really important for [him] to be [around] other people who [had] the same mindset or the same goals." He testified that when he was using drugs, he could not hold down a job or have a normal life, and was at constant risk of overdosing.

In both actions. the district court applied the wrong legal standard to determine whether SoCal and RAW met their

burden of demonstrating a triable issue of fact as to whether
their residents were "actually disabled" under the ADA or
FHA. The court unnecessarily limited its inquiry to
individualized medical evidence of the disability of current
residents, which Appellants chose not to provide.[30] Instead,
the court ought to have considered all the relevant evidence
complying with Rule 56(c) and showing that Appellants
served and intended to serve individuals with actual
disabilities. We therefore reverse the grant of summary
judgment and remand for the district court to evaluate the
evidence in accord with Rule 56(c) and to apply the
appropriate legal standards.[31]

### C. "Regarded As" Disabled

"In 2008, Congress enacted the [ADAAA], which
broadened the definition of disability under the [ADA]."
*Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 430 (9th Cir.
2018). "An individual meets the requirement of 'being
regarded as having such an impairment' if the individual
establishes that he or she has been subjected to an action
prohibited under this chapter because of an actual or
perceived physical or mental impairment." 42 U.S.C. §
12102(3)(A). After the ADA was amended, Appellants no
longer needed to show that the City subjectively believed

[30] We do not reach whether Appellants' refusal to produce records or
other information (whether as requested or redacted) was justified or
appropriate.

[31] If Appellants can proceed past summary judgment, they need to prove,
among other things, discrimination on the merits of their disparate
treatment, disparate impact, or reasonable accommodation claims. *See
Budnick v. Town of Carefree*, 518 F.3d 1109, 1114–19 (9th Cir. 2008)
(providing the elements of each claim). The merits of these claims were
not at issue before the district court and are not at issue on appeal.

that Appellants (or those they served) were substantially limited in a major life activity or disabled, in order to meet the "regarded as" prong of the disability definition. *See Nunies*, 908 F.3d at 434; *see also* 28 C.F.R. § 35.108(f)(1) (providing that the "regarded as" prong does not require showing that "the public entity" perceived the "actual or perceived impairment" as substantially limiting a major life activity). To establish disability under the "regarded as disabled" prong, Appellants need to show that the City perceived their "clients as being disabled and discriminated against them on that basis." *MX Grp.*, 293 F.3d at 340. The analysis turns on how an individual is perceived by others. *See* 42 U.S.C. § 12102(1)(C); 24 C.F.R. § 100.201(d); 28 C.F.R. § 35.108(f)(1). This question is fact-dependent and is adjudicated on a case-by-case basis.

Here, the district court erred by applying the pre-ADAAA standard. As Appellants and the United States argue, Appellants need not show that the City subjectively believed that all the residents (or even some specific residents) of Appellants' sober living homes were disabled. The district court's holding to the contrary is error.

Sober living homes, by the City's own definition, serve people with disabilities: "Sober living home[s]" are "group home[s] for persons who are recovering from a drug and/or alcohol addiction and *who are considered handicapped under state or federal law.*" Costa Mesa, Cal., Mun. Code § 13-6 (emphasis added). This is evidence that the district court must consider in deciding whether there is a triable issue of fact as to whether the City regarded the residents (or potential residents) of the sober living homes as disabled or handicapped, as the terms are used in the FHA and the ADA.

There is additional evidence that the district court must

also consider, if the district court finds it presented in accord with Rule 56(c). First, language in the permit denial letters and resolutions concerning whether the City regarded Appellants as serving people with disabilities in their sober living homes. For example, the Development Director's initial denial of RAW's reasonable accommodation requests stated: "I accept for purposes of your request that you are making this request on behalf of individuals who are considered disabled under state and federal law." Similarly, the Planning Commission stated that RAW "currently operates a sober living facility" at each Jeffrey Drive location and the Knox Street home. The Planning Commission was concerned that granting the permit for the Jeffrey Drive homes would have been "materially detrimental to other properties within the area," "to the health, safety and general welfare of the public," and "to the residential character of the City's neighborhoods" because "[t]he operation of a group home on contiguous parcels would result in the overconcentration of such facilities in [the] neighborhood." The City Council's resolution denying the permit for the Knox Street location found that "[t]he facility will contribute to the overconcentration of drug and alcohol treatment facilities and sober living homes in this neighborhood, which could lead to negative impacts in the neighborhood." The Planning Commission also rejected SoCal's permit applications for its Cecil, Hudson, and 21st Street residences through formal resolutions, each of which made a formal finding that the residence *was* a "sober living home" as defined by statute. To the extent this evidence is admissible, the City's recognition of Appellants' facilities as "sober living homes" seems to admit under the City's own definition that residents are "considered handicapped under state or federal law." Costa Mesa, Cal., Mun. Code § 13-6.

Further, the City cited and fined Appellants for operating sober living homes without approval. The City issued notices of violation to all three of SoCal's homes on the grounds that they were "sober living homes" operating without a permit. SoCal also received citations for violating the Ordinances. The City filed an abatement action against SoCal on the ground that it was operating a "sober living home" without a permit at the Hudson Street property. In its abatement complaint, the City repeatedly alleged that the Hudson Street residence was a "sober living group home." The City issued citations to RAW's residences for "operation of a sober living / group home without [City] approval," and sued RAW in state court to enjoin and abate "operation of an unlawful sober living group home." The state trial judge found that RAW was "operating a sober living home" or "allowing the operation of a sober living home" at its Knox Street location.**[32]**

On summary judgment, the district court can also consider appropriate evidence as to whether the City's actions were based on unfounded fears and stereotypes, since the "regarded as" prong concerns how people with disabilities are perceived by others. *See* 42 U.S.C. § 12102(1)(C); 24 C.F.R. § 100.201(d); 28 C.F.R. § 35.108(f)(1). Here, the City may have been influenced by the way others wrote and spoke about those with disabilities at public hearings. Congress added the "regarded as" prong because of its concern that "society's accumulated myths

**[32]** We may take judicial notice of the state court's findings in the abatement action, as a matter of public record that is not subject to reasonable dispute. *See Csutoras v. Paradise High Sch.*, 12 F.4th 960, 964 n.3 (9th Cir. 2021); *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 954 n.3 (9th Cir. 2011).

and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 50 (2d Cir. 2015) (cleaned up) (quoting *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 284 (1987)).  The oral testimony given at public hearings and written statements submitted to the City by residents opposing the permit applications for Appellants' sober living homes reflect stereotypes about the homes' residents.  Some described the residents of sober living homes as "capable of mayhem and violence," and as the cause of "[c]rime and homelessness." One person shared that single women are "uncomfortable" with residents of a sober living home residing so close to their homes.  The City referenced some of these stereotypes in its decisions denying Appellants' permit applications. The Sixth Circuit, *see MX Grp.*, 293 F.3d at 342, and the Fourth Circuit, *see S. Mgmt. Corp.*, 955 F.2d at 919, decided that this type of public speech about sober living home residents was evidence that the government regarded the population under discussion as disabled.  We agree that this type of evidence, if appropriately presented and to the extent it appears in the City Council's stated reasons for adopting the Ordinances or denying permits and reasonable accommodation requests, should be considered in the "regarded as disabled" analysis.

This type of evidence, if it can be considered under Rule 56(c), should have been examined by the district court in analyzing whether, in the light most favorable to Appellants, the City regarded Appellants' residents as disabled.  We therefore reverse each district court decision and remand for the court to consider whether Appellants established a genuine dispute of material fact on this prong.

## IV. CONCLUSION

For the reasons stated above, we **REVERSE** and **REMAND** to the district court.  In each action, the district court erred by finding that an individualized assessment of resident disability was necessary under the "actually disabled" prong of the disability definition, and that Appellants must prove the City's "subjective belief" that their residents were disabled under the "regarded as" prong. In the context of zoning discrimination against a home that aims to serve people with disabilities, we hold that courts must look at the evidence showing that the home serves or intends to serve individuals with actual disabilities *on a collective basis*, including the home's policies and the standards the municipality uses to evaluate the residence. Appellants provided the district court with evidence of (1) admissions criteria and house rules, (2) employee and former resident testimony, (3) public fears and stereotypes of their residents that may have influenced the City's perception, and (4) the actual content of City ordinances, denial letters, resolutions, citations, and abatement actions that acknowledged the residents in Appellants' homes were disabled.   This type of evidence, if it satisfied the requirements of Rule 56(c), should have been considered by the district court in evaluating whether Appellants established triable issues of fact under either or both of the "actually disabled" or "regarded as disabled" prongs.  We reverse each of the district court's grants of summary judgment and remand for the court to consider whether the record contains evidence sufficient to establish a genuine dispute of material fact on the "actually disabled" or

"regarded as disabled" prongs of the disability definition.[33]

**REVERSED AND REMANDED.**

---

[33] In light of this disposition and given the City's concession at oral argument, we also vacate and remand the awards of attorneys' fees and costs, without prejudice. *See Green v. Mercy Hous., Inc.*, 991 F.3d 1056, 1057–58 (9th Cir. 2021); *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012).



December 2022

# GROUP HOME TECHNICAL ADVISORY

## CA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

### DIVISION OF HOUSING POLICY DEVELOPMENT



# TABLE OF CONTENTS

1.  Executive Summary                                                                    1

2.  Terms Used                                                                           5

3.  Background                                                                           6

4.  Framework for Assessing if Local Land Use Policies and Practices Comply with
State Housing Laws' Protections of Group Homes                                           8

    A.   Do the Policies and Practices Comply with Housing Element Law and AFFH
    Requirements?                                                                        9

    B.   Do the Policies and Practices Unlawfully Discriminate Based on Disability or
    Other Protected Characteristics?                                                     12

         i.    Intentional Discrimination                                                14

         ii.   Discriminatory Effects                                                    17

         iii.  Reasonable Accommodations                                                 18

5.  Supportive Housing and Transitional Housing Requirements                             20

6.  State Law Provides Broader Protections Than Federal Law                              22

7.  Common Issues In Local Ordinances That Regulate Group Homes                          23

    A.   Definitions of Single Housekeeping Units or Single-Family Homes                 24

    B.   Requirements that All Group Homes with More than Six Residents Must
    Obtain Permits to Locate in Single-Family Zones                                      25

    C.   Retroactive Compliance                                                          27

    D.   Spacing Requirements                                                            27

    E.   Occupancy Limits and Building, Fire, or Other Health and Safety Code
    Requirements                                                                         30

    F.   Requirements For Operators and Residents                                        30

    G.   Civil Actions for Operating Without a Required State License                    33

    H.   Enforcing Generally Applicable Municipal Codes and Other Laws                   36

8.  Resource Materials and State Contacts                                                36

# 1. EXECUTIVE SUMMARY

Group homes are an especially important type of housing for persons with disabilities. By supporting their residents' individualized needs while providing flexible and affordable housing options, group homes help persons with disabilities live in deinstitutionalized settings that facilitate their integration into local communities.

In recent years, some local governments have amended their zoning ordinances to add new regulations for group homes, particularly for recovery residences—group homes that provide housing for persons recovering from alcoholism or drug addiction. These amendments have raised concerns that local governments are not complying with their affirmative obligations under state planning and zoning laws to promote more inclusive communities and affirmatively further fair housing (AFFH). These amendments have also generated disputes and confusion over whether local governments are violating fair housing laws by discriminating against persons with disabilities or other protected characteristics.

Among other concerns, local land use policies and practices can block new group homes from opening, force existing ones to close, and impose costs, legal fees, and administrative burdens that make it difficult for group homes to operate. These concerns arise in the context of a shortage of adequate housing for persons with disabilities, which is a particularly acute problem within California's broader housing crisis.

With concerns, disputes, and confusion continuing to grow, this Group Home Technical Advisory (Group Home TA) provides guidance on how state planning and zoning and fair housing laws apply when local governments attempt to regulate group homes through land use policies and practices. It is designed to help local governments comply with their obligations under these state laws, including, for example, the Planning and Zoning Law,[1] Housing Element Law,[2] AFFH provisions,[3] Anti-Discrimination in Land Use Law,[4] and the Fair Employment and Housing Act (FEHA)[5] (collectively, state housing laws).

The California Department of Housing and Community Development (HCD) is issuing the Group Home TA under its authority to provide guidance about housing law and

---

[1] Gov. Code, § 65000 et seq.

[2] Gov. Code, §§ 65580 - 65589.11.

[3] See, e.g., Gov. Code, §§ 8899.50, 65583, subds. (c)(5),(10).

[4] Gov. Code, § 65008.

[5] Gov. Code, § 12900 et seq.

policy.[6] The primary intended users are local planning agencies and their staff, but group home operators, advocates, and residents may also benefit from this information.

 **Contents**

- **Background information about group homes** and the essential role they play in providing housing for persons with disabilities (pp. 6-8);

- **General guidance about overall state housing law standards** that (1) require local governments to remove constraints on group homes and affirmatively support them, and (2) prohibit local land use policies and practices that discriminate against group home owners, operators, and residents (pp. 8-23);

- **Specific guidance about how these standards apply to common issues** that arise when local governments attempt to regulate group homes through local land use policies and practices (pp. 23-36);

- **Lists of state government resource materials and contacts** (pp. 36-37).

**Policy Guidance Summary**

The Group Home TA's guidance for how local governments can comply with state housing laws regarding group homes includes the following:

- **Housing Element Law and AFFH.** Assess whether a policy or practice complies with Housing Element Law and AFFH requirements to avoid constraining housing for persons with disabilities and to affirmatively support this housing and its residents' fair housing choices (pp. 8-12). Consider the Group Home TA's examples of specific questions to guide local governments' analysis of these issues (pp.11-12).

- **Discriminatory Purpose or Effect.** Ensure that the policy or practice does not discriminate on the basis of disability or other characteristics protected by state law. Apply the Group Home TA's analysis on how to determine if a policy or practice has a discriminatory purpose or effect and how to implement flexible reasonable accommodation procedures that promptly and efficiently resolve accommodation requests in compliance with state housing laws and regulations. (pp. 12-20).

---

[6] See, e.g., Health & Saf. Code, §§ 50152, 50406, subds. (e), (n), 50456, subd. (a), 50459, subd. (a); Gov. Code, § 65585, subd. (a). The Group Home TA is intended to provide general informational guidance only. It does not constitute legal advice.

- **Supportive and Transitional Housing.** Comply with the specific protections for group homes that fall within the definitions of supportive or transitional housing (pp. 20-22).

- **State and Federal Law Distinctions.** Confirm that a policy or practice complies with state housing laws even if it complies with federal law, because California law provides broader and different protections than federal law (pp. 22-23).

- **Definition of Single-Family Residence**. Avoid restrictive definitions of single housekeeping units or single-family homes that impermissibly constrain group homes from locating in single-family zones. This includes, for example, avoiding definitions that equate group homes with boardinghouses, require all residents to share a common deed or lease, overly scrutinize residents' living arrangements, or automatically exclude group homes that are owned by for-profit businesses or pay staff to help manage a home's operations (pp. 24-25).

- **Group Homes that Do Not Provide Licensable Services.** Allow group homes that operate as single-family residences and that do not provide licensable services to locate in single-family neighborhoods, subject only to the generally applicable, nondiscriminatory health, safety, and zoning laws that apply to all single-family residences (pp. 25-26).

- **Group Homes that Provide Licensable Services to Six or Fewer Residents.** Allow group homes that operate as single-family residences and that provide licensable services to six or fewer residents to locate in single-family neighborhoods, subject only to the generally applicable, nondiscriminatory health, safety, and zoning laws that apply to all single-family residences (pp. 25-26).

- **Group Homes that Provide Licensable Services to Seven or More Residents.** Ensure that any permitting or approval requirements for group homes that provide licensable services to seven or more residents are consistent with state housing laws (pp. 25-26).

- **Preexisting Nonconforming Uses.** Avoid retroactively applying a new zoning provision to group homes that were already operating before the provision was enacted (p. 27).

- **Spacing Requirements.** Avoid requirements for minimum spacing between group homes that go beyond those the Legislature has specified for limited types of licensed facilities and that conflict with state housing laws (pp. 27-29).

- **Occupancy Limits and Building, Fire, or Other Health and Safety Code Requirements.** Apply the same, generally applicable, nondiscriminatory occupancy limits and other building, fire, health, and safety requirements to group homes that apply to other housing, subject to reasonable accommodation requirements or the Legislature's requirements for specific types of licensed facilities, such as those serving persons with limited mobility (p. 29).

- **Other Requirements for Group Home Operators and Residents.** Avoid the other examples of special requirements for operators and residents discussed that can overly constrain group homes, conflict with the duty to affirmatively support this housing, and discriminate on the basis of disability and other protected characteristics. Examples discussed include, among other things, parking requirements, restrictions on residents or staff, neighborhood notice requirements, and local law enforcement registration requirements (pp. 30-33).

- **State Administrative Procedures for Investigating Licensing Issues.** Use the Department of Health Care Services (DHCS) or California Department of Social Services (CDSS) processes for investigating and resolving complaints that unlicensed group homes are providing services that require licenses from these departments (pp. 33-35).

- **Public Nuisance and Other Code Enforcement Actions.** Use generally applicable, nondiscriminatory laws and code enforcement procedures to investigate and, if appropriate, prosecute group home operators that are creating public nuisances; violating building, housing, fire, or other public health and safety codes; committing fraud; or engaging in other unlawful activities (p. 36).

This summary and the Group Home TA are not intended as all-inclusive guides to every issue that might arise when local governments attempt to regulate group homes. But by following the Group Home TA's framework and considering how it applies to the examples of common issues, local governments can ensure that their land use policies and practices comply with state housing laws.

**Conclusion**

Local governments that follow the Group Home TA's guidance can still address concerns about group homeowners or operators that mistreat or abuse their residents, engage in insurance fraud or other illegal practices, or operate their homes in unsafe manners or in ways that create public nuisances. But research has shown that these problems are limited to a small minority of group homes, with the majority of group homes being well managed and operating compatibly with their surrounding neighborhoods, while providing essential housing resources. Focusing on individual

group homes that are problematic is more consistent with state law and helps avoid adopting overly broad and constraining zoning regulations for all group homes.

## 2. TERMS USED

Different laws use the term "group homes" to refer to different types of housing for different populations covered by different regulatory schemes. The following terms refer to various types of residences in which unrelated persons share the residence:

- **Shared Living Residences**—any housing shared by unrelated persons, including, for example, group homes, recovery residences, some community care residential facilities, some supportive and transitional housing, emergency shelters, boardinghouses, dormitories, etc.

- **Group Homes**—housing shared by unrelated persons with disabilities that provide peer and other support for their residents' disability related needs and in which residents share cooking, dining, and living areas, and may, in some group homes, participate in cooking, housekeeping, and other communal living activities.

- **Licensed Group Homes**—group homes that provide services that require licenses under state law.

- **Unlicensed Group Homes**—group homes that may provide some supportive services for their residents but not services that require licenses under state law.

- **Recovery Residences** or **Sober Living Homes**—group homes for persons recovering from alcoholism or drug addiction in which the residents mutually support each other's recovery and sobriety and that do not require licenses from DHCS because they do not provide alcoholism or drug addiction recovery and treatment services.

- **Alcohol or Other Drug (AOD) Facilities**—residential facilities that must obtain licenses from DHCS because they provide alcoholism or drug addiction recovery and treatment services.[7]

---

[7] See, e.g., Health & Saf. Code, § 11834.02.

- **Community Care Residential Facilities**—residential facilities that must obtain licenses from CDSS because they provide 24-hour nonmedical care and supervision for adults or children.[8]

## 3. BACKGROUND

Among the many reasons that group homes are essential housing for persons with disabilities is the support these homes provide for their residents' individualized, disability-related needs. This includes the peer support that group homes encourage their residents to provide to each other when sharing a home, as well as the services these homes can provide. These services range from basic support for independent living to more intensive care and supervision services that require state licenses. By providing peer support, services, or both, group homes help their residents live in deinstitutionalized settings and integrate into local communities. For these and other reasons, as the California Legislature has recognized, "'persons with disabilities . . . are significantly more likely than other persons to live with unrelated persons in group [homes].'"[9]

Because group homes are such important housing resources for persons with disabilities, state law not only protects them from discriminatory land use policies and practices, it mandates that local governments affirmatively support group homes locating in their communities.[10] Federal law also protects group homes, leading courts across the country to conclude that "'encourag[ing] and support[ing] handicapped persons' right to live in a group home in the community of their choice'" is "'the public policy of the United States.'"[11]

The communities of choice for many group homes are often single-family neighborhoods. Recovery residences, for example, often locate in single-family

---

[8] See, e.g., Health & Saf. Code, §§ 1502, 1568.01, 1569.2, subds. (o)-(p).
[9] *Broadmoor San Clemente Homeowners Ass'n v. Nelson*, (1994) 25 Cal.App.4th 1, 6, quoting Stats. 1993, ch. 1277, § 18; 12 West Cal.Legis.Services, p. 6038.
[10] See, e.g., Gov. Code, §§ 8899.50, 65583, subds. (a)(1), (a)(7), (c)(10).
[11] *Broadmoor*, 25 Cal.App.4th at 9, quoting *Rhodes v. Palmetto Pathway Homes, Inc.* (South Carolina 1991) 303 S.C. 308, 400 S.E.2d 484, 486.

neighborhoods because this helps "'recovering addicts' reintegration into society and redevelopment of self-sufficiency."[12]

But "for every group home that is successfully established, experts estimate that another closes or never opens because of community opposition."[13] The legislative history of the Fair Employment and  Housing Act (FEHA), Government Code section 12900 et seq., and federal Fair Housing Act ("FHA"), 42 U.S.C. section 3601 et seq., show that the Legislature and Congress considered local governments' longstanding practices of using land use ordinances to exclude group homes when amending these civil rights laws to protect housing for persons with disabilities.[14]

Local opposition to group homes is often based on fears that they will disrupt neighborhoods, increase crime rates or drug use, generate excessive traffic and parking, or lower property values. But numerous studies, representing decades of research, have found that fears like these are unfounded.[15] In fact, studies have shown that group homes are often the best maintained properties on their blocks and function so much like other homes "that most neighbors within one to two blocks . . . do not even know that a group home . . . is nearby."[16]

This is not to minimize very real problems that have arisen at some group homes. In particular, some local governments have raised concerns based on problems at some recovery residences operated by unscrupulous owners seeking to maximize their profits

[12] Laurie C. Malkin, *Troubles at the Doorstep: The Fair Housing Amendments Act of 1988 and Group Homes for Recovering Substance Abusers* (1995) 144 U. Pa. L. Rev. 757, 772-73 & nn. 55-60; *Oxford House, Inc. v. Township of Cherry Hill* ("*Cherry Hill*") (D. New Jersey 1992) 799 F.Supp. 450, 453.

[13] Malkin, *supra*, n. 12 at 795 & n. 171.

[14] See, e.g., *Broadmoor*, *supra*, 25 Cal. App. 4th at 6, quoting Stats.1993, ch. 1277, § 18; 12 West Cal.Legis.Services, p. 6038; H.R. Rep. 100-711, 23-24, reprinted in 1988 U.S.C.C.A.N. 2173, 2184-2185.

[15] See, e.g., Malkin, *supra*, n. 12 at 797-798 & nn. 181-184; Council of Planning Librarians, *There Goes the Neighborhood - A Summary of Studies Addressing the Most Often Expressed Fears about the Effects Of Group Homes on Neighborhoods in which They Are Placed* (Bibliography No. 259) (Apr. 1990); Senate Comm. on Health Analysis of SB 786, Feb. 17, 2017 at 3, 5.

[16] Daniel Lauber, *A Real LULU: Zoning for Group Homes and Halfway Houses Under The Fair Housing Amendments Act of 1988* (Winter 1996) 29 J. Marshall L. Rev. 369, 384-385 & n. 50-52.

at the expense of their residents' wellbeing. These problems have included neglecting and abusing residents, engaging in insurance fraud, and creating public nuisances.[17]

While these are very real concerns, the examples of exploitive, abusive, and illegal practices appear to be limited to a small minority of recovery residences.[18] Moreover, in contrast to laws specially designed to address fraud, violations of state licensing laws, or health and safety violations and public nuisances, local land use policies are often too blunt and too broadly sweeping for properly addressing these problems. They risk continuing the history of discrimination against group homes by doing more to constrain and exclude well-functioning ones than they do to abate problems at dysfunctional ones.

Before local governments amend their zoning ordinances to regulate group homes, they should first determine if the proposed amendments will comply with state housing laws. They should apply the Group Home TA's framework and consider its examples of common issues that arise when local governments attempt to use land use laws to regulate group homes.

## 4. FRAMEWORK FOR ASSESSING IF LOCAL LAND USE POLICIES AND PRACTICES COMPLY WITH STATE HOUSING LAWS' PROTECTIONS OF GROUP HOMES

Confirming that local land use policies and practices for group homes comply with state housing laws involves assessing whether they comply with requirements for local governments to affirmatively support this housing in their communities and whether they discriminate on the basis of disability or other protected characteristics. Both assessments are necessary to confirm that a local land use policy or practice complies with state housing laws. Although the Group Home TA discusses Housing Element Law

---

[17] See, e.g., Samantha Schmidt, *Drug Rehab 'Mogul' Convicted of Sexually Assaulting 7 Female Patients at Treatment Centers*, Washington Post, Feb. 27, 2018, https://www.washingtonpost.com/news/morning-mix/wp/2018/02/27/drug-rehab-mogul-convicted-of-sexually-assaulting-7-female-patients-at-treatment-centers/; Danielle L. Liberman, Current Development, *Not Too Sunny in the Sunshine State: The Need to Improve Florida's Opioid Abuse Treatment Centers to Combat the National Public Health Crisis*, 31 Geo. J. Legal Ethics 723, 735-738 (2018).

[18] See, e.g., Government Accounting Office, *Report to Congressional Requesters: Substance Use Disorder – Information on Recovery Housing Prevalence, Selected States' Oversight, and Funding* ("*GAO Report*") (March 2018) at 7-9 & n.18, available at https://www.gao.gov/assets/gao-18-315.pdf; see also studies cited *supra*, nn. 15-16.

and AFFH requirements before fair housing laws, local governments can assess their compliance with these laws in any order.

## A. DO THE POLICIES AND PRACTICES COMPLY WITH HOUSING ELEMENT LAW AND AFFH REQUIREMENTS?

California law has long promoted more inclusive communities, such as by requiring local governments to protect and promote housing for persons with special needs, including, among others, lower income households and persons with disabilities or who have experienced homelessness.[19] Housing Element Law requires local governments to analyze the special housing needs of these populations and develop policies and programs to address those needs.[20]

As of January 1, 2019, AB 686 built upon these existing obligations to broadly require all state or local governments involved in programs or activities related to housing or community development to affirmatively further fair housing and take no actions inconsistent with this requirement.[21] The Legislature defined AFFH, to mean:

> taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws.[22]

In AB 686, the Legislature also amended Housing Element Law to include new, specific AFFH requirements starting in 2021 for local governments when they prepare and implement housing elements. These requirements include, for example, identifying and addressing fair housing issues; analyzing integration and segregation patterns;

---

[19] See, e.g., Gov. Code, § 65583, subds. (a)(1), (a)(7); Housing Elements Building Blocks, available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks.

[20] See, e.g., Gov. Code, § 65583, subds. (a)(7), (c).

[21] Gov. Code, § 8899.50, subd. (a)(2).

[22] *Id.* at (a)(1).

analyzing patterns and trends of disparate housing needs and disproportionate access to housing opportunities; and setting specific goals, adopting responsive policies, and taking effective actions that will affirmatively further fair housing.[23]

Taken together, the earlier Housing Element Law provisions and the newer AFFH requirements clarify local governments' affirmative responsibilities regarding group homes. As the historical record and California and federal legislative histories confirm, local land use laws have too often treated group homes as problems to be avoided or restricted. Local governments' obligations under state law have been misunderstood as being limited to avoiding discrimination and meeting a minimum threshold for fulfilling the locality's share of regional housing needs for persons with disabilities.

But local governments must go beyond these basic requirements by actively supporting the inclusion of group homes in their communities and removing constraints on this housing. This includes, for example, supporting the housing choices of individuals with protected characteristics.[24] Persons with disabilities have the right to live in accessible housing in the most integrated setting appropriate to their needs, which includes having access to disability-related support and services that individuals need to live in deinstitutionalized settings.[25] Local governments must also avoid policies that unjustifiably displace group home occupants from their homes.[26]

HCD has previously issued guidance about local governments' obligations under older Housing Element Law provisions and the more recently enacted AFFH provisions. These guidance documents are available through links listed under the Planning and Community Development tab on HCD's website.[27] Local governments should read the detailed guidance provided in these documents, which include:

- Affirmatively Furthering Fair Housing: Guidance for All Public Entities and for Housing Elements (April 2021 Update),[28]
- Housing Element Building Blocks,[29]

[23] See, e.g., Gov. Code, § 65583, subd. (c)(10).
[24] See, e.g., Gov. Code, § 65583, subd. (c)(10)(A)(iv); 24 C.F.R § 5.151 (2022).
[25] See, e.g., *Olmstead v. Zimring* (1999) 527 U.S. 581, 602, 607; 24 C.F.R. § 5.151 (2022); 28 C.F.R. § 35.130(d), (e)(1) (2022).
[26] Gov. Code. § 65583, subd. (c)(10)(A)(v).
[27] Available at https://www.hcd.ca.gov/.
[28] Available at http://www.hcd.ca.gov/community-development/affh/docs/AFFH_Document_Final_4-27-2021.pdf.
[29] Available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks.

- Housing Element Building Blocks – Persons with Disabilities,[30] and
- Housing Element Building Blocks – Constraints for People with Disabilities.[31]

HCD's earlier guidance documents discuss in more detail how local governments can assess their compliance with Housing Element Law and AFFH requirements. The following types of questions can help local jurisdictions assess if they are meeting their affirmative obligations to protect and promote the housing rights of persons with disabilities:[32]

- **Has the jurisdiction analyzed the special housing needs of persons with disabilities** by including in this analysis, among other things:
  - o data about the number of persons and households in this group?
  - o quantifiable and qualitative descriptions of their housing needs and descriptions of existing resources or programs for them?
  - o assessments of unmet needs?

- **Has the jurisdiction analyzed and explained how it will meet those needs** by, among other things:
  - o identifying potential programs, policy options, and resources?
  - o discussing local resources and service providers?
  - o identifying housing types that can accommodate persons with disabilities?
  - o developing housing programs or strategies to address identified needs?

- **Has the jurisdiction analyzed and removed constraints on housing for persons with disabilities** by, among other things:
  - o analyzing potential governmental constraints to the development, improvement, and maintenance of housing for persons with disabilities?
  - o examining ordinances, policies, or practices that are unjustifiably having the effect of constraining or excluding housing variety and availability for persons with disabilities?
  - o providing reasonable accommodations for persons with disabilities through programs that remove constraints?
  - o ensuring that its reasonable accommodation procedures comply with state fair housing laws and regulations?
  - o in general, demonstrating local efforts to remove constraints?

---

[30] Available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/people-disabilities-including-developmental-disabilities.
[31] Available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/constraints-people-disabilities.
[32] See, e.g., Gov. Code, §§ 8899.50, 65583, subds. (a)(4), (7), (c)(3), (5), (10).

- **Has the jurisdiction met its AFFH obligations for persons with disabilities** by, among other things:
  - actively supporting their integration into the local community?
  - actively supporting their fair housing rights, including their right to choose where to live and to access housing opportunities with services and support for their disabilities?
  - considering whether policies and practices are displacing persons with disabilities from their homes?
  - examining and redressing segregated living patterns?
  - fostering the integration of persons with disabilities into the community?
  - conducting outreach and education in the community to support the fair housing rights of persons with disabilities?
  - identifying and analyzing any policies or practices that have the purpose or effect of discriminating against persons with disabilities, perpetuating their segregation, or impeding their integration?
  - examining any justifications for policies or practices with discriminatory effects and identifying and implementing less discriminatory alternatives?

- **Has the jurisdiction conducted individualized, evidence- and data-based research and analysis**, including for:
  - any specific benefits that it believes a land use policy or practice regarding group homes will provide to persons with disabilities?
  - any specific health or safety issues that a jurisdiction believes justify land use polices or practices regarding group homes?[33]

## B. Do the Policies and Practices Unlawfully Discriminate Based on Disability or Other Protected Characteristics?

In addition to the laws requiring local governments to affirmatively support group homes, state fair housing laws prohibit jurisdictions from discriminating against them.[34] For example, the Anti-Discrimination in Land Use Law, Government Code section 65008,

---

[33] See, e.g., Cal. Code Regs., tit. 2, §§ 12042, subd. (f), 12179, subd. (b)(3).
[34] Fair housing laws protect group homes. See, e.g., Cal. Code Regs., tit. 2, § 12005, subd. (o); *Lakeside Resort Enterprises, LP v. Board of Sup's of Palmyra Twp*. (3d Cir. 2006) 455 F.3d 154, 159–60. See also *infra* at pp. 22-23 (explaining that while federal fair housing cases can provide important guidance for interpreting state fair housing laws, California's fair housing and disability rights laws provide broader protections than federal laws).

prohibits discriminatory local land use policies and practices and declares any such discriminatory policies or practices null and void.[35] This includes discrimination based on any characteristic protected by the FEHA and other state civil rights laws.[36]

Disability rights protections extend to persons with disabilities, persons regarded or treated as having, or having had, a disability, or persons with a record or history of a disability.[37] Complying with fair housing requirements for individuals with certain types of disabilities, such as individuals with developmental disabilities, will not excuse unlawful discrimination against other individuals with other types of disabilities, such as individuals recovering from alcoholism or drug addiction.[38]

The Anti-Discrimination in Land Use Law also includes protections not specified in the FEHA, such as prohibitions against land use policies and practices that discriminate against housing for "persons or families of very low, low, moderate, or middle income."[39] Therefore, depending on a group home's intended occupants, jurisdictions must consider whether their policies discriminate against not only persons with disabilities, but, for example, very low- or low income households if the residence is designed for persons with disabilities who have experienced homelessness.

State fair housing laws protect not only group homes' occupants, but other persons associated with them or other persons who may be harmed by discriminatory land use policies and practices, such as group homes' operators, owners, and landlords.[40]

---

[35] Gov. Code, § 65008, subds. (a), (b)(1). The FEHA similarly prohibits discriminatory land use policies and practices. Gov. Code, § 12955, subd. (l); Cal. Code Regs., tit. 2, §§ 12161, 12162.  See also Government Code section 11135 (prohibiting discrimination by recipients of state funding or financial assistance).

[36] See, e.g., Gov. Code, §§ 65008, subds. (a)(1)(A), (b)(1)(B)(i), 65583, subd. (c)(5).

[37] Gov. Code, § 12926, subds. (j), (m); 42 U.S.C. § 3602(h); Joint Statement of the Department of Housing and Urban Development and the Department of Justice – State and Local Land Use Laws and Practices and the Application of the Fair Housing Act (Nov. 10, 2016) at 6 ("HUD – DOJ 2016 Jt. Stmt. on Local Land Use Laws"), available at https://www.justice.gov/opa/file/912366/download.

[38] Recovering from alcoholism or drug addiction is a disability protected by fair housing laws. See, e.g., *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803 (9th Cir.1994), aff'd *City of Edmonds v. Oxford House* (1995) 514 U.S. 725; *Cherry Hill*, supra, 799 F.Supp. at 459; HUD – DOJ 2016 Jt. Stmt. on Local Land Use Laws at 6.

[39] Gov. Code, § 65008, subds. (a)(3), (b)(1)(C).

[40] Gov Code § 65008, subds. (a)(1)(A), (b)(1)(B)(ii), incorporating Gov. Code, § 12955, subd. (m).

Identifying and correcting discriminatory land use policies and practices requires understanding three general types of discrimination:

1. intentional discrimination,
2. discriminatory effects, and
3. failure to provide reasonable accommodations.[41]

i. INTENTIONAL DISCRIMINATION

Intentional discrimination includes "an act or failure to act" in which any protected characteristic "is a motivating factor . . . even though other factors may have also motivated the practice."[42] Unlike employment discrimination law, in which plaintiffs must prove that a defendant's action or inaction was substantially motivated by a discriminatory purpose, under fair housing law, a "housing practice" can be found illegal if it "demonstrates an intent to discriminate in any manner."[43]

Intentional discrimination is best understood as purposeful discrimination because it "does not require proof of personal prejudice or animus."[44] Even if local officials are not hostile towards persons with disabilities or act with benign intents to help them, a discriminatory policy or practice can still be unlawful. It is also unlawful for government officials to acquiesce to members of the public's prejudicial views even if the officials themselves do not share those views.[45]

Establishing intentional discrimination often involves evidence that persons with protected characteristics were treated worse than others without those characteristics. But this is only one way to prove discrimination.[46] Intentional discrimination does not require "the existence of a similarly situated entity who or which was treated better . . . ."[47] A local land use policy or practice that "inflicts collateral damage by harming some, or even all, individuals from a favored group in order to successfully

---

[41] Although these are some of the most common, general types of discrimination issues that arise with local land use policies and practices, this is not an exhaustive list. See, e.g., Cal. Code Regs., tit. 2, §§ 12161-62 (listing more detailed examples).

[42] Gov. Code, § 12955.8; *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 217-218; Cal. Code Regs., tit. 2, § 12041, subd. (b).

[43] Gov. Code, § 12955.8.

[44] Cal. Code Regs., tit. 2, § 12041, subd. (b).

[45] Cal. Code Regs., tit. 2, § 12161, subd. (c).

[46] *Pacific Shores Properties, LLC v. City of Newport Beach* (9th Cir. 2013) 730 F.3d 1142, 1158-1159.

[47] *Id*. at 1158.

harm members of a disfavored class does not cleanse the taint of discrimination."[48] Sometimes it "simply underscores the depth of the defendant's" discriminatory intent.[49]

Intentional discrimination can be established through facial discrimination, direct evidence, or circumstantial evidence.

### FACIAL DISCRIMINATION

Facially discriminatory laws or policies explicitly regulate housing or take an adverse action based on a protected characteristic.[50] Local governments can engage in facial discrimination even when a law or policy does not expressly refer to, for example, group homes or persons with disabilities. "Proxy discrimination is a form of facial discrimination" in which a jurisdiction:

> enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group. For example, discriminating against individuals with gray hair is a proxy for age discrimination because the fit between age and gray hair is sufficiently close.[51]

To avoid liability for a law or policy that facially discriminates against persons with disabilities, a local government must show that the policy:

> (1) either (a) actually benefits persons with disabilities or (b) is justified by individualized safety concerns raised by the persons the policy affects, and

> (2) is "the least restrictive means of achieving" one or both of these goals.[52]

---

[48] *Id*. at 1159.
[49] *Id*. See also *id*. at 1158 – 1162 & n. 23.
[50] Cal. Code Regs., tit. 2, § 12040, subd. (c).
[51] *Pacific Shores Properties*, 730 F.3d at 1160 n. 23, internal quotations and citations omitted.
[52] Cal. Code Regs., tit. 2, §§ 12042, subd. (f), 12161, subd. (d); *Larkin v. State of Mich. Dept. of Social Services* (6th Cir. 1996) 89 F.3d 285, 290.

These justifications for facial discrimination are "extremely narrow exception[s]," and jurisdictions should be wary of relying on them.[53] Jurisdictions must support them with at least, if not more than, the specific and thorough analysis and evidence required by Housing Element Law, including its AFFH provisions. Generalized concerns or ones based on stereotypes will not suffice.[54] Jurisdictions should also consider less discriminatory alternatives.[55] And in light of jurisdictions' obligations to "protect existing residents from displacement" and otherwise affirmatively further fair housing, laws or policies that displace group home occupants from their current, chosen residences warrant especially thorough scrutiny.[56]

### DIRECT EVIDENCE

Direct evidence includes written or oral statements showing in themselves that a protected characteristic was a motivating factor in a local jurisdiction's decision. Direct evidence can itself establish a violation. The affirmative defenses for facial discrimination claims do not apply to direct evidence claims.[57]

### CIRCUMSTANTIAL EVIDENCE

Even when policies or statements in themselves do not establish a discriminatory intent, local land use policies and practices can still be found discriminatory based on circumstantial evidence, which can include: (1) the policy's or practice's impact, (2) its historical background, (3) the more recent, specific sequence of events leading up to it, (4) departures from usual procedures, (5) departures from usual substantive standards, and (6) the legislative or administrative history.[58]

---

[53] *Dothard v. Rawlinson* (1977) 433 U.S. 321, 334; *Bangerter v. Orem City Corp.* (10th Cir. 1995) 46 F.3d 1491, 1504; see also *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 31 nn. 7, 8 (explaining that public policy exceptions to Unruh Act's prohibitions of discrimination are "rare" and "should be carefully and narrowly construed").
[54] *Larkin*, 89 F.3d at 291-292 (rigorously examining and rejecting an agency's justifications and evidence for spacing and community notice requirements for group homes in holding that they violate the FHA).
[55] Cal. Code Regs., tit. 2, § 12042, subd. (f).
[56] See, e.g., Gov. Code, § 65583, subds. (c)(10)(A)(iv), (v).
[57] See, e.g., Cal. Code Regs., tit. 2, § 12042, subds. (c)-(e).
[58] HUD – DOJ 2016 Jt. Stmt. on Local Land Use Laws at 4, citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.* (1977) 429 U.S. 252, 265-68.

These factors are not the only ones that may be considered.[59] And "very little evidence" is needed to "raise a genuine issue" of a discriminatory intent.[60] Procedural or substantive departures from AFFH or housing element requirements when regulating group homes would be relevant evidence to consider in assessing if local officials acted for discriminatory purposes.

ii.   DISCRIMINATORY EFFECTS

Even if a local government has not acted with a discriminatory purpose, its land use policies or practices can be found unlawful if they have an unjustified discriminatory effect. A discriminatory effect is generally established through statistical evidence showing that a policy or practice actually or predictably results in a disparate impact on a group of persons with protected characteristics or that it perpetuates segregation.[61]

If a local land use practice is found to have a discriminatory effect, a jurisdiction can avoid liability if it shows there is a legally sufficient justification for its policy or practice.[62] A jurisdiction must establish each of the following:

(1) The practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory purposes;

(2) The practice effectively carries out the identified purpose;

(3) The identified purpose is sufficiently compelling to override the discriminatory effect; and

(4) There is no feasible alternative practice that would equally or better accomplish the identified purpose with a less discriminatory effect.[63]

Generalized or hypothetical analysis of these elements will not suffice. They must be "supported by evidence."[64]

To comply with Housing Element Law, including its AFFH provisions, a jurisdiction should not wait for group home occupants or operators to bring discriminatory effects claims but should research on its own whether its policies or practices have discriminatory effects on these residences. If so, the jurisdiction should also complete

---

[59] *Pacific Shores Properties*, 730 F.3d at 1159.
[60] *Id.*; Gov. Code, § 12955.8; Cal. Code Regs., tit. 2, § 12041, subd. (b).
[61] Cal. Code Regs., tit. 2, § 12060, subd. (b).
[62] Cal. Code Regs., tit. 2, § 12062, subd. (b).
[63] *Id.*
[64] Cal. Code Regs., tit. 2, § 12062, subd. (c).

the evidence-based analysis needed to determine whether there are legally sufficient justifications for these discriminatory policies or practices, including analyzing less discriminatory alternatives.

   iii.   REASONABLE ACCOMMODATIONS

Discrimination can also arise from a jurisdiction failing "to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling."[65] A request for a reasonable accommodation may only be denied if:

> (1) The individual on whose behalf the accommodation was requested is not an individual with a disability;
>
> (2) There is no disability-related need for the requested accommodation (in other words, there is no [connection] between the disability and the requested accommodation);
>
> (3) The requested accommodation would constitute a fundamental alteration of the services or operations of the person who is asked to provide the accommodation.
>
> (4) The requested accommodation would impose an undue financial and administrative burden on the person who is asked to provide the accommodation; or
>
> (5) The requested accommodation would constitute a direct threat to the health or safety of others (i.e., a significant risk of bodily harm) or would cause substantial physical damage to the property of others, and such risks cannot be sufficiently mitigated or eliminated by another reasonable accommodation . . . .[66]

Three common issues, among others, can arise when group home operators or occupants request reasonable accommodations in local land use policies and practices:

1. **While a jurisdiction should adopt a formal reasonable accommodations process so that, among other reasons, the public knows how to request accommodations, these processes should be flexible enough to promptly and efficiently resolve accommodations requests without creating**

[65] Gov. Code, § 12927, subd. (c)(1).
[66] Cal Code Regs., tit. 2, § 12179.

**unnecessary procedural barriers.**[67] These processes should allow group home operators to request reasonable accommodations "at any time . . . while seeking or enjoying a housing opportunity," including, for example, when: (1) considering whether to buy or lease a home; (2) filing a permit application, or (3) responding to allegations they have violated a zoning code or other ordinance.[68] If local governments are repeatedly denying accommodation requests or delaying resolving them, they should analyze whether this is due to the requestors failing to provide sufficient information and support or to procedures erecting impermissible barriers to accommodations.[69]

2. **"'[I]n most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary'" to establish that a person has a disability or that this disability requires a reasonable accommodation in a land use policy or practice.**[70] A reliable third party with knowledge of a person's disabilities can usually provide sufficient information for assessing a request for an accommodation in a local land use policy or practice.[71] For example, it is well established that persons recovering from alcoholism or drug addiction have disabilities and that recovery residences support their recoveries. Thus, information provided by a recovery residence operator, such as its occupancy or other policies, for example, should generally suffice to establish its occupants have disabilities and the justifications for the

---

[67] See, e.g., *id.* at §§ 12176, subd. (c), 12178.
[68] See, e.g., *id.* at § 12176, subd. (f).
[69] See, e.g., *id.* at § 12177; see also these examples of reasonable accommodation ordinances: Oakland Mun. Code, ch. 17.131, available at https://library.municode.com/ca/oakland/codes/planning_code?nodeId=TIT17PL_CH17 .131REACPOPR; Model Ordinance for Providing Reasonable Accommodation Under Federal and State Fair Housing Laws ("Model Reasonable Accommodation Ordinance"), Mental Health Advocacy Services, Inc. (September 2003), available at https://www.hcd.ca.gov/community-development/building-blocks/program-requirements/address-remove-mitigate-constraints/docs/model_reasonable_accomodation_ordinance.pdf.
[70] Supplement to Initial Statement of Reasons for FEHC's Fair Housing Regulations at 26, quoting HUD DOJ May 17, 2004 Joint Statement on Reasonable Accommodations, available at https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2019/07/FairHousingReg-SupplementInitialStatementReasons.pdf.
[71] Cal. Code Regs., tit. 2, § 12178.

requested accommodations, allowing local officials to assess the request without probing into the occupants' private medical records or histories.[72]

3. **Denials of reasonable accommodation requests must be based on individualized assessments, and specific evidence, not generalized or speculative concerns about group homes or persons with disabilities.** The state's fair housing regulations provide specific guidance about the type of evidence required to meet this standard.[73]

## 5. SUPPORTIVE HOUSING AND TRANSITIONAL HOUSING REQUIREMENTS

If a group home operates in ways that fall within the statutory definitions of supportive housing or transitional housing, jurisdictions must also comply with Housing Element Law's specific protections of these types of housing. This section summarizes these protections, which are explained more fully in other HCD guidance documents, including:

- Housing Accountability Act Technical Assistance Advisory (Sep. 15, 2020),[74]
- Housing Element Building Blocks – Zoning for a Variety of Housing Types,[75]
- Senate Bill 2 – Legislation Effective January 1, 2008: Local Planning and Approval for Emergency Shelters and Transitional and Supportive Housing (Apr. 10, 2013 update),[76] and
- Transitional and Supportive Housing, Chapter 183, Statutes of 2013 (SB 745) (Apr. 24, 2014).[77]

---

[72] *Id*; *Regional Economic Community Action Program, Inc. v. City of Middletown* (2d Cir. 2002) 294 F.3d 35, 47-48 & n.3, superseded on other grounds as stated in *Brooker v. Altoona Housing Authority* (W.D. Penn 2013) 2013 WL 2896814 at *9 n. 8.
[73] Cal. Code Regs., tit 2, § 12179.
[74] Available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/hcd-memo-on-haa-final-sept2020.pdf.
[75] Available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/zoning-variety-of-housing-types.
[76] Available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/sb-2-combined-update-mc-a11y.pdf.
[77] Available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/sb745memo042414.pdf.

**Supportive Housing Definition.** Government Code section 65582, subdivision (g), defines supportive housing to mean housing that:

- has no limit on the length of stay;

- is linked to onsite or offsite services that assist residents in improving their health status, retaining the housing, and maximizing their ability to live and, where possible, work in the community; and

- is occupied by the "target population," which "means persons with low incomes who have one or more disabilities, including mental illness, HIV or AIDS, substance abuse, or other chronic health condition, or individuals eligible for services provided pursuant to the Lanterman Developmental Disabilities Services Act . . . and may include, among other populations, adults, emancipated minors, families with children, elderly persons, young adults aging out of the foster care system, individuals exiting from institutional settings, veterans and homeless people."[78]

**Transitional Housing Definition.** Government Code section 65582, subdivision (j), defines "transitional housing" to mean "buildings configured as rental housing developments, but operated under program requirements that require the termination of assistance and recirculating of the assisted unit to another eligible program recipient at a predetermined future point in time that shall be no less than six months from the beginning of the assistance." Therefore, in contrast to supportive housing, transitional housing may limit the length of stay, is not required to provide supportive services (though may be linked to them), and is not limited to residents within the "target population."

**Key Protections for Supportive and Transitional Housing**. If a group home operates in ways that qualify it as either supportive or transitional housing, jurisdictions must comply with Housing Element Law's additional protections for these types of housing.

**This includes the requirement that supportive and transitional housing "shall be considered a *residential use of property* and shall be *subject only to those restrictions that apply to other residential dwellings of the same type in the same zone.*"**[79] In other words, transitional housing and supportive housing are permitted in all zones allowing residential uses and are not subject to any restrictions (e.g., occupancy limit) not imposed on similar dwellings (e.g., single-family home, apartments) in the

---

[78] Gov. Code, § 65582, subd. (i).
[79] Gov. Code, § 65583, subd. (c)(3), emphasis added.

same zone in which the transitional housing and supportive housing is located. For example, transitional housing located in an apartment building in a multifamily zone is permitted in the same manner as an apartment building in the same zone, and supportive housing located in a single-family home in a single-family zone is permitted in the same manner as a single-family home in the same zone.

**In addition, if supportive housing meets the specifications of Government Code section 65650 et seq, it must be treated as "a use by right in all zones where multifamily and mixed uses are permitted . . . ."**[80] By-right approval means that the use cannot require a conditional use permit or other discretionary review, even if a permit is required for other residential dwellings of the same type in the same zone.[81] This nondiscriminatory (i.e., ministerial) approval requirement renders the proposed use statutorily exempt from the California Environmental Quality Act  if the project "complies with written, objective development standards and policies."[82]

**When supportive or transitional housing does require a permit of any type, the Housing Accountability Act limits jurisdictions' authority to deny the permit.** These limits are discussed at length in HCD's Housing Accountability Act Technical Assistance Advisory (Sep. 15, 2020).[83]

## 6. State Law Provides Broader Protections Than Federal Law

The Legislature has specified that the FEHA may be interpreted broadly to provide "greater rights and remedies" than federal laws.[84] The Legislature has also emphasized that "[t]he law of this state in the area of disability provides protections independent from those in [federal law]," noting that California law "has always, even prior to passage of the federal [ADA], afforded additional protections."[85]

Examples of California providing "greater rights and remedies" than federal law include, among other things, state law's broader definitions of disabilities (e.g., only requiring a mere limitation of a major life activity for a mental or physical condition to qualify as a

---

[80] *Id.*
[81] *Id.*
[82] Gov. Code, § 65651, subd. (b)(2); Pub. Resources Code, § 21080, subd. (b)(1); Cal. Code Regs., tit. 14, §§ 15002, subds. (i)(1), 15268(a).
[83] See *supra*, n. 74.
[84] Gov. Code, §§ 12955.6, 12993.
[85] Gov. Code, § 12926.1, subd. (a).

disability compared to federal law requiring a substantial limitation); prohibition of land use policies and practices that discriminate against housing designed for persons or families of very low, low, moderate, or middle income; requirements for how local governments must affirmatively support housing for persons with disabilities; specific requirements for supportive and transitional housing; and reasonable accommodations regulations.[86]

Therefore, federal laws set a floor, not a ceiling, for the fair housing rights that the state may provide through the FEHA, Anti-Discrimination in Land Use Law, and other state laws.[87] Likewise, although federal court decisions about federal fair housing laws can provide important guidance for interpreting state fair housing laws, their interpretations of state laws are not binding authority.[88] Confusion can arise if local governments assume that resolving whether a local land use policy or practice complies with federal law automatically resolves whether it complies with state law.

To avoid this confusion, local governments should follow these two general guidelines:

- **If a policy or practice violates federal fair housing law, it also likely violates state law.**

- **But the converse is not necessarily true**. If a policy or practice complies with federal fair housing laws, local governments should independently determine whether it complies with state law's broader protections.

## 7. COMMON ISSUES IN LOCAL ORDINANCES THAT REGULATE GROUP HOMES

HCD cannot anticipate all the issues that might arise if local governments attempt to regulate group homes through local land use laws. But the following are examples of some common ones that can arise.

---

[86] See, e.g., Gov. Code, §§ 12926.1; 65008, subds. (a), (b); 65583, subds. (a), (c); Cal. Code Regs., §§ 12176-12185.

[87] See, e.g., Gov. Code, § 12926.1, subd. (a); *California Federal Sav. and Loan Ass'n v. Guerra* (1987) 479 U.S. 272, 285; 42 U.S.C. § 3615.

[88] See, e.g., Cal. Code Regs, tit. 2, § 11001, subd. (b).

## A. DEFINITIONS OF SINGLE HOUSEKEEPING UNITS OR SINGLE-FAMILY HOMES

Zoning ordinances sometimes attempt to restrict or limit group homes in single-family residential zones (e.g., R-1) through definitions of single housekeeping units or single-family homes. Overly restrictive definitions risk violating not only state housing laws, but the California Constitution's protections of the rights of unrelated persons to live together in communal housing.[89]

Persons with disabilities choose to live in group homes because these homes provide peer and other support for their residents' disability-related needs, while helping to integrate residents into their communities. Group homes should be treated as single-housekeeping units if they are designed to foster these mutually supportive peer relationships; allow open-ended stays or at least, on average, stays of more than a few weeks; and provide shared kitchen, dining, living, and other spaces in which residents may, in certain homes, participate in basic, shared cooking and housekeeping activities.

In general, localities should avoid including provisions in definitions of shared-housekeeping units, single-family homes, or other single residential dwellings that:

- **Equate group homes with boardinghouses.** Group homes' shared communal purposes to provide peer and other support for their occupants' disability-related needs and to help integrate them into their local communities makes this an inapt comparison. Boardinghouses do not provide communal housing designed to support the needs of persons with disabilities.

- **Require all residents to share a common deed or lease**. The California Constitution's protections of personal privacy extend to individuals' choices to live together even when they are not joint owners or tenants.[90] And group homes can still provide a communal setting that supports their residents' needs without all residents being joint owners or tenants.

- **Automatically exclude group homes that are owned by for-profit businesses or that pay a house manager or resident to help manage a**

---

[89] See, e.g., *City of Santa Barbara v. Adamson* (1980) 27 Cal.3d 123.
[90] See, e.g., *Coalition Advocating Legal Housing Options v. City of Santa Monica* (2001) 88 Cal.App.4th 451, 458-459.

**home's operations.** These are well-established models for group homes.[91] And persons with certain types of disabilities may need supportive, in-house staff to be able to live in a group home.

- **Overly scrutinize living arrangements** by, for example, requiring residents to take care of all housekeeping tasks, share all bathrooms and refrigerators, and eat all meals together, or by prohibiting locks on bedroom doors. Localities do not impose such conditions on families of related persons, who may live in R-1 neighborhoods even if they can afford to hire housekeepers or gardeners, do not share all bathrooms, decline or lack the time to eat all meals together, or choose to install locks on parents', teenagers', or other relatives' bedroom doors. And different types of group homes may require different living arrangements and provide different levels of housekeeping or other services based on their residents' individualized needs or other considerations.

## B. REQUIREMENTS THAT ALL GROUP HOMES WITH MORE THAN SIX RESIDENTS MUST OBTAIN PERMITS TO LOCATE IN SINGLE-FAMILY ZONES

Some local zoning ordinances require all group homes with more than six residents to apply for conditional use permits or obtain other special approvals to locate in single-family zones. These ordinances appear to be based on Health and Safety Code statutes that require local governments to treat many types of licensed group homes with six or fewer residents the same as single-family homes and prohibit requiring these small, licensed group homes to obtain conditional use permits or other special approvals to locate in single-family zones.[92]

But local policies that require *all* group homes with more than six residents to obtain conditional use or other permits inappropriately turn state laws designed to remove constraints on small, licensed group homes into constraints on the many other group homes that do not require state licenses.

---

[91] Douglas L. Plocin and Diane Henderson, *A Clean and Sober Place to Live: Philosophy, Structure, and Purported Therapeutic Factors in Sober Living Homes*, 40 J Psychoactive Drugs (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556949/ (discussing how a "'strong manager' model of operations" can function in ways that provide the same or similar benefits of a communal environment and peer support as group homes that residents own and operate themselves).

[92] See, e.g., Health & Saf. Code, §§ 1566.3, 1569.85,11834.23.

To comply with the Health and Safety Code's exemptions for small, licensed group homes and with housing element, AFFH, and fair housing requirements to remove constraints on and prevent discrimination against group homes, local governments should follow these guidelines:

- **Group homes that operate as single-family residences and that do not provide licensable services should be allowed in single-family neighborhoods, subject only to the generally applicable, nondiscriminatory health, safety, and zoning laws that apply to all single-family residences.** This is true even if these homes have more than six residents. Because these homes are not providing licensable services, they should be treated the same as other residences.[93]

- **Group homes that operate as single-family residences and that provide licensable services to six or fewer residents should be allowed in single-family neighborhoods, subject only to the generally applicable, nondiscriminatory health, safety, and zoning laws that apply to all single-family residences.** This complies with, among other things, the Health and Safety Code protections for these smaller, licensed group homes.

- **Group homes operating as single-family residences that provide licensable services to more than six residents may be subject to conditional use or other discretionary approval processes.** Local governments must still provide flexible and efficient reasonable accommodations in these permitting processes. This means that some requests for exceptions to permitting processes should be resolved through reasonable accommodation procedures instead of conditional use procedures.[94] In addition, any substantive requirements for these group homes must still comply with the local government's obligations to remove constraints on housing for persons with disabilities, affirmatively support it, and prevent discrimination against it. The next sections provide further guidance on how to meet these obligations.[95]

---

[93] See also *supra* at pp. 20-22 (discussing specific protections for supportive and transitional housing).

[94] See, e.g., Letter from Attorney General Bill Lockyer to The Hon. William Hartz, Mayor of Adelanto (May 15, 2001) (explaining that relying on conditional use procedures to address reasonable accommodation requests can lead to fair housing violations).

[95] Although the Group Home TA focuses on group homes operating as single-family residences, the same principles apply to those operating, for example, as multifamily residences in multifamily zones.

## C. RETROACTIVE COMPLIANCE

Zoning codes typically allow uses that began lawfully before a new zoning provision was adopted or amended to continue after these new requirements are imposed, with the concept of legal nonconforming existing uses found in almost all zoning codes. For example, a local government may change zoning requirements to disallow auto repair uses in the downtown area. An existing auto repair shop would continue to be allowed to continue to operate because at the time when the use began it was an allowable use.[96]

Local governments should generally treat existing group homes similarly when amending their zoning codes. Retroactive application of new zoning provisions should be avoided, especially if it will displace persons with disabilities from the homes they have chosen. Any exception to the well-established practice of allowing legal non-conforming uses to continue should be supported by substantial analysis and evidence showing that it is required to protect public health, safety, and welfare. This analysis and evidence should include specific local data and evidence, not merely anecdotal reports about problems that have arisen at some group homes or generalized descriptions of the public health, safety, and welfare interests that the new amendments are designed to serve.

## D. SPACING REQUIREMENTS

Spacing requirements restrict group homes from locating within a specific distance of other group homes. Local governments should be very wary about imposing spacing requirements that extend beyond the limited requirements the Legislature has deemed necessary to prevent the overconcentration of certain licensed facilities to ensure their residents are integrated into their communities.

The Legislature has found spacing requirements justified only for specific types of licensed facilities. Community care facilities, intermediate care facilities serving persons with developmental disabilities who require intermittent but recurring skilled nursing care, and pediatric day health and respite care facilities that provide services to children with particularly acute or chronic healthcare needs and their parents or guardians must be separated by at least 300 feet. Congregate living health facilities serving persons with terminal or life-threatening illnesses or with catastrophic or severe disabilities

---

[96] See, e.g., *Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 552; *Edmonds v. Los Angeles County* (1953) 40 Cal.2d 642, 651.

acquired through trauma or nondegenerative neurologic illness must be separated by at least 1,000 feet.[97]

Further limiting these spacing requirements, the Legislature has specified that they:

- apply to some types of licensed facilities, but not to others. For example, the spacing requirements apply only to some types of intermediate care facilities but not to AOD facilities or to residential care facilities for the elderly;

- apply to proposed, new facilities, not existing ones;

- only require separation of facilities with similar licenses; and

- allow closer spacing based on local needs and conditions.[98]

Contrary to these carefully crafted limitations on spacing requirements, some local governments have imposed spacing requirements on recovery residences, including those already in operation. These spacing requirements are very unlikely to withstand scrutiny under state housing laws. Among other things:

- **They are at odds with the Legislature's narrowly crafted spacing requirements in section 1267.9.**

- **They can conflict with local governments' obligations to, for example, remove constraints on housing for persons with disabilities, affirmatively support such housing, avoid policies that displace persons with protected characteristics, and affirmatively support their right to live where they choose.[99]**

- **They are very hard to justify based on the narrow exceptions that state fair housing laws allow for facial discrimination.** Justifications based on the goal of avoiding overconcentration are difficult to establish and require substantial and detailed statistical evidence establishing that an overconcentration of recovery residences has reached the point where it is, for example, creating an institutionalized living environment or perpetuating segregation within specific

---

[97] Health & Saf. Code, §§ 1267.9, subd. (b) (setting spacing requirements for these types of community care residential facilities), 1502 (defining facilities that are subject to 300-foot spacing requirements), 1250 (defining facilities subject to 1000-foot spacing requirements).
[98] Health & Saf. Code, § 1267.9.
[99] See, *supra,* at pp. 9-12.

neighborhoods or communities. Merely comparing the number of recovery residences in one city with the number in others generally will not suffice.[100]

- **They can lack the flexibility required to reasonably accommodate recovery residences and their occupants' disability-related needs.**

- **The Legislature has repeatedly rejected attempts to impose spacing requirements on recovery residences.** As recently as 2018, for instance, the Legislature declined to adopt SB 786, a bill that would have imposed a 300-foot spacing requirement on recovery residences.[101] The legislative history shows that the Legislature considered the lack of clear data showing that this spacing requirement would benefit persons recovering from alcohol and drug addiction. The Legislature also considered concerns that this spacing requirement would discriminate on the basis of disability, impede opening new recovery residences, reduce access to much needed recovery and treatment services, and stigmatize recovery residences and their occupants.[102]

In sum, local governments should avoid imposing spacing requirements that extend beyond those specified in Health and Safety Code section 1267.9.[103]

---

[100] See, *supra,* at pp. 15-16. Spacing requirements like this also need to withstand scrutiny under other standards for assessing intentional discrimination or discriminatory effects. See, *supra,* at pp. 12-19.

[101] Sen Bill No. 786 (2017-2018 Reg. Session). This bill is one of many times that the Legislature has declined to enact, or the Governor has vetoed bills attempting to regulate recovery residences. See, e.g., Sen. Com. on Health, analysis of Sen. Bill 786 (2017-2018 Reg. Sess.) at 7-8 (listing several other bills with similar provisions that the died in the Legislature between 2006 and 2007); California Research Bureau, *Sober Living Homes in California: Options for State and Local Regulation* (October 2016) at 14-16 (listing over 20 bills affecting recovery residences introduced between 1998 and 2016 that the Legislature did not pass or the Governor vetoed).

[102] Sen. Com. on Health Analysis of Sen. Bill 786 at 6, 8-9.

[103] Recent federal court decisions rejecting challenges under federal and California laws to spacing requirements for recovery residences have not considered the important differences between state and federal laws. See, e.g., *Yellowstone Women's First Step House, Inc. v. City of Costa Mesa* (C.D. Cal. Oct. 8. 2015) 2015 WL 13764131 at *7-8, affirmed in part and vacated in part, 2021 WL 4077001 (9th Cir. Sep. 8, 2021) (unpublished, nonprecedential decision). These differences include, for example, the affirmative duties that California's Housing Element Law imposes on local governments and the broader rights and remedies for persons with disabilities under California's fair housing laws. See, *supra,* at pp. 22-23.

### E. OCCUPANCY LIMITS AND BUILDING, FIRE, OR OTHER HEALTH AND SAFETY CODE REQUIREMENTS

Subject to the Legislature's requirements for specific types of licensed facilities, such as those serving persons with limited mobility, and to requests for reasonable accommodations, local governments should apply the same generally applicable occupancy limits to group homes that they do to other housing. Under the Uniform Housing Code section 503.2, at least one room in a dwelling unit must have a floor area of at least 120 square feet, with other habitable rooms, except kitchens, required to have a floor area of at least 70 feet. When more than two people occupy a room for sleeping purposes, the required floor area increases by 50 square feet. For example, a bedroom intended for two people could be as small as 70 square feet, while a bedroom would need to be at least 120 square feet to accommodate three people or at least 170 square feet to accommodate four people.

Likewise, to avoid imposing overly costly and burdensome constraints on group homes, the best practice is to apply the same general building, fire, and other health and safety codes that apply to other residences, subject to state health and safety code provisions specific to certain types of residential facilities.[104] Although group home operators may request reasonable accommodations from public health and safety standards, fair housing laws allow local governments to deny these requests if, among other things, they would cause direct threats to public health and safety.

### F. REQUIREMENTS FOR OPERATORS AND RESIDENTS

Requirements for operators and residents often take the form of specific services or management practices that the local jurisdiction feels are necessary for the successful operation of group homes. These requirements tend to deal with the internal affairs of the operations and frequently involve issues beyond those in typical land use regulations. For example, local jurisdictions do not typically regulate the number of daily visitors to a single-family home or other residential property.

When applied to group homes, these types of regulations raise concerns that a local government is imposing conditions on them that are contrary to its duties to support housing for persons with disabilities, prevent discrimination on the basis of disability or other protected characteristics, and provide reasonable accommodations.

---

[104] See, e.g., Health & Saf. Code, § 13113 (requiring sprinkler systems in certain licensed residential facilities).

Before adopting or applying any such regulations even for licensed group homes, local governments should analyze whether they are consistent with state housing laws and document this analysis. Local governments should also consider whether such regulations are consistent with the Health and Safety Code's provisions and regulations for licensed facilities.

Although this Group Home TA cannot address all potential issues regarding potential regulations of operators and residents, the following are examples of requirements taken from recent local ordinances:

**Imposing Special Parking Requirements on Group Homes**. Requiring group homes to have or construct additional off-street parking spaces can impose considerable costs that constrain housing opportunities for persons with disabilities. These special parking requirements will often conflict with the right to privacy under the California Constitution,[105] as well as local governments' obligations to affirmatively support housing for persons with disabilities and avoid discriminating against them. Jurisdictions imposing additional parking requirements assume that group homes serving adults will have more residents who drive and will therefore use more on-street parking than other households. But these assumptions should at the very least be tested by studying the actual causes and extent of on-street parking shortages in an area.[106] Local governments should also consider less discriminatory alternatives, such as street-parking permit systems for all households or other generally applicable parking and vehicle regulations.

**Restricting Recovery Residence Occupants to Persons Actively Participating in Recovery Programs.** While most occupants of recovery residences participate in recovery programs, local governments should not impose this as a condition of living in a recovery residence. There are different models of recovery, not all of which involve participating in 12-step or similar programs. And recovering from alcoholism or drug addiction is legally recognized as a protected disability regardless of whether someone has participated or is currently participating in a recovery or treatment program.[107]

---

[105] *Adamson*, *supra,* 27 Cal.3d at 133 (concluding that parking concerns are best addressed by limitations that "appl[y] evenly to all households" and concluding that zoning ordinances are suspect when they focus on users instead of uses).
[106] See, e.g., Lauber, *supra*, n. 16 at 385 & n. 52 (citing studies finding that group homes do not generate undue amounts of parking or traffic).
[107] *Hernandez v. Hughes Missile System Co.* (9th Cir. 2004) 362 F.3d 564, 568; HUD – DOJ 2016 Jt. Stmt. on Local Land Use Laws at 7-8.

**Restricting Occupancy Exclusively to Persons with Disabilities.** Regulations restricting group home occupancy exclusively to persons with disabilities or with a specific disability may sometimes intrude on individuals' fair housing choices and privacy rights. They also risk discriminating on the basis of other protected statuses. Inflexible occupancy restrictions, for example, could preclude group homes designed for families in which one member has a disability or recovery residences designed for parents in recovery who are seeking to reunite with their children.

**Restricting Occupants or Staff from Homes Based on Their Criminal History Records.** Policies that prohibit individuals from living in or working at group homes based on individuals' criminal history records may be intended to protect the occupants of these homes. But local governments contemplating adopting or applying such policies should carefully review California Code of Regulations, title 2, sections 11017.1; 12162, subdivision (b); and 12264-12271, which set parameters on using criminal history information that, among other things, restrict access to employment or housing. Local governments should also consider state laws and regulations that apply to criminal background checks for licensed facilities' employees.[108]

**Requiring Recovery Residences or AOD Facilities to Immediately Remove Occupants Who Violate Policies Prohibiting Alcohol or Drug Use.** Although Health and Safety Code section 11834.26, subdivision (d), requires AOD facilities to plan how to address a resident's relapse, that subdivision clarifies that this "does not require a licensee to discharge a resident." This recognizes that approaches to addressing someone's relapse may vary depending on a recovery residence's or AOD facility's program, the circumstances of the relapse, and an individual's personal history and needs. Local policies should allow the same flexibility. Moreover, requirements to immediately remove relapsing residents with tenancy rights may conflict with landlord-tenant laws.

**Other Examples**

- **House Manager Requirements**—requiring group homes to have a house manager on site around the clock or always available to come to the residence within 30 or 45 minutes.

- **Visitor Restrictions**—requiring group homes to limit who can visit and under what conditions.

---

[108] See, e.g., Health & Saf. Code §§ 1522, 1569.17, 11834.27; Cal. Code Regs., tit. 9, §§ 10564, 10615, 10624, tit. 22, §§ 80019-19.2.

- **Records Maintenance**—requiring group homes to maintain specific records about the internal affairs or occupants of the house.

- **Codes of Conduct**—requiring group homes to have special conduct codes for their residents.

- **Neighborhood Notice Requirements**—imposing special neighborhood notice requirements on group homes.

- **Law Enforcement Registration Requirements**—requiring group homes to register with the local sheriff's office or other law enforcement offices.

Regulations like these can be based on mistaken or prejudicial fears about group homes, instead of actual data and evidence. Particularly in light of research finding that fears about group homes endangering neighbors' health and safety are unfounded, [109] such provisions may in themselves be regarded as evidence that a local government is not complying with its requirements to affirmatively support housing for persons with disabilities and prevent discrimination against group homeowners, operators, and residents.

Regulations like these can also create unnecessary constraints on group homes by imposing overbroad, additional costs and burdens on the many group homes that capably serve their occupants' needs and seamlessly integrate into their communities. They can intrude on privacy rights. They can discriminate on the basis of disability or other protected characteristics if, for example, requirements like these are imposed on group homes but not on other housing. For these reasons, among others, regulations like these generally conflict with state housing laws.

## G. Civil Actions for Operating Without a Required State License

Some categories of group homes, such as all those serving children, require state licenses. But many, if not most, group homes do not require state licenses to operate. These include, for example, group homes that provide peer support and limited services to residents but not the more extensive care and supervision that requires obtaining a license. Recovery residences that do not provide alcoholism or drug addiction recovery or treatment services are other examples of group homes that do not require licenses.

Examples of group homes that do require licenses include the ones in this table:

---

[109] See, *supra,* nn. 15-16.

| Use | Health and Safety Code Sections | Licensing Agency |
|---|---|---|
| Community Care Residential Facilities (including various subcategories) | § 1500 et seq. & § 1569 et seq., e.g., | California Department of Social Services (CDSS) |
| AOD Facilities | § 11834.01 et seq. | California Department of Health Care Services (DHCS) |

Some local governments have amended their zoning ordinances to declare that operating a business without a required state license is a public nuisance. Some of these ordinances single out recovery residences that are providing recovery or treatment services without a license. These jurisdictions file civil actions seeking to abate these nuisances by closing some noncompliant recovery residences, requiring others to obtain the required license, or imposing limitations on recovery residences that were not providing recovery or treatment services.

Local governments have discretion to define as public nuisances' business or construction activities that are undertaken without a required permit or license. And at least one California appellate court has upheld a city's public nuisance action against a recovery residence where the owners' own website advertised that they provided on-site drug addiction treatment services.[110]

But jurisdictions considering adopting this practice should still carefully assess the issues and problems that can arise under state law. Guidelines for local governments considering this include the following:

- **Avoid targeting these nuisance actions on group homes operating without required licenses while ignoring other businesses operating in residences without required licenses.** Although public prosecutors have broad discretion to prioritize which violations or violators to prosecute, they cannot use this discretion in ways that discriminate on the basis of disability or other protected characteristics. Jurisdictions should not single out group homes unlawfully operating without required licenses while ignoring businesses doing the same thing in other residences.

[110] *City of Dana Point v. New Method Wellness, Inc.* (2019) 39 Cal.App.5th 985.

- **Give group homes the same opportunities to respond to and resolve alleged code violations as other alleged violators.** For example, if other property owners or businesses are allowed to respond to and resolve alleged code violations during investigations or administrative hearings, those same procedures should apply to group homes that are allegedly providing services that require a license without having obtained one.

- **Use the processes available through DHCS and CDSS, for example, for resolving allegations that a group home is operating without a required license**. If a locality has evidence that a residence is providing unlicensed recovery or treatment services in facilities under DHCS's jurisdiction or unlicensed care or supervision for residents in facilities under CDSS's jurisdiction, it should use these departments' processes for investigating such complaints and abating them if they have merit.[111] This is especially important when group home operators have not openly admitted that they are providing unlicensed services on-site.

  Determining what activities at a group home rise to the level of licensable services, in contrast to common policies or mutual support activities that do not require licenses, can involve nuanced and technical issues that are beyond the expertise of most local planning or code enforcement staff. DHCS's and CDSS's staff have the expertise and experience to investigate these claims, make these determinations, and abate violations of the licensing laws they enforce.

  If jurisdictions are filing their own, more costly civil actions to resolve disputes over whether a group home requires a license, this runs the risk of courts issuing mistaken rulings without the benefit of DHCS's or CDSS's findings and expertise.[112] It also raises questions under state housing laws about why a local government is not availing itself of DHCS's or CDSS's procedures and opting instead to subject a group home to more expensive and burdensome civil litigation.

---

[111] See, e.g., Cal. Code Regs., tit. 9, § 10542, tit. 22, § 80006.
[112] *Cf. Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 (explaining that under primary jurisdiction doctrine, courts may suspend proceedings to allow an administrative agency with specialized expertise to determine an issue within the scope of its regulatory authority).

## H. ENFORCING GENERALLY APPLICABLE MUNICIPAL CODES AND OTHER LAWS

If group home operators are engaging in activities that constitute public nuisances; violating generally applicable building, housing, or other health and safety laws; committing fraud; or engaging in other illegal activities, local governments can address these issues through the same code enforcement and other legal processes they apply to others who violate municipal codes and other laws. This may still require considering if reasonable accommodations are appropriate in some circumstances. And local governments should avoid overbroad or discriminatory applications of nuisance laws, such as basing nuisance actions on 911 calls for emergency services.[113] But if a group home is found to have violated local or state law, local governments may seek equitable relief that could include more stringent oversight and other affirmative relief to prevent further violations.

Focusing on individual group homes that are actually causing problems is a better practice than adopting overly broad and constraining regulations for all group homes that conflict with state housing laws.

## 8. RESOURCE MATERIALS AND STATE CONTACTS

**Resource Materials**

Affirmatively Furthering Fair Housing: Guidance for All Public Entities and for Housing Elements (April 2021 Update), available at https://www.hcd.ca.gov/community-development/affh/docs/affh_document_final_4-27-2021.pdf

Housing Accountability Act Technical Assistance Advisory, HCD (Sep. 15, 2020), available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/hcd-memo-on-haa-final-sept2020.pdf

Housing Element Building Blocks, HCD, available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks

---

[113]  See. e.g., Cal. Code Regs., tit. 2, § 12162, subd. (a); United States Department of Housing and Urban Development, Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances (Sep. 13, 2016), available at https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF.

Housing Element Building Blocks – Constraints for People with Disabilities, HCD, available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/constraints-people-disabilities

Housing Element Building Blocks – Persons with Disabilities, HCD, available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/people-disabilities-including-developmental-disabilities

Housing Element Building Blocks – Zoning for a Variety of Housing Types, HCD, available at https://www.hcd.ca.gov/planning-and-community-development/housing-elements/building-blocks/zoning-variety-of-housing-types

Joint Statement of the Department of Housing and Urban Development and the Department of Justice – State and Local Land Use Laws and Practices and the Application of the Fair Housing Act, HUD - DOJ (Nov. 10, 2016), available at https://www.justice.gov/opa/file/912366/download

Senate Bill 2—Legislation Effective January 1, 2008: Local Planning and Approval for Emergency Shelters and Transitional and Supportive Housing, HCD (Apr. 10, 2013 update), available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/sb-2-combined-update-mc-a11y.pdf

Transitional and Supportive Housing, Chapter 183, Statutes of 2013 (SB 745), HCD (Apr. 24, 2014), available at https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/sb745memo042414.pdf

**Contacts**

**HCD**

HCD accepts requests for technical assistance from local jurisdictions and requests for review of potential violations from any party. All comments submitted to HCD are subject to the California Public Records Act. Send email requests to: ComplianceReview@hcd.ca.gov.

**California Department of Health Care Services (DHCS)**

Information about DHCS's complaint process for licensing issues at AOD facilities is available at https://www.dhcs.ca.gov/individuals/Pages/Sud-Complaints.aspx, by emailing sudcomplaints@dhcs.ca.gov, or by calling (877) 685-8333.

**California Department of Social Services (CDSS)**

Information about CDSS's complaint process for licensing issues at facilities that it regulates is available at https://www.cdss.ca.gov/reporting/file-a-complaint/ccld-complaints or by calling (844) 538-8766.

STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY                                     GAVIN NEWSOM, *Governor*

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**DIVISION OF HOUSING POLICY DEVELOPMENT**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA  95833
(916) 263-2911 / FAX (916) 263-7453
www.hcd.ca.gov



November 29, 2023


Lori Ann Farrell Harrison, City Manager
City of Costa Mesa
77 Fair Drive
Costa Mesa, CA 92626

Dear Lori Ann Farrell Harrison:

**RE: Group Home Ordinances – Letter of Technical Assistance**

In the attached May 9, 2023, findings letter, the California Department of Housing and Community Development (HCD) offered to provide additional technical assistance regarding, among other things, implementation of Costa Mesa's (City) 6th cycle housing element programs to review its group home and related policies. This letter provides that technical assistance for the City's review of its group home ordinances, including Ordinance Nos. 14-13, 15-11, and 17-05, which amended Title 13 of the City's Municipal Code (MC 13), as well as related City policies, such as its reasonable accommodations procedures.

HCD has reviewed the City's group home ordinances and related policies under its authority pursuant to Government Code section 65585, which includes authority to review cities' compliance with the Land Use Discrimination Law (Gov. Code, § 65008), Affirmatively Furthering Fair Housing (AFFH) Law (Gov. Code, §§ 8899.50, 65583), and State Housing Element Law (Gov. Code, § 65580 et seq.). HCD finds that the City's group home ordinances and related policies violate Government Code sections 65008, 65583, and 8899.50 by failing to meet the City's obligations to affirmatively further, protect, and remove constraints on housing for persons with disabilities, and also by discriminating against this housing.

To comply with state law, the City must, among other things, immediately stop enforcing its group home ordinances, repeal them, and revise its reasonable accommodations policies. These actions are also necessary to timely and effectively implement the programs in the 6th cycle housing element that the City adopted on November 15, 2022, which are required for the City's housing element to substantially comply with State Housing Element Law. These include Program 2J (Transitional and Supportive Housing), 2N (Reasonable Accommodation), Program 2O (Definition of Single Housekeeping Unit), Program 2P (Group Homes), and 4A (Fair Housing).

## Definitions

Various laws use the term "group homes" to refer to different types of housing for different populations. For the purposes of state fair housing and planning and zoning laws, the following terms refer to various types of residences in which unrelated persons share the residence:

- **Shared Living Residences**—any housing shared by unrelated persons, including, for example, group homes, recovery residences, some community care residential facilities, some supportive and transitional housing, emergency shelters, boardinghouses, and dormitories.

- **Group Homes**—housing shared by unrelated persons with disabilities that provide peer and other support for their residents' disability-related needs and in which residents share cooking, dining, and living areas, and may, in some group homes, participate in cooking, housekeeping, and other communal living activities and that do not provide services that require licenses under state law.

- **Licensed Facilities**—shared living residences that provide services that require licenses under state law.

- **Recovery Residences** or **Sober Living Homes**—group homes for persons recovering from alcoholism or drug addiction in which the residents mutually support each other's recovery and sobriety and that do not require state licenses because they do not provide alcoholism or drug addiction recovery and treatment services.[1]

- **Alcohol or Other Drug (AOD) Facilities**—residential facilities that must obtain state licenses because they provide alcoholism or drug addiction recovery and treatment services.

---

[1] Individuals recovering from alcoholism or addiction are recognized as people with disabilities (see Gov. Code, § 12926, subd. (j)), and "sober living homes and other dwellings intended for occupancy by persons recovering from alcoholism and drug addiction are protected from illegal discrimination against the disabled." *SoCal Recovery, LLC v. City of Costa Mesa* ("*SoCal Recovery*") (9th Cir. 2023) 56 F.4th 802, 814.

**Statutory Background**

**Land Use Discrimination Law**

California's Planning and Zoning Law (Gov. Code, § 65000 et seq.) prohibits jurisdictions from engaging in discriminatory land use and planning activities. Specifically, Government Code section 65008, subdivision (a)(1), deems any action taken by a city to be null and void if it denies an individual or group of individuals the enjoyment of residence, landownership, tenancy, or any other land use in the state due to illegal discrimination. Section 65008 prohibits discrimination based on any characteristic, including disabilities, protected by other state or federal laws, while adding its own prohibitions of discrimination against individuals or households who have very low, low, moderate, or middle incomes.[2] The law further recites multiple categories of actions that are determined to be discriminatory, including enactment or administration of ordinances that prohibit or discriminate based on a protected characteristic[3] and imposition of requirements on a residential use for persons with protected characteristics that are not generally imposed upon other residential uses.[4]

**AFFH Law**

Government Code section 8899.50 requires all California public agencies, including cities, "to administer their programs and activities relating to housing and community development in a manner to affirmatively further fair housing, and take no action that is materially inconsistent with [this] obligation . . . ."[5] AFFH means:

> taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws.[6]

Moreover, the "duty to affirmatively further fair housing extends to all of a public agency's activities and programs relating to housing and community development."[7]

---

[2] Gov. Code, § 65008, subds. (a)(1)(A), (b)(1)(B)-(C), (2)(B), (3).
[3] *Id.* at subd. (b)(1)(B).
[4] *Id.* at subd. (d)(2)(A).
[5] Gov. Code, § 8899.50, subds. (a)(2)(B), (b)(1), (2).
[6] *Id.* at subd. (a)(1).
[7] *Id.*

**Housing Element Law**

In addition to the general AFFH requirements in Government Code section 8899.50, State Housing Element Law includes more specific AFFH requirements for cities. Government Code section 65583 requires cities to thoroughly analyze fair housing issues related to housing for people with disabilities and set forth a program of actions that protect and promote such housing. Through their housing elements, cities must "remove governmental constraints that hinder . . . meeting the need for housing for persons with disabilities," which requires "remov[ing] constraints to, and provid[ing] reasonable accommodations for housing designed for, intended for occupancy by, or with supportive services for, persons with disabilities."[8] Section 65583 also requires cities to "promote and affirmatively further fair housing opportunities and promote housing throughout the community or communities all persons regardless of . . . disability" or "other protected characteristics."[9] And cities' housing elements must include a fair housing assessment with specific goals, implementation strategies, and "metrics and milestones" for evaluating results.[10] In complying with these AFFH duties, cities are required to analyze data and set measurable objectives and milestones.[11]

**<u>Resource Materials</u>**

In revising its policies, amending its ordinances, and implementing its housing element programs, the City should consider HCD's Group Home Technical Advisory (Group Home TA)[12] and its AFFH Guidance Memorandum (AFFH Memo).[13] The City should also consider, among other things, the analysis in the amicus brief that HCD and CRD filed in the pending appeal in *The Ohio House, LLC v. City of Costa Mesa,* 9th Cir. Case No. 22-56181, Docket No. 25-2 (Amicus Brief). The guidance documents and Amicus Brief discuss relevant statutes, regulations, and case law, as well as HCD's and other government agencies' earlier guidance documents, academic papers, and demographic and statistical analyses.

---

[8] Gov. Code, § 65583, subds. (a)(6), (c)(3).
[9] *Id.* at subd. (c)(5).
[10] *Id.* at subd. (c)(10)(A)(iv).
[11] See, e.g., Gov. Code, § 65583, subds. (a)(5), (a)(7), (b)(1), (c)(10)(A)(ii).
[12] Available at https://www.hcd.ca.gov/sites/default/files/docs/planning-and-community/group-home-technical-advisory-2022.pdf.
[13] Available at https://www.hcd.ca.gov/community-development/affh/docs/affh_document_final_4-27-2021.pdf.

**<u>Findings</u>**

HCD's findings include, but are not necessarily limited to, those described below.

**Permitting Requirements**

Ordinance Nos. 14-13, 15-11, and 17-05 establish permitting requirements for group homes.

- MC 13-311(a) requires a special use permit for unpermitted group homes of six or fewer occupants located in R1 (single-family) zones and prohibits group homes with seven or more occupants in these zones.

- MC Title 9, Chapter II, Article 23, 9-372 requires group homes of six or less to apply for an operator's permit, regardless of licensure status.

- MC 13-322 requires a Conditional Use Permit (CUP) for group homes of six or less in R2-MD, R2-HD and R3 residential zones and the PDR-LD, PDR-MD, PDR-HD, PDR-NCM, PDC, and PDI (Planned Development Zones) Zones.

- MC 13-323 requires a CUP for group homes in the R2-MD, R2-HD and R3 residential zones and the PDR-LD, PDR-MD, PDR-HD, PDR-NCM, PDC, and PDI (Planned Development Zones) with seven or more occupants.

The City's permitting requirements for group homes and its application and enforcement of these requirements violate Government Code sections 65008, 65583, and 8899.50 by, among other things, discriminating against housing for persons with disabilities, constraining and failing to promote this housing, and restricting the fair housing choices of persons with disabilities (their right to housing of their choice and the housing they find most suitable for their disability-related needs).

The ordinances do not impose similar restrictions on other dwellings located in the zones listed above. The discriminatory effects and constraints these permitting requirements impose on group homes are evident through, among other things, the City's own data showing how severely the permitting requirements have curtailed group homes in Costa Mesa. And there are considerable other discriminatory effects, including, and among other things, the costs and burdens imposed on group homes, the displacement of persons with disabilities from housing of their choice and the disruptions of their lives, and the City's efforts to deter new group homes from opening in Costa Mesa.[14]

---

[14] See, e.g., Amicus Brief at pp. 27-28; *SoCal Recovery*, *supra*, 56 F.4th at p. 806 (finding that Costa Mesa engaged in "an explicit effort to reduce the number of sober living homes operating within the City.").

Furthermore, the City should not continue attempting to justify its group home
restrictions by comparing them to its treatment of boardinghouses. Group homes are
designed to provide communal living environments with peer and other support for their
occupants' disability-related needs and to help integrate their residents into local
communities. Boardinghouses do not serve these same goals. Government Code
sections 65008, 65882, and 8899.50 also impose specific and unique duties on cities to
affirmatively promote and protect housing for persons with disabilities that do not
similarly apply to all boardinghouses.

The overall problems with the City's permitting system require the City to immediately
stop enforcing its group home ordinances and repeal them. To provide additional
guidance, this letter discusses below further examples of how specific provisions in
these ordinances conflict with the City's duties under Government Code sections 65008,
65583, and 8899.50.

**Definition of Single Housekeeping Unit**

MC 13-06 defines a single housekeeping unit as follows:

- Single housekeeping unit. The occupants of a dwelling unit have established ties
  and familiarity with each other, jointly use common areas, interact with each
  other, share meals, household activities, and expenses and responsibilities;
  membership in the single housekeeping unit is fairly stable as opposed to
  transient, members have some control over who becomes a member of the
  household, and the residential activities of the household are conducted on a
  nonprofit basis. There is a rebuttable presumption that integral facilities do not
  constitute single housekeeping units. Additional indicia that a household is not
  operating as a single housekeeping unit include, but are not limited to: the
  occupants do not share a lease agreement or ownership of the property;
  members of the household have separate, private entrances from other
  members; members of the household have locks on their bedroom doors;
  members of the household have separate food storage facilities, such as
  separate refrigerators.

HCD encourages the City to review pages 24-25 of the HCD Group Home Technical
Advisory for policies to avoid when creating a definition of a single housekeeping unit.
These problematic policies include requiring all residents to share a common lease or
deed, excluding for-profit group homes and overly scrutinizing living arrangements (e.g.,
not allowing for locks on rooms or having separate entrances).

**Lack of Grandfathering**

Typically, when a zoning code changes, preexisting, nonconforming uses are "grandfathered" in and allowed to continue operating under the requirements that were in place before the amendments.[15] Costa Mesa's zoning code follows this well-established practice by allowing preexisting, nonconforming residential uses to continue operating unless they are abandoned, the dwellings they are in are declared physically unsafe, or the owner proposes structural alterations. (MC 13-203(b), 13-204.) But the City departs both from general grandfathering practices and its own grandfathering code provisions by requiring preexisting group homes to apply for permits in the same fashion as new ones to remain operational. (MC 13-311, 13-322, and 13-323.) This imposes discriminatory and constraining conditions on preexisting group homes, while creating displacement impacts that AFFH duties and State Housing Element Law require the City to consider and avoid.[16] The City should apply its generally applicable grandfathering provisions to preexisting group homes, subject to reasonable accommodations requirements.

**Occupancy Limits**

The City sets special occupancy limits on group homes that prohibit group homes of seven or more occupants in R-1 single family zones, require group homes with seven or more occupants to obtain permits to operate in other zones, and require group homes with six or fewer occupants to obtain permits to operate in any residential zone. (MC 9-372, 13-311)(a), 13-322, 13-323.) This is another example of the City imposing discriminatory and constraining restrictions on group homes. Concerns about overcrowding should be addressed through applying the generally applicable occupancy limits that apply to all residences instead of singling out specific types of housing based on occupants' disabilities.[17]

Costa Mesa's ordinances appear to be based on a faulty application of Health and Safety Code statutes that allow local governments to subject licensed group homes with more than six residents to conditional use or other discretionary approval processes but require local governments to treat many types of licensed group homes with six or fewer residents the same as single-family homes and prohibit requiring these small, licensed group homes to obtain conditional use permits or other special approvals to locate in single-family zones.[18] The City, however, cannot justify its restrictions on group homes

---

[15] See, e.g., *Edmonds v. Los Angeles County* (1953) 40 Cal.2d 642, 651 ("The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected.").

[16] Gov. Code, § 65583, subds. (c)(10)(A)(ii), (v).

[17] See Uniform Housing Code, § 503.2; see also *City of Santa Barbara v. Adamson* (1980) 27 Cal.3d 123, 133.

[18] See, e.g., Health & Saf. Code, §§ 1566.3, 1569.85, 11834.23.

through statutes designed to protect small licensed facilities, which provide higher levels of support and care that require state licenses.[19] These statutes specifically apply to licensed facilities, not to unlicensed group homes. In effect, the City is inappropriately transforming state laws designed to prevent local constraints on small, licensed facilities into constraints on group homes that do not provide services requiring state licenses. Moreover, the City is imposing more restrictions on group homes with six or fewer residents than state law allows it to impose on licensed facilities with similar numbers of residents. To avoid imposing overly costly and burdensome constraints on group homes, the best practice is to apply the same general building, fire, and other health and safety codes that apply to other residences, subject to state health and safety code provisions specific to certain types of licensed facilities and to reasonable accommodations requirements.[20]

**Separation Requirement**

MC 13-322, 13-323, and 13-324 require 650 feet of separation between group homes, sober living homes, or state-licensed drug and alcohol treatment facilities, new and existing.

These spacing requirements have a particularly severe impact on group homes, severely limiting where they can locate, causing group homes to close, and preventing others from opening. Yet the City has not shown that these spacing requirements are necessary or that there are health, safety, or similar justifications for the spacing requirements, or that if these were actual issues, that the City could not address them through less restrictive and discriminatory policies.

Pages 27-29 of the Group Home TA provides additional guidance illustrating why the City's spacing requirements conflict with its duties under state housing law (e.g., Gov. Code, §§ 8899.50, 65008, 65583, subds. (c), (1), (5), (10)), as does the Amicus Brief.

**Vehicle and Parking Requirements**

The City imposes special vehicle and parking requirements on group homes. MC 13-311(a)(5) states that each dwelling resident is limited to one vehicle that must be used as the resident's primary form of transportation. MC 13-311(a)(5) requires each dwelling resident to park their vehicle on dwelling premises or within 500 feet of the dwelling.

Concerns about parking and traffic should be addressed through generally applicable rules instead of restrictions that target housing for persons with disabilities.[21]

---

[19] See Group Home TA at pp. 25-26.
[20] See, e.g., Health & Saf. Code, § 13113 (requiring sprinkler systems in certain licensed facilities).
[21] See *Adamson*, *supra*, 27 Cal.3d at 133; Group Home TA at p 31.

**Examples of Other Permitting and Operational Requirements**

The City imposes the following restrictions on group homes but not on other residences:

- MC 13-311(a)(4) requires a manager to be present during all hours, seven days a week.
- MC 13-311(a)(14)(vi) requires that the operator must have a good neighbor policy directing residents "to be considerate of neighbors, including refraining from engaging in excessively loud, profane or obnoxious behavior that would unduly interfere with a neighbor's use and enjoyment of their dwelling unit."
- MC 13-311(b) requires group homes applying for a permit to provide notice to the owner of record and all occupants within 500 feet of the group home.

Singling out group homes for restrictions like these can burden group homes with additional, unjustified costs, while perpetuating fears and stereotypes about persons with disabilities. Pages 30-33 of the Group Home TA provide additional guidance on how to avoid these and other restrictions in Costa Mesa's group home ordinances that conflict with the City's duties under Government Code sections 8899.50, 65008, 65583, subds. (c)(1), (c)(5) and (10), among others.[22]

**Reasonable Accommodations**

Failing to make reasonable accommodations to rules or policies, in order to allow persons with disabilities the opportunity to access housing, is a form of discrimination.[23] Making reasonable accommodations is also necessary to fulfill the City's AFFH duties and its duties to remove constraints on housing for persons with disabilities.[24]

The City should review its reasonable accommodation policies in Municipal Code section 13-200.62, along with its application of these policies, to ensure compliance with state law.[25] For example, the City: (i) must avoid denying requested accommodations based on fears or prejudicial assumptions about people with disabilities, such as that group home residents somehow uniquely cause problematic traffic, noise, or activity; (ii)

---

[22] See also *Oconomowoc Residential Programs, Inc. v. City of Milwaukee* (7th Cir. 2002) 300 F.3d 775, 783 (finding that house manager requirement is discriminatory because it effectively mandates an "institutional" arrangement that is not "on par with" housing policies for those who are not disabled); *Potomac Group Home Corp. v. Montgomery County, Md.* (D. Md. 1993) 823 F.Supp. 1285, 1296 (finding that notice requirements discriminate against and stigmatize persons with disabilities).
[23] See, e.g., Gov. Code, § 12927, subd. (c)(1).
[24] See, e.g., Gov. Code, §§ 8899.50, 65583, subds. (a)(6), (c)(3), (5).
[25] See, e.g., Cal. Code Regs., tit. 2, §§ 12176-12185; Group Home TA at pp. 18-20; Amicus Brief at pp. 21-25.

may not place the burden on reasonable accommodation applicants to demonstrate that their requested accommodations would not create undue burdens on the City or fundamental alterations to its zoning code; (iii) may not require applicants to show that they could not find any other housing within the city that would meet their disability-related needs; and (iv) must engage in good faith with reasonable accommodation requests and avoid delay or burdensome procedural requirements.[26]

### **Costa Mesa May Still Address Problems that Might Arise at Individual Group Homes**

The City has resources to legally address problems that might occur at individual group homes. If group home operators are engaging in activities that constitute public nuisances; violating generally applicable building, housing, or other health and safety laws; committing fraud; or engaging in other illegal activities, the City can address these issues through the same code enforcement and other legal processes it applies to others who violate municipal codes and other laws. If the City has evidence that a group home operator is providing services that require a license without obtaining one, it can contact the state's Department of Social Services or Department of Health Care Services, which can initiate investigations and take remedial action if appropriate.[27]

This may still require considering if reasonable accommodations are appropriate in some circumstances. And the City should avoid overbroad or discriminatory applications of nuisance laws, such as those basing civil nuisance actions on 911 calls for emergency services.[28] But if a group home is found to have violated local or state law, the City may, for example, seek equitable relief that could include more stringent oversight and other affirmative relief to prevent further violations.

Focusing on individual group homes that are actually causing problems is a better practice than adopting overly broad, constraining, and unlawful regulations for all group homes.

---

[26] See, e.g., Cal. Code Regs., tit. 2, §§ 12177-12179; 28. C.F.R. § 35.150(a)(3).
[27] See Group Home TA at pp. 33-36, 37.
[28] See. e.g., Cal. Code Regs., tit. 2, § 12162, subd. (a); see also California Attorney General Rob Bonta letter to all Cities and Counties in California re Crime Free Hosing Policies (Apr. 21, 2023), available at https://oag.ca.gov/system/files/attachments/press-docs/Crime%20Free%20Housing%20Guidance_4.21.23.pdf.

**Conclusion**

Costa Mesa's ordinances are blocking new group homes from opening, forcing existing
ones to close, and imposing costs, administrative burdens, and fees that make it difficult
for group homes to operate, while displacing persons with disabilities and disrupting
their lives. The City is creating these restrictions and problems in the context of a
shortage of adequate housing for persons with disabilities, which is a particularly acute
issue within California's broader housing crisis.

HCD has reviewed the City's group home ordinances and found that they violate
Government Code sections 65008, 65583, and 8899.50. The City must stop enforcing
these ordinances, repeal them, change its reasonable accommodation policies and
practices, and review other zoning practices in light of HCD's guidance to ensure that
the City is complying with state law. These actions are necessary for the City to comply
with its duties under Government Code sections 65008, 65583, and 8899.50, and are
among the things that the City must do to bring its 6th cycle housing element into
substantial compliance with State Housing Element Law.

For technical assistance regarding the City's 6th Cycle housing element, please contact
Jose Armando Jauregui at jose.jauregui@hcd.ca.gov. If you have any questions
regarding the content of this letter, please contact Bentley Regehr at
bentley.regehr@hcd.ca.gov.

Sincerely,

David Zisser
Assistant Deputy Director
Local Government Relations and Accountability


Enclosures: Letter from HCD regarding City of Costa Mesa's 6th Cycle (2021-2029)
Adopted Housing Element (May 9, 2023)

STATE OF CALIFORNIA - BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY                    GAVIN NEWSOM, *Governor*

**DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**
**DIVISION OF HOUSING POLICY DEVELOPMENT**
2020 W. El Camino Avenue, Suite 500
Sacramento, CA 95833
(916) 263-2911 / FAX (916) 263-7453
www.hcd.ca.gov



May 9, 2023

Lori Ann Farrell Harrison, City Manager
City of Costa Mesa
77 Fair Drive
Costa Mesa, CA 92626

Dear Lori Ann Farrell Harrison:

**RE: City of Costa Mesa's 6th Cycle (2021-2029) Adopted Housing Element**

Thank you for submitting the City of Costa Mesa's (City) housing element that was adopted on November 15, 2022 and received for review on March 10, 2023. In addition, the California Department of Housing and Community Development (HCD) considered technical modifications from its prior review authorized by Resolution Number 2022-67. Pursuant to Government Code section 65585, subdivision (h), HCD is reporting the results of its review. In addition, HCD considered comments from Costa Mesa First pursuant to Government Code section 65588, subdivision (c).

The adopted housing element meets the statutory requirements of State Housing Element Law (Gov. Code, § 65580 et seq.). However, the housing element cannot be found in substantial compliance until the City has completed necessary rezones to make prior identified sites available and address the shortfall of sites to accommodate the RHNA pursuant to Assembly Bill 1398 (Chapter 358, Statutes of 2021) as described below.

Pursuant to Assembly Bill 1398 (Chapter 358, Statutes of 2021), a jurisdiction that failed to adopt a compliant housing element within one year from the statutory deadline cannot be found in compliance until rezones to make prior identified sites available or accommodate a shortfall of sites, pursuant to Government Code section 65583, subdivision (c) (1) (A) and Government Code section 65583.2, subdivision (c), are completed. As this year has passed and Programs 3B (Fairview Development Center), 3C (North Costa Mesa Specific Plan), 3D (Urban plans and Overlays), and 3N (Reused sites) have not been completed, the housing element is out of compliance and will remain out of compliance until the rezoning has been completed. Once the City completes the rezone, a copy of the resolution or ordinance should be transmitted to HCD. HCD will review the documentation and issue correspondence identifying the updated status of the City's housing element compliance.

Additionally, the City must continue timely and effective implementation of all programs including but not limited to the following:

- Program 2A (Inclusionary Housing Ordinance)
- Program 2B (Affordable Housing Development)
- Program 2I (State Density Bonus Incentives)
- Program 2J (Transitional and Supportive Housing)
- Program 2M (Parking Standards for Residential Development)
- Program 2N (Reasonable Accommodation)
- Program 2O (Definition of Single Housekeeping Unit)
- Program 2P (Group Homes): Please note, HCD may follow up with additional technical assistance. Please see HCD's Group Home Technical Advisory at https://www.hcd.ca.gov/sites/default/files/docs/planning-and-community/group-home-technical-advisory-2022.pdf.
- Program 3B (Fairview Development Center)
- Program 3G (City-wide Vote Requirements)
- Program 3R (Development of Large Sites)
- Program 4A (Fair Housing)

The City must monitor and report on the results of these and other programs through the annual progress report, required pursuant to Government Code section 65400. Please be aware, Government Code section 65585, subdivision (i), grants HCD authority to review any action or failure to act by a local government that it determines is inconsistent with an adopted housing element or State Housing Element Law. This includes failure to implement program actions included in the housing element. HCD may revoke housing element compliance if the local government's actions do not comply with state law.

Several federal, state, and regional funding programs consider housing element compliance as an eligibility or ranking criteria. For example, the CalTrans Senate Bill (SB) 1 Sustainable Communities grant, the Strategic Growth Council and HCD's Affordable Housing and Sustainable Communities programs, and HCD's Permanent Local Housing Allocation consider housing element compliance and/or annual reporting requirements pursuant to Government Code section 65400. With a compliant housing element, the City will meet housing element requirements for these and other funding sources.

For your information, some general plan element updates are triggered by housing element adoption. HCD reminds the City to consider timing provisions and welcomes the opportunity to provide assistance. For information, please see the Technical Advisories issued by the Governor's Office of Planning and Research at: https://www.opr.ca.gov/planning/general-plan/guidelines.html.

HCD appreciates the dedication and cooperation of the City's housing element team provided during the review and update. HCD particularly applauds the efforts of Jennifer Le and Scott Drapkin whose collaboration, communication, expertise and public service is truly commendable. HCD wishes the City success in implementing its housing element and looks forward to following its progress through the General Plan annual progress reports pursuant to Government Code section 65400. If you have any questions or need additional technical assistance, please contact Jose Armando Jauregui of our staff, at Jose.jauregui@hcd.ca.gov.

Sincerely,

Paul McDougall
Senior Program Manager