**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

INSIGHT PSYCHOLOGY AND

ADDICTION, INC., and JANE DOE,

                      Plaintiffs,

      v.

CITY OF COSTA MESA, et al.,

                    Defendants.

CITY OF COSTA MESA,

               Counter-Plaintiff,

      v.

INSIGHT PSYCHOLOGY AND

ADDICTION, INC., et al.,

               Counter-Defendants.

Case No.:  8:20-cv-00504-MEMF-JDE

**ORDER GRANTING IN PART CITY OF COSTA MESA'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 140] AND GRANTING IN PART INSIGHT PSYCHOLOGY AND ADDICTION, INC., MARY HELEN BEATIFICATO, GERALD GROSSO MOTION FOR PARTIAL SUMMARY JUDGMENT, AND JANE DOE'S JOINDER [ECF NOS. 144, 146]**

/ / /

/ / /

1

Before the Court are the Motion for Summary Judgment (ECF No. 140 ("MSJ")) filed by the City of Costa Mesa (the "City," "Costa Mesa," or "Defendant") and the Motion for Partial Summary Judgment (ECF No. 144 ("PMSJ")) filed by Plaintiff Insight Psychology and Addiction, Inc. ("Insight" or "Plaintiff") and Counter Defendants Mary Helen Beatificato ("Beatificato") and Gerald Grosso ("Grosso," and, with Beatificato, "Counter Defendants").[1] Plaintiff Jane Doe ("Doe") filed a Joinder (ECF No. 146 ("Joinder")) in support of Insight's Motion for Partial Summary Judgment and in support of Insight's Opposition to the City's Motion for Summary judgment (ECF No. 155 ("Opp. Joinder")).

For the reasons stated herein, the Court hereby GRANTS IN PART Costa Mesa's Motion for Summary Judgment and GRANTS IN PART Insight's Motion for Partial Summary Judgment.

## BACKGROUND

### I.    Factual Background

Plaintiffs Jane Doe and Insight allege that Insight provides supportive housing in Costa Mesa "for adults with mental health and cognitive disabilities, including but not limited to individuals with post-traumatic stress disorder ('PTSD'), bipolar disorder, anxiety, sexual trauma, and depression." ECF No. 28 ("FAC"), ¶ 1. Insight rents a six-unit multifamily apartment building located at 2641 Santa Ana Avenue in Costa Mesa that Insight intends to continue to use for supportive housing for adults with mental health or cognitive disabilities. *Id.* ¶ 10. Plaintiffs allege the Costa Mesa Zoning Code impermissibly differentiates between, on the one hand, "single housekeeping units" and "boarding houses," "whose occupants generally do not have disabilities that require supportive living services," and on "group homes," which the City's Code specifically defines as "a supportive living environment for persons who are considered handicapped under state or federal law," on the other hand. *See* FAC ¶ 30 (citing Costa Mesa Municipal Code ("CMMC" § 13-6.) Plaintiffs allege that the City enacted discriminatory zoning codes that apply more stringent rules on "group homes"

---

[1] The Court's citations to the record cite to the pagination imposed by the CM/ECF system and not to any pagination inherent to the document itself.

than non-group homes and that the city intended to discriminate against individuals with disabilities when it enacted such regulations. *See* FAC ¶¶ 37–39. Plaintiffs allege that Insight submitted an application for a conditional use permit ("CUP"). FAC ¶ 65. Plaintiffs also allege that although "Insight disagreed that the City's application of the separation requirement under these circumstances was lawful or constitutional, consistent with the City's direction, on August 3, 2018, Insight submitted a request for a reasonable accommodation from the City (Application No. RA-19-06) to address the alleged conflict with the separation requirement." FAC ¶ 69. Plaintiffs alleged that through the various appeals, the City improperly denied Insight's reasonable accommodation request seeking to waive the 650-foot separation requirement and that members of the community expressed animosity towards people with disabilities. *See* FAC ¶¶ 81, 83, 85, 91, 93–97.

## II.   **Procedural History**

On August 7, 2020, Plaintiffs filed the First Amended Complaint. *See generally* FAC. The FAC states claims against the City for violations of the Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), Rehabilitation Act, Equal Protection Clause, Due Process Clause, the California Fair Employment and Housing Act ("FEHA"), California Government Code section 11135 ("Section 11135"), and the California Unruh Civil Rights Act. Act. *Id.*

On January 11, 2021, the City filed its Third Amended Answer and Third Amended Counterclaim. ECF No. 59 ("Answer"). The Answer asserted twelve affirmative defenses and states counterclaims for violation of Business and Professions Code section 17000 *et seq.*, and declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201 and 2202. *Id.* After two motions to dismiss, the Court narrowed the declaratory relief claim to state only a narrow nuisance claim. ECF Nos. 88 (Order Regarding Motion to Dismiss), 90 (Order Regarding Motion for Clarification). Plaintiff and Counter Defendants filed their Answer to the Third Amended Answer and Third Amended Counterclaim on April 19, 2021. ECF No. 95 ("Plaintiff's Answer").

On December 6, 2021, the City filed its Motion for Summary Judgment. ECF No. 140 ("MSJ"). On December 27, 2021, Insight filed its Opposition, and Doe filed a joinder. ECF Nos. 150 ("Opp."), 155 ("Opp. Joinder"). On January 10, 2022, the City filed its Reply. ECF No. 160. ("Reply").

3

On December 6, 2021, Insight filed its Motion for Partial Summary Judgment and Doe filed a Joinder. ECF Nos. 144 ("PMSJ"), 146 ("Joinder"). On December 27, 2021, the City filed its Opposition. ECF No. 152 ("City's Opp."). On January 10, 2022, Insight, Beatificato, and Grosso filed their Reply. ECF No. 166 ("Plaintiff's Reply"). The Court held a hearing on May 12, 2022, and took the motions for summary judgment under submission. ECF No. 185. After the Court took the motions under the submission, the Court permitted Insight, Beatificato, and Grosso to submit a request for judicial notice in support of Insight's motion for partial summary judgment and opposition to the City's motion for summary judgment, which Insight, Beatificato, and Grosso filed on December 29, 2023. ECF Nos. 190, 191, 192. The Court gave the City an opportunity to oppose the request for judicial notice, and the City filed its opposition on January 4, 2024. *Id.*; ECF No. 193.

## REQUESTS FOR JUDICIAL NOTICE

### I.  **Applicable Law**

A court may take judicial notice of facts not subject to reasonable dispute where the facts "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

### II.  **Discussion**

#### A.  **Costa Mesa's Request for Judicial Notice**

The City filed a request for judicial notice in support of its motion for summary judgment. The City requests that the Court take judicial notice of numerous sections of its municipal code. ECF No. 141.

Judicial notice may be taken of matters of public record, including legislative enactments and public records. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that judicial notice may be taken of public records); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) (holding that "matters of public record," including official municipal enactments, "fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice"). Municipal ordinances are proper subjects for judicial notice because they constitute matters of public record that are not subject to reasonable dispute. *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 938 n.1

4

(9th Cir. 2007); *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 n.2 (9th Cir. 2007). Judicial notice of city council minutes, transcript, and video recording as public records is proper. *See Jonna Corp. v. City of Sunnyvale*, 2017 U.S. Dist. LEXIS 93353, at *10 (N.D. Cal. 2017).

As such, the Court GRANTS Costa Mesa's request for judicial notice.

**B.  Insight's Requests for Judicial Notice**

Insight filed a request for judicial notice in support of its motion for partial summary judgment, and a request for judicial notice in support of its opposition to the City's motion for summary judgment. ECF Nos. 148, 158. The requests seek judicial notice of the same exhibits. *Id.* Insight requests that the Court take judicial notice of a number of Costa Mesa ordinances, the Planning Commission agenda reports for Insight's hearings with the city, the Planning Commission's agenda and report for a hearing on the City's land use matrix, the City's General Plan Land Use Map, the Planning Commission's resolution denying Insight's appeal, the City Council agenda report for Insight's appeal, the City Council's resolution denying the appeal, and a notice of violation from the California Department of Housing and Community Development to the City of Encinitas. *Id.*

As discussed above, judicial notice is proper for public records, which include municipal ordinances, as well as municipal government minutes and meeting records. The Court therefore GRANTS Insight's requests for judicial notice.

**C.  Post-hearing Request for Judicial Notice**

On December 29, 2023, Insight filed a request for judicial notice, seeking judicial notice of three different items: a new Ninth Circuit case, *Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802 (9th Cir. 2023), *cert. denied sub nom. City of Costa Mesa, California v. Socal Recovery, LLC*, 144 S. Ct. 422, 217 L. Ed. 2d 234 (2023), as well as the California Department of Housing and Community Development's Group Home Technical Advisory, dated December 2022, and the California Department of Housing and Community Development's Letter of Technical Assistance to the City. ECF No. 192. Insight contends that *SoCal* is binding and that the two documents constitute matters of public records that are properly the subject of judicial notice. *Id.*

The City opposes this request for judicial notice with respect to the second and third items (the technical advisory and letter of technical assistance). ECF No. 193. The City contends that the fact that a state agency issued a "technical advisory" and sent a demand letter of technical assistance to the City has no legal bearing on the determination of the issues before this Court. *Id.* at 2. The City contends that Insight improperly seeks judicial notice of the truth of the matters asserted in these documents. The City also advances additional legal arguments related to its Motion for Summary Judgment. *Id.* at 4–7. Finally, the City agrees that *SoCal* represents a new standard of proof and thus does not dispute the request for judicial notice with respect to *SoCal*. Accordingly, the Court takes judicial notice of exhibit 1 (*Socal*). The Court also takes judicial notice of the existence of exhibits 2 and 3 (the technical advisory and letter of technical assistance), but because courts cannot take judicial notice of disputed facts stated in public records, the Court does not take judicial notice of the facts and assertions contained within these exhibits. *See Lee*, 250 F.3d at 690.

## ISSUES COMMON TO THE PARTIES' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT

The parties have each brought motions for summary judgment. Because the applicable law, rulings on evidentiary objections, and factual findings are common across both motions, the Court will address them together. The discussion of the merits of the respective motions will be addressed in subsequent sections.

### I.   Applicable Law

#### A.  Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Under Rule 56(a), a court also has authority to grant *partial* summary judgment, or
"judgment on less than the entire case." 10B Charles Alan Wright & Arthur R. Miller, *Federal
Practice & Procedure* § 2737 (4th ed. 2022) (citing Fed. R. Civ. P. 56(a)). Under Rule 56(g), a court
that "does not grant all the relief requested by the motion . . . may enter an order stating any material
fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ.
P. 56(g).

A court must view the facts and draw inferences in the manner most favorable to the non-
moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil
Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of
persuasion at trial—usually, but not always, a defendant—has both the initial burden of production
and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine
Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]he moving party must either
produce evidence negating an essential element of the nonmoving party's claim or defense or show
that the nonmoving party does not have enough evidence of an essential element to carry its
ultimate burden of persuasion at trial." *Id.* (citation omitted). "In order to carry its ultimate burden
of persuasion on the motion, the moving party must persuade the court that there is no genuine issue
of material fact." *Id.* (citation omitted).

Where a moving party fails to carry its initial burden of production, the nonmoving party has
no obligation to produce anything, even if the nonmoving party would have the ultimate burden of
persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for
summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its
burden of production, the burden shifts to the nonmoving party to produce evidence showing a
genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,
the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the
depositions, answers to interrogatories, and admissions on file, designate specific facts showing that
there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal
quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a
genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule

56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for" the opposing party." *Liberty Lobby*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

Where parties file cross motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "[E]ach motion must be considered on its own merits." *Id.* Even if both parties assert that no genuine disputes of material fact exist, the court must still review the record and determine that there are no disputes of material fact before granting summary judgment to either party. *See id.*

## B.  Alternative Theories of Disability Discrimination

Insight has brought claims under the FHA, the ADA, and the Rehabilitation Act. Insight has also brought claims under the state counterparts of these federal statutes, namely, the FEHA, the

Unruh Civil Rights Act[2], and Section 11135, respectively. Under each of these statutes, a plaintiff may show disability discrimination based on "disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 736–37, 38, 39 (9th Cir. 2021); (explaining that disparate impact and failure to accommodate theories are viable under the ADA and Rehabilitation Act); *see* 42 U.S.C. § 3604 (f)(3)(B) (describing theory of liability based on failure to make reasonable accommodation under the FHA); Cal. Gov. Code § 12927 (c)(1) (expressly defining discrimination in connection with housing accommodation to also include the failure to make a reasonable accommodation); Cal. Gov. Code § 11135 (b) (expressly providing that "[w]ith respect to discrimination on the basis of disability, programs and activities subject to [Section 11135,] subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132) and the federal rules and regulations adopted in implementation thereof. . . ."); *see also Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 502–504 (9th Cir. 2016) (noting that disparate treatment and disparate impact theories are viable under the FHA); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) (noting that through the ADA, "Congress [also] intended to prohibit outright discrimination" or disparate treatment); *Bassilios v. City of Torrance*, 166 F. Supp. 3d 1061, 1084 (C.D. Cal. 2015) (California Government Code "[s]ection 11135 'is identical to the Rehabilitation Act except that the entity must receive State financial assistance rather than Federal financial assistance.'"); *Rodriguez v. Barrita, Inc.*, 10 F. Supp. 3d 1062, 1074 (N.D. Cal. 2014) ("Because the ADA itself contains no intent requirement, the California Supreme Court has held that where an Unruh Act claim is premised on a violation of the ADA, the plaintiff need not demonstrate intentional discrimination to recover. [Citation omitted.]"); *Sisemore v. Master Fin., Inc.*, 151 Cal. App. 4th 1386, 1418 (2007) (noting that disparate impact and disparate treatment theories under FEHA are cognizable").

/ / /

---

[2] The Court will address the Unruh Civil Rights Act claim separately, however, as the City seeks summary judgment on this claim for additional reasons. City MSJ at 37–38.

### C.  Fair Housing Act (FHA) and California Fair Employment and Housing Act (FEHA)

Under the FHA, it is illegal to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-- (A) that buyer or renter . . . or (C) any person associated with that buyer or renter." 42 U.S.C. §§ 3604(f)(1)(A)–(C). Discrimination also includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604 (f)(3)(B).

"Person" includes "one or more individuals and corporations, partnerships, [and] associations . . . ." 42 U.S.C. § 3602 (d). Likewise, "dwelling" means "any building, structure, or portion therefore which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b). Under the FHA, handicap does not include "current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21)" and means "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment[.]" 42 U.S.C. § 3602(h).

The FEHA provides that "the opportunity to seek, obtain, and hold housing without discrimination because of . . . disability. . . is hereby recognized as and declared to be a civil right." Cal. Gov. Code § 12921(b). The term "disability" includes mental and physical disabilities. Cal. Gov. Code §§ 12926(j) (defining mental disability), 12926(m) (defining physical disability); *see also id.* § 12921(n) ("Notwithstanding subdivisions (j) and (m), if the definition of "disability" used in the federal Americans with Disabilities Act of 1990 (Public Law 101-336) would result in broader protection of the civil rights of individuals with a mental disability or physical disability, as defined in subdivision (j) or (m), or would include any medical condition not included within those definitions, then that broader protection or coverage shall be deemed incorporated by reference into, and shall prevail over conflicting provisions of, the definitions in subdivisions (j) and (m).") Discrimination under the FEHA "includes refusal to make reasonable accommodations in rules,

10

policies, practices, or services when these accommodations may be necessary to afford a disabled

person equal opportunity to use and enjoy a dwelling." Cal. Gov. Code § 12927(c)(1).

### D.  Americans with Disabilities Act (ADA) and the Unruh Civil Rights Act

The ADA provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Disability, with respect to a person, means "(A) a physical or mental impairment that substantially

limits one or more major life activities of such individual; (B) a record of such an impairment; or (C)

being regarded as having such an impairment. . . ." 42 U.S.C. § 12102 (1); see also *id.* § 12102(3)

(further defining the phrase "regarded as having such an impairment"). The ADA defines public

entity as "any State or local government" and "any department, agency, special purpose district, or

other instrumentality of a State or States or local government." 42 U.S.C. §§ 12131 (1)(A), (B).

"[Q]ualified individuals with a disability" is defined as "an individual with a disability who, with or

without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids

and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." *Id.* § 12131(2).

"A violation of the right of any individual under the federal Americans with Disabilities Act

of 1990 (Public Law 101-336) shall also constitute a violation of" the Unruh Civil Rights Act. Cal.

Civ. Code § 51(f). In addition, under the Unruh Civil Rights Act, "[a]ll persons within the

jurisdiction of this state are free and equal, and no matter what their . . . . disability [or] medical

condition . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or

services in all *business establishments* of every kind whatsoever." Cal. Civ. Code § 51(b) (emphasis

added). Because the parties dispute whether the City constitutes a business establishment, the Court

will separately analyze the Unruh Civil Rights Act claim.

### E.  The Rehabilitation Act and California Government Code section 11135

"The Rehabilitation Act was the first major federal statute designed to protect the rights of

and provide assistance to" individuals with disabilities. *Smith v. Barton*, 914 F.2d 1330, 1338 (9th

Cir. 1990). Congress viewed this sort of discrimination to be "to be most often the product, not of

invidious animus, but rather of thoughtlessness and indifference." *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 954 n.5 (9th Cir. 2020) (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)). A successful Section 504 claim "requires a showing that (1) the plaintiff is an individual with a disability; (2) [the plaintiff] is otherwise qualified to receive the benefit; (3) [the plaintiff] was denied the benefits of the program solely by reason of . . . disability; and (4) the program receives federal financial assistance." *Id.* at 954 (citing *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017); *see also* 29 U.S.C. § 794(a)). Disability is defined the same way as in the ADA. *See* 29 U.S.C. § 705(9)(B) ("[F]or purposes of sections 701, 711, and 712 of this title and subchapters II, IV, V, and VII, the meaning given it in section 12102 of Title 42.") The Ninth Circuit has explained, that while "a private plaintiff must show intentional discrimination under the statutes modeled after Title VI, . . . [courts] interpret this requirement 'somewhat more broadly' for Rehabilitation Act claims in light of that statute's purpose." *Schmitt*, 965 F.3d at 954 (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008)) (footnote omitted). As a result, Section 504 should be interpreted broadly enough to encapsulate actions that are not "fueled by a discriminatory intent." *See id.* at 954, n.5.

Section 11135 "is identical to the Rehabilitation Act except that the entity must receive" financial assistance from the state rather than the federal government. *Bassilios*, 166 F. Supp. 3d at 1084. Section 11135 prohibits denying individuals with physical and mental disabilities, among others, "full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov. Code § 11135(a). Section 11135 applies the same definitions as Government Code section 12926. *Id.* § 11135(c). The protected groups include those who have or are perceived as having any protected characteristics and those who associate with a person who has or is perceived to have any of the protected characteristics. *Id.* § 11135 (d).

## II. Rulings On the Parties' Respective Evidentiary Objections

As a threshold matter, the Court considers the evidentiary objections offered by each party, ECF Nos. 154, 159, 162, 169.

First, the parties' relevance objections are redundant to the summary judgment standard, and as such, the Court OVERRULES these objections. Under Rule 56, a court may only grant summary judgment if "the movant shows that there is no genuine dispute as to any *material* fact." Fed. R. Civ. P. 56(a) (emphasis added). It follows that a court may not rely on *irrelevant* facts that are immaterial to the legal issues, and thus relevance objections are redundant. Instead of objecting to the admissibility of the Exhibits, the parties may simply argue that the facts proffered are not material. The Court determines that all facts listed in its Findings of Fact are material.

Second, the parties' objections to the *form* of evidence are not proper for consideration at summary judgment, and as such, the Court OVERRULES the objections on the basis of hearsay, lack of personal knowledge, authentication, the best evidence rule, and incompleteness. The Ninth Circuit has recognized that "a party does not necessarily have to produce evidence in a *form* that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). In other words, when evidence is not presented in admissible form at summary judgment but could be later presented in an admissible form at trial, a court may still consider the evidence for the purposes of summary judgment. *Id.* at 1037; *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

The City offers boilerplate objections to almost the entirety of the declarations of Jane Doe, Grosso, Beatificato, Carla DiCandia, and Mark Binder as well as the supplemental declarations of Beatificato and Alisha Patterson. ECF No. 154, 162. Boilerplate recitations of evidentiary principles without analysis applied to specific items of evidence are not proper objections, and a court need not give weight to them. *Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development."); *Cmtys. Actively Living Indep. & Free v. City of Los Angeles*, No. CV 09–0287 CBM (RZx), 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad). The Court therefore OVERRULES them.

Insight objects to several portions of the declarations of Jennifer Le and Christopher Lee on the basis that they improperly state a legal opinion. ECF Nos. 159, 169. The Court SUSTAINS objections to Jennifer Le and Christopher Lee's declarations based on improper legal opinion and overrules all other objections.

"Defects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection." *Hoye v. City of Oakland*, 653 F.3d 835, 841 n.3 (9th Cir. 2011) (quoting *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 485–86 (9th Cir. 1991)). The City did not file formal objections to the Moss Joyner Expert report. *See generally* ECF Nos. 154, 162. Instead, the City opposed the conclusions made by Moss Joyner, and argued that the expert report is unsupported and lacks foundation. *See* ECF No. 152 at pp. 12–15; *see* ECF No. 160 at pp. 15–18. The City made the same arguments in its opposition to Insight's partial summary judgment motion and in its reply in support of its motion for summary judgment. *Id.* Insight addressed these arguments in its reply in support of its motion for partial summary judgment. ECF No. 163 at pp. 10–14. Insight has demonstrated that the expert report is admissible as presented and is adequately supported and does not lack foundation. Accordingly, the Court OVERRULES these objections.

## III.   Findings Of Fact[3]

The Court finds that the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and (g).

/ / /

---

[3] The facts set forth below are taken from the parties' prepared Statements of Undisputed Facts and responses. ECF Nos. 143 ("Defendant's UF in support of MSJ"), 151 ("Plaintiff's responses to Defendant's UF", 145 ("Plaintiff's UF in support of PMSJ"), 153 ("Defendant's response to Plaintiff's UF"), 156 ("Defendant's AUF in support of Opposition to PMSJ), 166, ("Plaintiff's Response to SAUF Opp'n").

To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set forth were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

Facts originating from the City's statement of undisputed facts in support of its motion for summary judgment are labeled – "City-UF." Facts originating from Insight's statement of undisputed facts in support of its motion for partial summary judgment are labeled "P-UF."

1

**A.  Insight and the Property**

2      Since February of 2015, Insight has leased six residential units at 2641 Santa Ana Avenue,

3 Units A-F, Costa Mesa, CA 92626 (the "Property") and provides housing. P-UF 1–2, 19. Three of

4 the units on the Property (Units A, B, and C) are detached single-family dwellings, and the other

5 three units (Units D, E, and F) are attached multi-family dwellings (i.e., apartments). P-UF 20.

6      The Property has at least 24 rooms, including bedrooms and living rooms, and has at least 15

7 bedrooms. P-UF 21, 22. Insight's Costa Mesa housing can accommodate up to 30 residents, but

8 typically accommodates less than 25 residents at any given time. P-UF 23–24.

9      Between February 2015 and early-2016, Insight provided shared housing at the Property for

10 individuals recovering from substance use disorders. P-UF 3. However, since late 2016, Insight has

11 provided shared housing for individuals with a primary mental health diagnosis at the Property. P-

12 UF 4. Insight does not use the Property to provide treatment. P-UF 6. Having a disability is only *one*

13 of the admissions criteria for Insight's Costa Mesa housing. P-UF 8. From late-2016 onward,

14 virtually all of the residents of Insight's Costa Mesa housing had a primary mental health diagnosis.

15 P-UF 9. Insight's Clinical Director screens every potential resident to ensure they have a disability

16 that makes Insight's Costa Mesa housing an appropriate placement. P-UF 9, 12. Insight's owner,

17 Beatificato, signed an affirmation for the City under penalty of perjury that "only residents (other

18 than the house manager) who are handicapped as defined by state and federal law . . .  reside at the

19 group homes." P-UF 10.

20      The City's General Plan land use designation for the Property is Medium Density

21 Residential. P-UF 32. The Property is located in a R2-MD district (Multiple-Family Residential

22 District, Medium Density), a multifamily zoning district. P-UF 33, 34. There are other multi-family

23 apartment buildings directly to the north and south of the Property. P-UF 31.

24      / / /

25      / / /

26      / / /

27

28

15

**B. Zoning Code Provisions**[4]

Prior to January 2, 2014, the City's Zoning Code defined "single housekeeping unit" as "the functional equivalent of a traditional family, whose members are a nontransient interactive group of persons jointly occupying a single dwelling unit, including the joint use of common areas and sharing household activities and responsibilities such as meals, chores, and expenses." P-UF 40. Effective January 2, 2014, Ordinance No. 13-05 amended the Zoning Code's definition of "single housekeeping unit" to mean:

> the occupants of a dwelling unit have established ties and familiarity with each other, jointly use common areas, interact with each other, share meals, household activities, lease agreement or ownership of the property, expenses, and responsibilities; membership in the single housekeeping unit is fairly stable as opposed to transient, and members have some control over who becomes a member of the single housekeeping unit.

P-UF 42.

The definition of "single housekeeping unit" was amended again, effective November 20, 2014. P-UF 45–46. Since November 20, 2014 (the effective date of Ordinance No. 14-13), the Zoning Code defines "single housekeeping unit" as:

> The occupants of a dwelling unit have established ties and familiarity with each other, jointly use common areas, interact with each other, share meals, household activities, and expenses and responsibilities; membership in the single housekeeping unit is fairly stable as opposed to transient, members have some control over who becomes a member of the household, and the residential activities of the household are conducted on a nonprofit basis. There is a rebuttable presumption that ***integral facilities*** do not constitute single housekeeping units. Additional indicia that a household is not operating as a single housekeeping unit include but are not limited to: the occupants do not share a lease agreement or ownership of the property; members of the household have separate, private entrances from other members; members of the household have locks on their bedroom doors; members of the household have separate food storage facilities, such as separate refrigerators.

P-UF 46.

---

[4] The Court also notes that the Ninth Circuit summarized the relevant municipal ordinances in *Socal Recovery,* 56 F.4th at 807.

Since December 17, 2015, the CMMC has defined a "boardinghouse" as "[a] residence or dwelling, other than a hotel, wherein rooms are rented under two (2) or more separate written or oral rental agreements, leases or subleases or combination thereof, whether or not the owner, agent or rental manager resides within the residence." City-UF 3. The CMMC further differentiates between small and large boardinghouses. *Id.* "Boardinghouse, small means two (2) or fewer rooms being rented. Boardinghouse, large means three (3) to six (6) rooms being rented. Boardinghouses renting more than six (6) rooms are prohibited." *Id.* The CMMC defines "group home" as

> A facility that is being used as a supportive living environment *for persons who are considered handicapped under state or federal law*. A group home operated by a single operator or service provider (whether licensed or unlicensed) constitutes a single facility, whether the facility occupies one (1) or more dwelling units. Group homes shall not include the following: (1) residential care facilities; (2) any group home that operates as a single housekeeping unit.

Insight's response 27.c to City-UF 27 (citing ECF No. 141-1 at p. 5 (emphasis added)).

Likewise, since December 17, 2015, small boardinghouses must be at least 650 feet from other small boardinghouses, and large boardinghouses must be at least 1,000 feet from any other boardinghouse. City-UF 6.

Before the effective date of Ordinance No. 14-13, the City did not have regulations for "group homes." P-UF 48. Effective November 20, 2014, Ordinance No. 14-13 created regulations for group homes in single family residential (R1) zoning district *only*. P-UF 45, 49 (emphasis added). For the R1 district only, Ordinance No. 14-13 created a requirement for a small group home (6 or fewer occupants) to obtain a special use permit ("SUP") and did not permit a group home with 7 or more occupants. P-UF 50–51. In addition, Ordinance No. 14-13 prohibits a sober living home from being located within 650 feet, as measured from the closest property lines, of any other sober living home or a state licensed alcoholism or drug abuse recovery or treatment facility. P-UF 52.

Ordinance No. 15-11 became effective on December 17, 2015, and created "group home" regulations for Costa Mesa's multifamily residential zoning districts, including the R2-MD zoning district. P-UF 58, 59. Ordinance No. 15-11 required that small group homes (6 or fewer occupants) in multi-family districts obtain a SUP. P-UF 60. Ordinance No. 15-11 required large group homes (7 or more occupants) in multi-family districts to obtain a conditional use permit ("CUP"). P-UF 61.

Finally, Ordinance No. 15-11 prohibited a group home from being located within 650 feet of any group home, sober living home, or state licensed drug and alcohol treatment facility, as measured from the property line. P-UF 62.

One of the stated purposes of Ordinances 14-13 and 15-11 was to address the perceived "overconcentration" of group homes. P-UF 74.

### C. The Conditional Use Permit Application and The Request for a Reasonable Accommodation

In August of 2016, the City cited Insight for a number of alleged violations of its zoning ordinances. P-UF 87. The City informed Insight that it would need to apply for a CUP to continue operating. *Id.*

On or about October 26, 2016, Insight submitted applications for a CUP and operator's permit. P-UF 88. Around March 2018, the City discovered an apparent separation conflict ("Separation Conflict") for Insight's housing — Insight's housing was located within 650 feet of certain state-licensed drug and alcohol treatment facilities in unincorporated Orange County (the "County facilities"). P-UF 89. On or about July 2, 2018, the City informed Insight of the apparent Separation Conflict, and told Insight that it would recommend denying Insight's CUP unless Insight was able to obtain approval of a "reasonable accommodation." P-UF 90, 93. On or about August 3, 2018, Insight submitted an application for a reasonable accommodation asking the City to either: (1) waive the 650 feet separation requirement for Insight's housing; or (2) determine that Insight's housing is not within the purview of the City's group home regulations. P-UF 94. However, or about April 5, 2019, the City's Director of Economic and Development Services ("Director") denied Insight's reasonable accommodation request. P-UF 96. The Planning Commission directed staff not to relax the 650-foot separation requirement for group homes. P-UF 97.

### D. The Appeal to Various City Entities

Insight appealed the CUP denial to Costa Mesa's City Planning Commission ("Planning Commission") on April 12, 2019. P-UF 98. The Planning Commission denied Insight's appeal after a hearing. P-UF 99-100. Insight then appealed to the Costa Mesa's City Council, which also denied its appeal after another hearing. P-UF 101–02, 105–08. The City Council adopted a Resolution

upholding the Planning Commission's denial of Insight's Reasonable Accommodation Request and denying Insight's CUP. P-UF 108. On November 14, 2019, the City sent Insight a letter requesting Insight "cease operations of the subject group home by December 14, 2019. P-UF 110. The City receives financial assistance from both the state and federal government. P-UF 117–18.

## COSTA MESA'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 140)

The City seeks summary judgment on all of Plaintiffs' claims, or in the alternative, partial summary judgment. As noted above, Plaintiffs bring three federal statutory claims, three California statutory claims, and two constitutional claims. Because, as discussed above, a plaintiff can plead three alternative theories under each of federal and state statutes asserted, the Court will largely discuss the claims according to the theory asserted, rather than the particular statute. Accordingly, after discussing the City's arguments regarding the threshold element of "disability," the Court will discuss the claims in the following order: (1) all disparate treatment claims, (2) all disparate impact claims, (3) all failure to accommodate claims, (4) the Unruh Civil Rights Act claim, and (5) the Section 1983 constitutional claims.

I.   **Discussion**

   A.  **Under Recent Ninth Circuit Law, The City's Arguments—That All of Insight's Disability Claims Cannot Survive Because Insight Cannot Prove "Disability"—Fail**

"The standards of proof required for the Plaintiffs' FHA, ADA, and FEHA disparate treatment claims are identical, and are all drawn largely from Title VII cases." *Pac. Shores Props., LLC v. City of Newport Beach* (*Pac. Shores*), 730 F.3d 1142, 1158 n.19 (9th Cir. 2013) (citations omitted). "The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act ("ADA")." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004). As explained above, the FHA defines disability as having "a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment[.]" 42 U.S.C. § 3602(h).

Focusing on the first definition[5], the City argues that it is entitled to summary judgment on all disability claims because Plaintiffs cannot prove that they are disabled on a case-by-case basis, as is required under *Toyota Motor Manufacturing, Kentucky v. Williams*, 534 U.S. 184, 198 (2002) (superseded by statute on other grounds). *See* MSJ at 16–17. The City further argues that the Second Circuit's decision in *Regional Economic Community Action Program v. City of Middletown* ("*RECAP*"), 294 F.3d 35 (2d Cir. 2002) is distinguishable because it was based on statutory requirements of halfway houses. *Id.* at 17–18.

Insight is not required to provide individualized evidence of disability. The Ninth Circuit rejected this argument in *Socal Recovery, LLC v. City of Costa Mesa* ("*Socal Recovery*"), 56 F.4th 802, 814–15 (9th Cir. 2023), *cert. denied sub nom. Costa Mesa, CA v. Socal Recovery, LLC*, 144 S. Ct. 422, 217 L. Ed. 2d 234 (2023). There, the Ninth Circuit held that "[a]ppellants and other sober living home operators can satisfy the 'actual disability' prong on a *collective basis* by demonstrating that they serve or intend to serve individuals with actual disabilities." *Id.* at 814. The Court disagrees that *RECAP* is distinguishable. The Ninth Circuit in *Socal Recovery* cited *RECAP* with approval and noted that the plaintiffs could show that their residents were actually disabled by using "admissions criteria and house rules, testimony by employees and current residents, and testimony by former residents." *Socal Recovery*, 56 F.4th at 815.

Here, the City has also not shown that Plaintiffs lack evidence with respect to each definition of handicap. Insight has provided testimony of former residents. *See* Opp. at 14–15 (Doe Decl. ¶¶ 3, 5, 10, 24–29). Virtually all of Insight's residents come to Insight's housing immediately after being released from 24-hour psychiatric care (Grosso Decl. ¶ 29; Beatificato Decl. ¶ 27; Beatificato Supp. Decl. ¶¶ 92–95) and Insight's Clinical Director attested that all of Insight's residents have one or

---

[5] For the first time on reply, the City argues that Plaintiffs cannot prevail on all claims based on the second and third subdefinitions of disability. Reply at 12–13. "The district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)). This is improper, and the Court does not consider arguments made for the first time on reply. While the City recognized that there are three definitions of disabled under the FHA, the City only focused on one definition of disability, specifically 42 U.S.C. § 3602(h)(1). MSJ at 16–17.

more mental impairments that substantially limit major life activities, such as caring for themselves,

working, learning, concentrating, communicating, eating, and sleeping (Grosso Decl. ¶¶ 26–28.)

Finally, Insight provided evidence that Insight's owner signed an affirmation under penalty of

perjury declaring that Insight's housing would only serve residents with disabilities. ECF No. 157-19

at p. 128. This evidence is more than sufficient to establish that Insight's residents are disabled.

Accordingly, the City is not entitled to summary judgment on this basis.

### B. The City Has Not Shown That It Is Entitled to Summary Judgment on Insight's Claims Under a Disparate Treatment Theory.

The City makes several arguments in support of its MSJ against all claims asserting a

disparate treatment theory of disability discrimination. First, the City argues that Plaintiffs cannot

make a prima facie case of disability discrimination under *McDonnell Douglas*. MSJ at 19–21.

Second, the City argues that its zoning code is not facially discriminatory and is beneficial such that

it cannot support a disparate treatment claim. *Id.* at 21–29. Third, the City argues that it can

articulate legitimate, nondiscriminatory reasons for its decision. *Id.* at 29–31. Fourth, the City argues

that Plaintiffs cannot prove that their legitimate nondiscriminatory reason was pretext. *Id.* at 31.

Fifth, and finally, the City argues that its "same decision" defense precludes liability for all disparate

treatment claims. *See id.* at 31–32.

### 1. Insight Need Not Rely on *McDonnell Douglas* To Create a Triable Issue of Fact on Its Disparate Treatment Claims.

The Court groups the City's first, third, and fourth arguments together because they are

related to the *McDonnell Douglas* burden-shifting framework, and addresses them below.

As an initial matter, the City argues that Plaintiffs' disparate treatment claims fail because

Plaintiffs cannot make a prima facie case of disability discrimination as applied in *Budnick v. Town

of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008) (applying a variation of the *McDonnell Douglas*

framework). MSJ at 19–20.[6] But, as Insight explains, Insight is relying on the *Arlington Heights*

framework to make out its claim. Opp. at 10–11; *id.* at 11, n.8. "[I]t is well established that the

*Arlington Heights* factors also provide one way for a plaintiff who alleges *statutory discrimination* to

establish discriminatory intent." *Pac. Shores*, 730 F.3d at 1159, n.21 (emphasis added). Therefore,

any failure by Insight to meet the requirements of *Budnick* is not a basis to grant summary judgment

to the City and the Court will not grant summary judgment to the City on this ground.

In *Pacific Shores*, a case concerning similar claims regarding similar regulations of group

homes, the Ninth Circuit held that rather than relying on the *McDonnell Douglas* approach to create

a triable issue of fact, a plaintiff could rely on the *Arlington Heights* approach. *Pac. Shores*, 730 F.3d

at 1158. Under that approach, "where . . . there is direct or circumstantial evidence that the defendant

has acted with a discriminatory purpose and has caused harm to members of a protected class, such

evidence is sufficient to proceed to trial under a disparate treatment theory." *Id.* at 1148. Applying

that approach here, Insight has produced enough such evidence to proceed to trial.[7] Opp. at 11–16.

> Under *Arlington Heights*, this Court looks at the following five non-exhaustive factors:
> (1) statistics demonstrating a "clear pattern unexplainable on grounds other than"
> discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he
> specific sequence of events leading up to the challenged decision," (4) the
> defendant's departures from its normal procedures or substantive conclusions, and
> (5) relevant "legislative or administrative history."

---

[6] The Court notes that City-UF 16 relies on Exhibits "4" through "31" of the City's request for judicial notice. ECF Nos. 141-1 to 141-28, which is nearly the entirety of its Zoning Code. Insight disputes this fact, pointing out that Insight's experts opined that the City's stated rationale for its Group Home Regulations (e.g., occupancy, parking, noise, secondhand smoke, etc.) were not legitimate and could be addressed through other regulations (e.g., the City's Nuisance Ordinance [ECF No. 147-25] and Noise Ordinance [ECF No. 157-69]) that did not single out housing for people with disabilities for different treatment. The evidence cited by the City demonstrates that these are rationales that were provided in the recitals of the ordinances, not that the recitals are true. *See*, *e.g.*, ECF No. 141-3.

[7] In its reply, the City does not respond to Insight's arguments about application of *Arlington Heights* rather than *McDonnell Douglas*. *See generally* City Reply. It is difficult to imagine what response the City could present in support of its position that Insight must satisfy *McDonnell Douglas* to prevail. The Ninth Circuit has "unambiguously rejected this position" explaining, "*McDonnell Douglas* simply *permits* a plaintiff to raise an inference of discrimination by identifying a similarly situated entity who was treated more favorably. It is not a [straitjacket] *requiring* the plaintiff to demonstrate that such similarly situated entities exist." *Pac. Shores*, 730 F.3d at 1159. Similarly, the Court need to reach the City's arguments about pretext which are based upon *McDonnell Douglas*. *See* MSJ at 29–31; City-UF 16.

1    *Pac. Shores*, 730 F.3d at 1158–59 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*

2    (*Arlington Heights*), 429 U.S. 252, 266–68 (1977)); *Comm. Concerning Cmty. Improvement v. City*

3    *of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (applying the *Arlington Heights* factors). Importantly,

4    the Ninth Circuit has made clear that "very little" of such evidence is needed, and, in fact, "*any*

5    indication of discriminatory motive" may create a genuine issue of material fact. *Id.* at 1159 (quoting

6    *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (emphasis added) (quoting

7    *Lowe v. City of Monrovia*, 775 F.2d 988, 1009 (9th Cir. 1985)).

8        Consistent with *Arlington Heights* and *Pacific Shores*, Insight has presented ample

9    circumstantial evidence of discriminatory intent with respect the underlying group home regulations

10   and the City's application of the group home regulations against Insight. *See, e.g.*, Opp. at 20–21

11   (citing ECF Nos. 141-3 at p. 4, 141-4 at p. 5.) Insight presents evidence that addresses the "historical

12   background of the decision," "[t]he specific sequence of events leading up to the challenged

13   decision," as well as "[d]epartures from the normal procedural sequence" with respect to its

14   reasonable accommodation application. Opp. at 22–23.

15        Insight points to evidence that the purpose of the City's group home regulations is to reduce

16   the number of group homes. ECF No. 141-3 at p. 42 (citing concerns about the "significant increase

17   in sober living homes" and "the proliferation of sober living homes"); ECF No. 141-4 at p. 62. The

18   City's Zoning Code defines "group home" as "a supportive living environment for persons who are

19   considered handicapped under state or federal law." ECF No. 141-1 at p. 13 (CMMC § 13-6). The

20   regulations create barriers (namely separation, use permit, and operator's permit requirements) for

21   providers of shared housing for the disabled that the City does not place on providers of single and

22   multi-family housing for the general population, which the City also permits by right in its

23   residential zones. ECF No. 141-2 (CMMC Table 13-30, rows 1–2.2) at pp. 2–3; ECF No. 157-64 at

24   pp. 81–83 (testimony that the deponent believed that the group home regulations would not apply if

25   Insight went back to being "apartments"); Binder Decl., ¶¶ 16–19 (attesting that the City has not

26   required the declarant to obtain special use or conditional use permits even though the declarant

27   owns multiple multifamily properties in Costa Mesa). The City made its new group home

28   regulations retroactive, preventing existing homes from taking advantage of the City's legal

nonconforming use protections that other land uses enjoy. ECF No. 141-4 at pp. 67–68 (Ord. 15-11, § 13-324, which provides that the regulations apply to existing group homes in R2-MD zones, among others); ECF No. 141-30 (CMMC § 13-204 on "nonconforming provisions"). Finally, Insight provides evidence that the City targeted group homes for enforcement, issuing hundreds of citations and publicly tracking them on its website. ECF No. 157-56 (Group Homes Cited WEB smartsheet.)

With respect to discrimination against Insight in its application, Insight presents evidence that it was told by City staff to apply for a reasonable accommodation from the Director even though the City Staff knew that, despite what the City's Code says, the Director had no authority to grant such accommodations. *See* ECF No. 157-65, at pp. 124–27 (testimony that the Planning Commission was not interested in deviating from the 650-foot separation requirement even when individuals submitted a reasonable accommodation); *see also* ECF No. 141-8 (CMMC § 13-200.62 (d), (e)). The public hearings on Insight's appeals included public comment about Insight, its owners, and its residents, much of which appears to have been based on fear and prejudice. *See, e.g.*, ECF No. 157-52 at p. 53 (Business owner testifying) ["somebody is mentally disabled does not belong in a neighborhood next door to me or any of us in this room"]. Finally, Insight presents evidence that during its appeal presentation to the City Council, Insight was not told that there would be a time limit and was also cut off abruptly during its presentation. *Id.* at pp. 41–44.

Insight has presented enough evidence to raise a triable issue of fact as to whether there was a discriminatory intent against individuals with disabilities with respect to the City's enactment of the ordinances, as well as against Insight under the *Arlington Heights* factors. Therefore, the City is not entitled to summary judgment on the disparate treatment claims on this basis.

2. The City has not shown that the Challenged Ordinances are "Beneficial."

The City contends that the group home ordinances are actually beneficial to the disabled— when compared to other boardinghouses—and therefore Insight's disparate treatment claim fails. MSJ at 21–29. It appears to this Court that the City's arguments in support of this contention fail for many of the same reasons that similar arguments by the municipality in *Pacific Shores* failed: at

best, the City's arguments show over-discrimination, which is itself prohibited.[8] As the Ninth Circuit made clear, "[a] willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination; it simply underscores the depth of the defendant's animus." *Pac. Shores*, 730 F.3d at 1159.

Similarly, the City's "same decision defense" fails. The City argues that it is entitled to summary judgment based on the "same decision" defense, and cited a number of non-binding cases in support.[9] MSJ at 31–32 (citing *Arlington Heights*, 429 U.S. at 270, n. 21.) In a footnote, the Supreme Court explained the same decision defense as follows:

> Proof that the decision by the [government] was motivated *in part* by a . . . discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the [government] the burden of establishing that the *same decision* would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

*Arlington Heights*, 429 U.S. at 271, n. 21 (emphasis added). The City has failed to demonstrate that it is entitled to the same decision defense in this instance. The City argues that the Group Home Regulations *required* the denial of a CUP if the applicant is within 650 feet of another sober living home or a state licensed alcoholism or drug abuse recovery or treatment facility, which Insight was. MSJ at 32. But the City has erroneously focused solely on the discrete action of *denying the CUP* as the basis for the disparate treatment claim as opposed to the *denial of the reasonable accommodation*. MSJ at 32, City Reply at 19. As Insight points out, Plaintiffs' claims are based on the City's failure to grant the reasonable accommodation by relaxing the 650-foot separation

---

[8] The City acknowledges that Insight is not bringing a facial challenge, but argues without support that because Insight's as-applied challenge relies on a claim of facial discrimination, *United States v. Salerno* applies and the question before the Court is whether Insight *could* bring a facial challenge. Simply put, Insight has not brought a facial challenge, and so *Salerno* does not apply. The Court therefore need not address its application any further.

[9] The City cites *New Hope Fellowship, Inc. v. City of Omaha*, No. B04CV259, 2005 WL 3508407, at *6 (D. Neb. Dec. 22, 2005) and *A.H.D.C. v. City of Fresno*, No. CIV-F-97-5498 OWW, 2004 WL 5866233, at *20 (E.D. Cal. Mar. 9, 2004), *aff'd sub nom. Affordable Housing Dev. Corp. v. City of Fresno*, 433 F.3d 1182 (9th Cir. 2006), in support.

requirement. The Court notes that the City does not point to any portion of the zoning code which would require the denial of the *reasonable accommodation* request. Therefore, the City has failed to demonstrate that the same decision defense applies. Accordingly, the City is not entitled to summary judgment on this basis.

But even putting to one side the evidence of over-discrimination, the City has failed to show that the ordinances at issue do not provide for less favorable treatment for the disabled. First, the City points to the regulation of boardinghouses in R1 zones. Insight's project is in the R2 (multifamily) zone (Beatificato Decl. ¶¶ 33–36, 45), so the regulation of boardinghouses in a different zone is irrelevant. Similarly, the City's citations to the recitals of its ordinances do not demonstrate that the group home regulations are not facially discriminatory.[10] The City has failed to point to portions of the zoning code that apply to group homes in the multifamily districts. Accordingly, the City is not entitled to summary judgment on this basis.

Second, the City has failed to show the absence of a genuine issue of material fact with respect to whether these ordinances benefit the disabled. The Court notes that the City makes several conclusory arguments without citation to authority or the evidence that support its position that its own ordinances are beneficial. MSJ at 27. The City argues that the full context of its zoning code needs to be considered, including that the Group Home Regulations[11] are *optional* beneficial exceptions to the City's Boardinghouse Regulations.[12] MSJ at 27. While the City argues that it "is a

---

[10] A facially discriminatory policy is one which on its face applies less favorably to a protected group." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007) (footnote omitted) (citing *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000)); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995) (holding that an ordinance that singled out the handicapped and applied different rules to them was discriminatory on its face). With respect policies or ordinances that are discriminatory on their face, "a plaintiff makes out a prima facie case of intentional discrimination under the [Fair Housing Act] merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment." *Cmty. House*, 490 F.3d at 1050 (quoting *Bangerter*, 46 F.3d at 1501).

[11] The City defines "Group Home Regulations" within the municipal code as "the City's zoning ordinances 14-13, 15-11, and 17-05, and [other] related ordinances, ('the Ordinances') and corresponding Municipal Code ('CMMC') §§ 13-6, 13-30, 13-200.60 through 13-200.63, 13-310 through 13-313, 13-320 through 13-325, and 9-370 through 9-378." MSJ at 12.

[12] The City defines "Boardinghouse Regulations" within the municipal code as CMMC §§ 13-6 (definition of Boardinghouse) and 13-30 (Citywide Land Use Matrix restricting Boardinghouses). MSJ at 12.

logical certainty that boardinghouses that can qualify as group homes are absolutely equal with similarly situated boardinghouses that serve non-disabled persons, because boardinghouses that can qualify as group homes can still apply as a boardinghouse serving non-disabled persons and be subject to the exact same regulations," MSJ at 27 (footnote omitted), the City fails to cite the relevant code provisions that lead it to *that* conclusion.[13] *See also* MSJ at 28 (arguing that "boardinghouses that can qualify as group homes have a more than equal opportunity" without citation to relevant municipal code provisions). Arguments "not supported by citations to the record or to case authority are generally deemed waived." *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010). Here, Insight has already shown that the group home regulations are defined in such a way as to only include housing for individuals who are considered handicapped or disabled under state and federal law. *See* Opp. at 16 (citing ECF No. 141-1 at p. 13 [CMMC § 13-6]). The City has not explained why it would be beneficial for a group home operator in a multi-family district to obtain a CUP and an operator's permit when such group homes were not previously required to do so. Accordingly, the City has not demonstrated that its regulations are beneficial to individuals with disabilities and is not entitled to summary judgment on this basis.

### C. The City Has Not Shown That It Is Entitled to Summary Judgment on Insight's Disparate Impact Claims.

In addition, the City seeks summary judgment on all claims asserting a disparate impact theory of disability discrimination. MSJ at 32–35. In support of its motion, the City makes two primary arguments: (1) that Insight cannot make out a prima facie case of disparate impact as required under governing law; and (2) Insight cannot show that the City's justification for the ordinances are a pretext, thereby defeating any disparate impact claim.

/ / /

/ / /

---

[13] In a footnote, the City argues that applicants have the choice regarding whether they affirm that they serve disabled persons. To the Court, it seems that the City is saying that applicants can choose to perjure themselves when submitting the application for the permit to enjoy the alleged beneficial exceptions. *See* MSJ at 27, n.3.

1.  Insight is Required to Show a Discriminatory Effect, Using Statistical Evidence.

Disparate impact claims concern discriminatory effects. *See Budnick,* 518 F.3d at 1118. A plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997) (quoting *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996)). A plaintiff must set forth "statistics or other proof" demonstrating causation, specifically, that the challenged practice had a "significantly adverse or disproportionate impact" on a protected group. *Id.* "[A] disparate-impact claim that relies on a statistical disparity . . . fail[s] if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015) (emphasis added).

After a plaintiff makes out a prima-facie disparate impact case, "housing authorities. . . state and explain the valid interest served by their policies. This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability." *Texas Dep't of Hous.*, 576 U.S. at 541 (citation omitted). To meet this burden, a defendant must "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* at 527 (quoting 24 C.F.R. § 100.500(c)(2)). HUD regulations provide: "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a *legally sufficient justification*. . . ." 24 C.F.R. § 100.500 (emphasis added). Legally sufficient justification is further defined. 24 C.F.R. § 100.500 (b)(1). To provide a legally sufficient justification, a defendant must prove with *evidence* that the challenged practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the . . . defendant, with respect to claims brought under 42 U.S.C. 3613 . . . *and* . . . [t]hose interests could not be served by another practice that *has a less discriminatory effect*." 24 C.F.R. § 100.500 (b)(1) (emphasis added); *id.* § 100.500 (b)(2) (providing that evidence is required to establish as legally sufficient justification).

1    Governmental policies are "contrary to the disparate-impact requirement . . . [when] they are

2    'artificial, arbitrary, and [create] unnecessary barriers.'" *Texas Dep't of Hous.*, 576 U.S. at 543

3    (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). If a defendant satisfies the burden of

4    proof and sets forth a legally sufficient justification, the "plaintiff may still prevail upon proving that

5    the substantial, legitimate, nondiscriminatory interests supporting the challenged practice *could be*

6    *served by another practice that has a less discriminatory effect*." 24 C.F.R. § 100.500 (c)(3)

7    (emphasis added).

8                    2.   Insight has proffered evidence of disparate impact.

9          Insight acknowledges its burden to provide evidence of disparate impact, and points to the

10   expert report of its designated expert Ann Moss Joyner and data provided by the City to show that

11   the ordinances have had an adverse impact on the disabled. In response, the City argues that the

12   evidence presented is insufficient and/or irrelevant. Having considered the City's arguments, the

13   Court finds that the City has failed to show the absence of a genuine issue of material fact with

14   respect to the question of whether beds for the disabled have gone up or down in the wake of the

15   ordinances.

16         First, the City argues that the best evidence available shows no disparate impact. In fact,

17   according to the City—and mirroring its arguments on disparate treatment that the ordinances are

18   beneficial—the number of housing opportunities for the disabled went up significantly since the

19   ordinances were passed. The City points to data indicating that those opportunities increased by over

20   500, across all residential districts for at least two years after the regulations were passed—10 for R-

21   1, 254 for R-2, and 273 for R-3. City-UF 29 (citing Le Decl. ¶¶ 17–30, Exs. 2, 3). The City asks the

22   Court to draw an inference that by October 2017, the impact (if any) of the ordinances would have

23   been felt, and therefore the fact that there were so many more beds in October 2017 shows that the

24   ordinances did not cause beds to decrease, and the ordinances did not have any negative impact on

25   the disabled, much less a disparate one. However, Insight points to evidence showing that the City

26   had not begun its enforcement efforts in earnest as of October 2017 (the final data set relied upon by

27   the City), which calls into question the conclusions that the City draws from its data. *See* ECF No.

28   151, Insight's response to City-UF 29.b (ECF No. 157-22 at p. 3 ("Due to the workload and backlog

1    of group home applications at the time, staff was unable to evaluate and proceed with the

2    [Conditional Use] application [for this group home] until early 2018.")). If believed by a jury, this

3    would mean that the impact (if any) of the ordinances was not felt by October 2017 and therefore

4    any October 2017 increase in housing opportunities for group homes does not show that the

5    ordinances did not have a disparate impact on the disabled. Accordingly, drawing all inferences in

6    favor of Insight, the Court concludes that this purported 2014-to-2017 increase does not establish the

7    absence of a genuine issue of material fact as to disparate impact.

8        Second, the City argues that the 2021 data—which Insight asserts shows the true impact of

9    the ordinances—is irrelevant. This 2021 data, according to Insight, shows that the majority of the

10   group homes closed after receiving citations and/or when they could not obtain use permits from the

11   City. Opp. at 31 (citing ECF Nos. 157-79 (Smartsheet Data from April 2021), 147-20 (April 5, 2019

12   City Letter to Insight denying Reasonable Accommodation request), 157-56 (Group Homes Cited

13   WEB), 157-76 (Application Status Website Smartsheet) (tracking status of group home conditional

14   use applications and SUPs)). The City's response to this data is that "Plaintiffs do not know how

15   many boardinghouses existed prior to the Ordinances or at any time, how many closed or opened or

16   why, how many residents were served and if they qualified as disabled, or any other necessary

17   specific facts or statistics." MSJ at 33–34. Put another way, the City is arguing that the 2021 data is

18   not limited to group homes for the disabled, so it cannot show the impact of the ordinances on the

19   disabled. This argument is belied, however, by the City's 30(b)(6) witness, who makes clear that this

20   2021 data *is* indeed limited to "group homes" (which by definition serve the disabled).[14] Moreover,

21   the Patterson Supplemental Declaration lays out a logical analysis of the data, which a jury could

22   believe and could find shows a decrease in beds for the disabled. The City has therefore failed to

---

[14] Ms. Le testified that the Smartsheets only tracks "group homes" and do not track "boardinghouses" that do not qualify as "group homes." ECF No. 151, P-UF 27.d.; *see also* ECF No. 157-84 at pp. 11-12 (Le 30(b)(6) Depo., 53:24–54:25) (Q: "Are the boardinghouses that do not qualify as group homes tracked in the City's SmartSheets that are on the website?" ... A: "... Boardinghouses that are group homes are what are specifically on the City's website." Q: "... But they wouldn't have boardinghouses that are not group homes?" ... A: "Correct. ... The SmartSheets are specific to the group home form of boardinghouse.").

1   show the absence of a genuine issue of material fact on whether the ordinances had a disparate

2   impact on the disabled.

3   Finally, the City argues that Insight can only show a "hypothetical" impact since many

4   unlicensed facilities—including Insight—continue to operate. In other words, because there may be

5   many facilities serving the disabled in violation of the ordinances, Insight cannot show that the

6   ordinances have a disparate impact on the disabled. There is no support in case law or in common

7   sense for this argument. The City cannot enact apparently discriminatory regulations and begin

8   enforcement of them, but then defend them on the grounds that there are entities that continue to

9   operate in violation of the regulations. As Insight points out, to the extent that there are entities

10  continuing to operate, they do so under constant threat of closure. Insight need not wait for the City

11  to complete its enforcement campaign to attempt to stop what it contends is discrimination against

12  the disabled.

13          3.   <u>Failure to Demonstrate Pretext Does Not Bar This Claim.</u>

14  Second, relying on *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir.

15  2007) ("*City of Boise*"), the City argues that its affirmative defense related to pretext applies to bar

16  these claims. MSJ at 34–35. The City argues that same analysis as the disparate treatment claim

17  apply, and the City's legitimate nondiscriminatory reasons applies. *Id.*

18  Insight argues that the City incorrectly cites "sham or pretext" as the standard for disparate

19  treatment claims. Insight argues that under *Avenue 6E*, when a policy creates a disparate impact, the

20  City must "attempt to minimize that impact by determining whether there is an alternative that

21  accommodates both the city's legitimate objective and the developer's legitimate goals." Opp. at 32

22  (quoting *Ave. 6E Invs., LLC*, 818 F.3d at 510 (citing 24 C.F.R. § 100.500)). The City argues in a

23  conclusory manner that "[t]here is no evidence to support th[is] claim" and that the chart that

24  Plaintiffs rely on is irrelevant. MSJ at 33.

25  In *City of Boise*, the Ninth Circuit applied *McDonnell Douglas* to a disparate treatment claim,

26  not a disparate impact claim. *City of Boise*, 490 F.3d at 1052. As such, the City has not shown that

27  Plaintiffs alleged failure to demonstrate pretext is an affirmative defense to the disparate treatment

28  claims. Accordingly, the City is not entitled to summary judgment on this basis.

**D.  The City is Not Entitled to Summary Judgment on the Reasonable Accommodation Claims.**

The City also seeks summary judgment on all claims asserting a reasonable accommodation theory of disability discrimination. A plaintiff bringing a disability discrimination claim based upon a reasonable accommodation theory must show the following:

> (1) he suffers from a handicap as defined by the [Fair Housing Amendments Act] FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap;(3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and  (4) defendants refused to make such accommodation.

*Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003) (quoting *United States v. Calif. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997)); *see also Budnick*, 518 F.3d at 1119 (same). The Ninth Circuit has further held that a plaintiff seeking an accommodation bears the initial burden of showing that the requested accommodation is reasonable. For example, in *Giebeler*, the Ninth Circuit—after noting that it applied the case law of the FHAA, Rehabilitation Act, and ADA somewhat interchangeably—explained that:

> Under the [Rehabilitation Act] case law, a plaintiff requesting accommodation bears the "initial burden of producing evidence that a reasonable accommodation was possible." *Vinson*, 288 F.3d at 1154. Once evidence of the possibility is produced, the burden shifts to the other party to produce rebuttal evidence that the requested accommodation is not reasonable. *Id.*

*Giebeler*, 343 F.3d at 1156. Similarly, the Ninth Circuit noted that in the ADA employment context, the Supreme Court in *United States Airways v. Barnett*, 535 U.S. 391, 402 (2002) held that once the burden shifts, the defendant can rebut the plaintiff's showing by demonstrating "that the accommodation would cause undue hardship in the particular circumstances." *Id.* at 1156.

At issue in this litigation is the third element set forth in *Giebeler*, sometimes referred to as the "causation element."[15] The City argues that Insight's requested accommodation—waiver of the

---

[15] The causation element is easily established because "[t]he vast majority of reported cases brought under § 3604(f)(3) involve developers' requests for variances of zoning ordinances that would allow them to build housing for handicapped persons. [Citations omitted.] In these cases, causation poses no independent hurdle for the plaintiffs. The city policies

separation requirement—was neither necessary nor reasonable. The Court addresses each argument below.

The City contends that Insight's requested accommodation was not "necessary" under governing law because rather than providing persons with disabilities an *equal* opportunity for group housing under the law, the requested accommodation would provide persons with disabilities with a *preferential* opportunity—something they are not entitled to. MSJ at 35–36 (citing *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City* ("*Cinnamon Hills*"), 685 F.3d 917, 923 (10th Cir. 2012)). But the Supreme Court has already held "reasonable accommodation in the service of equal opportunity may require preferential treatment of the disabled," *see Giebeler*, 343 F.3d at 1150, and that "accommodation requirements . . . do sometimes require preferring disabled individuals over others who are otherwise similarly situated but are not disabled." *id.* at 1154. The City provides no other arguments in support of its contention that Insight's requested accommodation was not necessary, and therefore it has failed to show the absence of a genuine issue of material fact in its favor on this issue. [16]

_____

directly interfere with use and enjoyment because they prevent the housing from being built." *Calif. Mobile Home Park Mgmt. Co.*, 107 F.3d at 1382 n.3. Here, Insight has satisfied the causation element because the zoning laws interfere with Insight's disabled residents' ability to use and enjoy the housing. The at-issue zoning laws require a 650-foot separation requirement, and Insight sought a reasonable accommodation requesting a waiver of the separation requirement. City-UF 6; *see* P-UF 94, 96.

[16] The Court finds a number of other reasons to reject application of *Cinnamon Hills* to this case. First, *Cinnamon Hills* concerned a request for residential housing in a commercial area, as opposed to seeking a particular type of residential housing in what is already zoned as a residential area. *Cinnamon Hills*, 685 F.3d at 920. Second, the *Cinnamon Hills* approach appears inconsistent with the Ninth Circuit's admonition in *Pacific Shores* that overdiscrimination is impermissible. *Pac. Shores*, 730 F.3d at 1160. ("The principle that overdiscrimination is prohibited undergirds all of constitutional and statutory anti-discrimination law, although it often goes unsaid precisely because it is so foundational. Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals."). Where, as alleged here, a municipality regulates all forms of shared housing as a means of limiting housing for the disabled, a reasonable accommodation claim is not precluded. Third, in rejecting this "preferential treatment" notion as contrary to the Supreme Court's ruling in "*Barnett*. . . [which] held that accommodation requirements (1) do sometimes require preferring disabled individuals over others who are otherwise similarly situated but are not disabled; and (2) are not limited only to lowering barriers created by the disability itself," *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1154 (9th Cir. 2003), the Ninth Circuit appears to have cited favorably the principle stated by the Seventh Circuit in *Oconomowoc Residential Programs v. City of Milwaukee* (*Oconomowoc II*), 300 F.3d 775, 787 (7th Cir. 2002) this sort of approach "ignores the fact that group living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide, and not similarly essential for the non-disabled." *See Giebeler*, 343 F.3d at 1154 n. 8.

1    Next, the City contends that Insight's requested accommodation was not "reasonable"

2    because it would constitute a "fundamental alteration" of the ordinances. But the "fundamental

3    alteration" test propounded by the City does not appear to be found in any authority that is binding

4    on this Court. *See* MSJ at 36–37 (citing only Eighth and Eleventh Circuit cases, as well as District of

5    Maryland cases). The question in the Ninth Circuit is whether the accommodation is reasonable, or

6    alternatively, whether it would work an undue hardship on the defendant. Insight presented evidence

7    that the requested accommodation was possible and reasonable on its face because the City would

8    have accepted the separation waiver under a different sequence of events. Opp. at 35–36; *see also*

9    ECF No. 157-64 at pp. 78–80. The City has not pointed to any evidence demonstrating that the

10   accommodation was not reasonable, nor any evidence that it would result in an undue hardship. It

11   has therefore failed to show the absence of a genuine issue of material fact on this issue.

12   Accordingly, the City's motion fails with respect to all the reasonable accommodation

13   claims. [17]

14   **E.  The City is Entitled to Summary Judgment on the Unruh Civil Rights Act Claim.**

15   The parties dispute whether the City is subject to the Unruh Civil Rights Act. MSJ at 37–38;

16   Opp. at 37–38. The City cites *Brennon B. v. Superior Court*, 57 Cal. App. 5th 367, 369 (2020), and

17   several unpublished district court cases to support its argument that the Unruh Act applies only to

18   business establishments, and not to government bodies. MSJ at 37. Insight opposes, arguing that

19   many district courts and other California courts have held public agencies can be "business

20   establishments" under Section 51(b) of the California Civil Code. Opp. at 38. In a footnote, Insight

21

22

23   _____

24

25   [17] Insight argues that the reasonable accommodation test need not even be applied in this case. First, according to Insight, because the ordinances constitute facial discrimination, the concept of reasonable accommodation is inapplicable. P.'s Opp. at 34 (citing *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch* (*BAART*), 179 F.3d 725, 734 (9th Cir. 1999)). The Court need not reach this argument to resolve the City's Motion. Second, Insight argues that under *Mark H.*, the test is "meaningful access" not reasonable accommodation. Opp. at 34. *Mark H.* appears to discuss meaningful access only with respect to the Rehabilitation Act. *See generally Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008). Since the Court finds that the City's MSJ fails on reasonable accommodation, the Court need not reach the question of whether it would also fail if a "meaningful access" test were applied.

argues that Section 51(f) of the Unruh Civil Rights Act does not specify a type of actor; rather, it applies to any actor that violates the ADA. *Id.* at 38, n.18.

When the City's motion was briefed, *Brennan B.* was pending on appeal to the California Supreme Court. That appeal has since been resolved, and the California Supreme Court's holding confirms that the City's interpretation is correct—the Unruh Act was primarily intended to apply to private actors, rather than to government bodies. *Brennon B. v. Superior Ct.*, 13 Cal. 5th 662, 678 (2022), *reh'g denied* (Aug. 31, 2022). "[T]o be a 'business establishment' under the Act an entity must effectively operate as a business or a commercial enterprise or engage in behavior involving sufficient businesslike attributes." *Id*. at 681 (cleaned up) (citations omitted). The California Supreme Court agreed with various decisions of the California Courts of Appeal which concluded that "government bodies do not function as 'business establishments' when they enact legislation," and are not subject to the Unruh Act in those contexts. *See id.* at 682–83 (citations omitted). However, the California Supreme Court did not foreclose the possibility that the Unruh Act could be applied against a government body when the entity "resemble[s] an ordinary for-profit business[.]" *See id*. at 684 (quoting *Zuccaro v. Martinez Unified Sch. Dist.*, No. 16-CV-02709-EDL, 2016 WL 10807692, at \*12 (N.D. Cal. Sept. 27, 2016)).

Here, the City's zoning activities fundamentally do not function as a commercial enterprise. No goods or services were exchanged for money; rather, the city government engaged in zoning and CUP decisions—quintessential functions of a municipal government. Moreover, the California Supreme Court also rejected Insight's argument that Section 51(f) applies to *any* actor. Opp. at 38, n.18. The California Supreme Court agreed with the City's reading of "subdivision (f) to mean that 'any violation of the ADA by a *business establishment* is also a violation of the Unruh Civil Rights Act.'" *Brennon B.*, 13 Cal. 5th at 685 (emphasis added). "Neither the language of the subdivision nor its legislative history indicates it was intended to bring about the monumental change suggested by Brennon: that any entity (public or private) that violates the ADA could be held liable under the Unruh Civil Rights Act . . . ." *Id.* As such, the Court finds that the Unruh Act does not apply, and GRANTS summary judgment on this claim.

/ / /

**F.  The City is Not Entitled to Summary Judgment on the Section 1983 Claims.**

Section 1983 creates a cause of action against a "person who, under color of any [state law], subjects, or causes to be subjected, any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). A plaintiff bringing a claim under section 1983 must show that "(1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." *Id.* (citation omitted). Plaintiffs bring two section 1983 claims, alleging violations of both their equal protection and substantive due process rights. FAC ¶¶ 153–59, 160–68.

The City contends that it is entitled to summary judgment on the section 1983 claims because there is at least a rational basis for the ordinances and group home regulations. *See* MSJ at 40–41. The City also argues that since disability is not a suspect classification, all that is required is a rational basis between the disparity of treatment and the legitimate government purpose. *Id.* at 39.

Insight opposes, arguing that rational basis review does not apply because they have provided evidence of a discriminatory purpose as the motivating factor for the City's action. *See* Opp. at 39. Insight further argues that whether there was a discriminatory purpose is a question of fact for the jury. *Id.*

The central inquiry . . . [for] an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose." *Ballou v. McElvain*, 29 F.4th 413, 423 (9th Cir. 2022). "Because 'the disabled do not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the non-disabled need only be 'rationally related to legitimate legislative goal' to pass constitutional muster." *Lee*, 250 F.3d at 687 (quoting *Does 1–5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996) (citing *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249)). Rational basis review also applies to the due process claim. *Gamble*, 104 F.3d at 307 (citing *Munoz v. Sullivan*, 930 F.2d 1400, 1404 n. 10 (9th Cir. 1991)).

In the *City of Cleburne*, the Supreme Court held, "[t]o withstand equal protection review, legislation that distinguishes between the . . .[ individuals with mental disabilities] and others must

be *rationally related* to a legitimate governmental purpose. . . . The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render *the distinction arbitrary or irrational*." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (emphasis added) (citations omitted). Furthermore, some objectives—such as 'a bare . . . desire to harm a politically unpopular group' . . . —are not legitimate state interests." *Id.* at 446–47 (quoting *United States Dept. of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)) (citing *Zobel v. Williams*, 457 U.S. 55, 63 (1982)). "[N]egative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally [disabled] differently from apartment houses, multiple dwellings, and the like." *Id.* at 448. In *City of Cleburne*, the Supreme Court rejected the council's objections to the facility for individuals with mental disabilities, noting that each objection was either based on vague fears, that the differential treatment was not rationally related to the objective, or unjustified, and concluded that requiring a special use permit appeared to rest "on an irrational prejudice." *Id.* at 449–50.

The facts of this case appear to be on all fours with *City of Cleburne*.[18] The City identifies as its "rational basis" the interests set forth in the ordinances and group home regulations, citing generally to the language of the regulations.[19] Even assuming these are legitimate interests, the City has not presented *evidence* on the classification used here and the *relationship* to the interests the City has identified. Put another way, the City has not shown that the restrictions here are *rationally related* to the interests it has identified. On the other hand, however, Insight has presented evidence of that the restrictions were motivated by irrational, vague, and undifferentiated negative attitudes

---

[18] In support of its request for summary judgment on this federal claim, the City inexplicably relies most heavily on a decision of the California Court of Appeals, *Ewing v. City of Carmel-By-The-Sea*, 234 Cal. App. 3d 1579 (1991). City MSJ at 40–41.

[19] The City argues that it "has stated in the Ordinances and Group Home Regulations, just as was sufficient in *Ewing*, that the basis included 'to preserve the residential character,' 'to free the handicapped [] from institutional style living,' to reduce 'overcrowding, inordinate amounts of second-hand smoke,' 'noise and traffic,' and to promote safety and well-being of both the clients of group homes as well as the community. [UF 16]." City MSJ at 41; Le Decl. ¶ 12; Exhibits "4" through "31" of the City's request for judicial notice. As noted above in a previous footnote, the evidence cited by the City demonstrates that these are rationales that were provided in the recitals of the ordinances, not that the recitals are true. *See, e.g.*, ECF No. 141-3.

and fears of the residents of its housing—just like in *City of Cleburne*. *See, e.g.*, ECF No. 157-52 at

p. 53 (business owner testifying), *id.* at p. 63 (opining that the facility is just a sober living facility in

disguise). Accordingly, the City has not demonstrated that it is entitled to summary judgment on

these constitutional claims.

## INSIGHT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## AND JANE DOE'S JOINDER (ECF NOs. 144, 147)

Insight seeks partial summary judgment on the liability component of its disability

discrimination claims based on (1) disparate treatment/methods of administration[20] under the FHA,

ADA, Section 504, FEHA, and Section 11135 claims; (2) disparate impact claims, and (3) failure to

accommodate claims under the same statutes. PMSJ at 1.

Insight also seeks summary judgment on the City's remaining affirmative defenses as well as

the City's counter claim. PMSJ at 1–2.

I.   **Discussion**

   **A.  Insight is Not Entitled to Summary Judgment on its Disparate Treatment Claims**

      **Based on "Methods of Administration."**

Insight contends that it is entitled to summary judgment on its "disparate treatment/methods

of administration." PMSJ at 3, *id.* at 23–28. The Court narrowly construes Insight's partial MSJ with

respect to methods of administration to apply only to the ADA and Rehabilitation Act claims

because Plaintiffs only mention "methods of administration" in the ADA and Rehabilitation Act

claims. FAC ¶¶ 135, 137 (ADA claim); *id.* ¶ 150 (Rehabilitation Act claim); *see also* 28 C.F.R. §

35.130 (b)(3) (ADA) ("A public entity may not, directly or through contractual or other

arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting

qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the

purpose or effect of defeating or substantially impairing accomplishment of the objectives of the

---

[20] Insight is not moving for partial summary judgment on the animus-based disparate treatment claims because there are
disputes of material fact. Insight Reply at 23, n. 14.

public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State."); 45 C.F.R. § 84.4 (b)(4) (Rehabilitation Act) ("A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons. . . .").

Insight argues that "[e]xcluding Insight's Residents from the City's By-Right [h]ousing [p]rogram is a [c]riteria or [m]ethod of [a]dministration that [d]iscriminates on the [b]asis of [d]isability." PMSJ at 27. Insight relies on 28 C.F.R. § 35.130 (b)(3)(i) and (ii), federal regulations for the ADA, to argue that the City's boardinghouse and group home regulations discriminate on the basis of disability. PMSJ at 27. The portion of section 28 C.F.R. § 35.130 (b)(3)(ii) referring to "defeating or substantially impairing accomplishment of the objectives of the public entity's program" does not appear to apply in this instance based on Insight's own arguments that the City's conduct was express and intentional, and so only 28 C.F.R. § 35.130 (b)(3)(i) concerning direct "methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," appears to apply to Insight's arguments. *Id.* As discussed above with respect to the City's MSJ, the *Arlington Heights* framework applies to Insight's disparate treatment claims.[21] The Court finds that although Insight has presented evidence

_____

[21] Insight argues that it has demonstrated disability discrimination under *Weinreich v. Los Angeles County Metropolitan Transportation*, 114 F.3d 976, 978 (9th Cir. 1997) because it has provided evidence of all three elements of a Title II-ADA discrimination claim. *See* PMSJ at 24. The elements of an ADA discrimination claim under Title II are:

> To prove a public program or service violates Title II of the ADA, a plaintiff must show: (1) he [or she] is a "qualified individual with a disability"; (2) he [or she] was either excluded from [(i)] participation in or denied the benefits of a public entity's services, programs or activities, or [ii] was otherwise

that the City "acted with a discriminatory purpose and has caused harm to members of a protected class," *Pac. Shores.*, 730 F.3d at 1158, it has not shown that there is no genuine issue of disputed fact with respect to the *Arlington Heights* elements.[22] Accordingly, Insight is not entitled to summary judgment.

### B.  Insight is Not Entitled to Summary Judgment on its Disparate Impact Claims.

Insight seeks summary judgment on the disparate impact discrimination under the FHA (First Claim), ADA (Second Claim), Section 504 (Third Claim), FEHA (Sixth Claim), and Section 11135 (Seventh Claim). PMSJ at 2, 28–33. The City opposes the motion, and repeats the same arguments made in support of its own motion for summary judgment on these claims, and includes new arguments. Opp. at 24–29.

As noted in the Court's discussion on disparate impact claims above, to establish a prima facie case under a disparate impact theory, a plaintiff must show "(1) the occurrence of certain outwardly *neutral* practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble*, 104 F.3d at 306 (emphasis added) (quoting *Pfaff*, 88 F.3d at 745).[23] In the discussion regarding the disparate

---

discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his [or her] disability.

*Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). The ADA and the Rehabilitation Act apply to zoning. *BAART*, 179 F.3d at 730–32.

The third element appears to be what is disputed here—was any discrimination occasioned by the ordinances and group home regulations *by reason of disability*.

[22] Insight also argues—relying on *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996)—that "denial of meaningful access to a covered program is discrimination on the basis of disability." PMSJ at 25. According to Insight, the Ninth Circuit's test for denial of "meaningful access" is whether a policy or practice burdens individuals with disabilities "in a manner different and greater than it burdens others." PMSJ at 26 (citing *Crowder*, 81 F.3d at 1484.) PMSJ at 25–27. In its Opposition, the City argues that *Crowder* is inapposite. Opp. at 20.

The Court agrees with the City that *Crowder* is inapposite. *Crowder* involved a "quarantine requirement [that] applie[d] equally to all persons entering the state with a dog," however "its enforcement burden[ed] visually-impaired persons in a manner different and greater than it burdens others." *Crowder*, 81 F.3d at 1484. This is categorically different from the restrictions and requirements that the City has imposed. Accordingly, Insight's meaningful access arguments fail.

[23] Black's Law Dictionary defines disparate impact as, "The adverse effect of a *facially neutral practice* (esp. an employment practice) that nonetheless discriminates against persons because of their race, sex, national origin, age, or disability and that is not justified . . . ." Black's Law Dictionary (11th ed. 2019).

impact claims, the Court assumed, without deciding, that the zoning laws were neutral because neither party addressed this element in the City's motion for summary judgment. Even assuming that this element has been met on Insight's claim, Insight has not shown the *absence* of a genuine issue of material fact on the *impact* of the zoning laws. Given the City's arguments about Insight's statistical evidence and Insight's expert's conclusions—particularly given the nature of the data and the possibility it could be read in multiple ways, especially when drawing all inferences in favor of the City—disputes of material fact remain as to whether there has been an impact, the nature of the impact, and its significance.

Accordingly, Insight is not entitled to summary judgment on these claims.

**C.  Insight is Entitled to Summary Judgment on its Failure to Accommodate Claims.**

Insight seeks summary judgment on the failure to accommodate under the FHA (First Claim), ADA (Second Claim), Section 504 (Third Claim), FEHA (Sixth Claim), and Section 11135 (Seventh Claim). PMSJ at 2, 33–39. Insight argues that it meets all of the elements of a reasonable accommodation claim and cites various undisputed facts in support. *See* PMSJ at 33–34. Insight contends that pursuant to 28 C.F.R. § 35.150(a)(3), after plaintiffs demonstrate a claim for a reasonable accommodation, the burden shifts to the City to demonstrate a fundamental alteration. Insight further contends that under *BAART*, 179 F.3d at 734, the ADA does not require reasonable accommodations analysis where "actual removal of the portion of the law that discriminates on the basis of disability" is required to avoid discrimination. Insight argues that it has demonstrated causation because the city's zoning laws *are* the impediment and that this case is on analogous to *Oconomowoc Residential Programs v. City of Milwaukee*. *See* PMSJ at 36–37. Finally, in a footnote, Insight argues that the City would bear the burden on a direct threat or public safety defense citing *Dadian v. Village of Wilmette*, 269 F.3d 831, 840 (7th Cir. 2001) in support. PMSJ at 39, n.13.

In opposition, the City repeats a condensed version of the same arguments it raised in its own motion for summary judgment. City Opp. at 30–32. The City repeats the argument that it is Insight's burden to demonstrate that the requested accommodation was necessary and reasonable. City Opp. at 30. The City contends that Plaintiffs must first demonstrate a prima facie reasonable accommodation claim before the burden shifts to it to demonstrate a fundamental alteration. City Opp. at 30. The

City contends that the requested accommodation would not have afforded an equal opportunity but instead a preferential opportunity, and that the Court should follow *Cinnamon Hills*, 685 F.3d at 923. City Opp. at 30–31.

As noted above in the Court's discussion on the City's motion for summary judgment on the reasonable accommodation claims:

> To make out a claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation. *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir.1997) ( *"Mobile Home II"*).

*Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003). In addition to the FHA, the ADA, the Rehabilitation Act, the FEHA, and Section 11135 require municipalities to "make reasonable accommodations." *See* 42 U.S.C. § 3604(f)(3)(B) (defining discrimination under the FHA to include the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling"); Cal. Gov. Code § 12927(c)(1) (defining discrimination to include failure to make a reasonable accommodation); Cal. Gov. Code § 11135(b) (providing that section 11135(a) provides the same levels of protection and prohibitions as section 202 of the ADA, or stronger protections); *Mark H.*, 513 F.3d at 938 (9th Cir. 2008) ("[A] public entity can be liable for damages under § 504 [of the Rehabilitation Act] if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons."); *McGary v. City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004) (ADA) (collecting cases).

Insight presented evidence that it met its initial burden under *Giebeler*. PMSJ at 15–16, 18–19, 22–23. Insight has demonstrated that all of its residents and Jane Doe have disabilities through Jane Doe's Declaration as well as through evidence of admissions criteria. PMSJ at 21 (Doe Decl. ¶¶ 3–10); PMSJ at 23; *see also* P-UF 8–9 (citing Grosso Decl. ¶¶ 25–26 & Beatificato Decl. ¶ 43). Likewise, Insight has also demonstrated that the City knew or reasonably should have known that Insight's housing serves residents with disabilities because—as part of the operator's permit application—Insight's owner (Beatificato) and the property owner both signed an affirmation

"UNDER PENALTY OF PERJURY" that "only residents (other than the house manager) who are handicapped as defined by state and federal law shall reside at the group home." PMSJ at 18; P-UF 10 (citing Beatificato Decl. ¶ 44 & ECF No. 147-19 at p. 128); PMSJ at 33 (same). Insight presented evidence that it requested a reasonable accommodation on August 3, 2018, asking the City to either: (1) waive the 650 feet separation requirement for Insight's housing; or (2) determine that Insight's housing is not within the purview of the City's group home regulations; and that on April 5, 2019, the City's Director denied Insight's reasonable accommodation request. P-UF 94 (citing Beatificato Decl. ¶ 55 & ECF No. 147-17); P-UF 96 (citing Beatificato Decl. ¶¶ 59–61 & ECF No. 157-20). Finally, Insight presented evidence that the requested accommodation "may be necessary" to afford Plaintiffs an equal opportunity to use and enjoy the dwelling. There is no other housing such as Insight's in Orange County. P-UF 12–13, 18. Insight provides housing for a different clinical population—individuals with mental illness who are "stepping down" from 24-hour residential care (usually in a state-licensed facility). P-UF 11–12 (citing Grosso Decl. ¶¶ 14, 38, 48; Beatificato Decl. ¶¶ 37–38; DiCandia Decl. ¶¶ 12–15, 37). Insight's housing serves individuals who are too high-functioning to require 24-hour care, but need a safe and supportive place to adjust to community living. *See* P-UF 15 (citing Grosso Decl. ¶¶ 37, 49; Beatificato Decl. ¶ 39; Doe Decl. ¶ 39). Without Insight's housing, its residents are significantly more likely to regress after leaving residential care and end up back in the hospital, or worse. P-UF 16 (citing Grosso Decl. ¶ 36; Beatificato Decl. ¶ 40; DiCandia Decl. ¶¶ 29–31; Doe Decl. ¶¶ 40, 42). Moreover, Insight has presented evidence that individuals who do not have access to supportive housing have died by suicide. P-UF 17 (citing DiCandia Decl. ¶ 30).

The burden then shifts to the City to show that the requested accommodation was not necessary, not reasonable, or would cause undue hardship. Because the City relied solely on the fundamental alteration argument and the idea that it cannot waive the separation requirement—as doing so would undermine its argument that the separation argument is fundamental—the City declined to present any *evidence* to controvert Insight's evidence that its request accommodation was reasonable and necessary, nor did it present any evidence that the requested accommodation would cause undue hardship. It has therefore failed to create a genuine issue of material fact.

1    Accordingly, Insight is entitled to summary judgment on the reasonable accommodation

2  claims.

3    **D.  Insight is Not Entitled to Summary Judgment on the City's Affirmative Defenses.**

4    Insight seeks summary judgment on the City's affirmative defenses. Insight contends that the

5  City has not and cannot produce any evidence or legal justification in support of its remaining

6  Affirmative Defenses 1–5, 7–10, and 12.[24] PMSJ at 39. The City notes that Insight made no citation

7  to authority, evidence, and that the motion is inadequate with respect to the affirmative defenses.

8  City Opp. at 32. In reply, Insight argues all it needed to do was "inform the district court of the basis

9  for its motion" and "identif[y] those portions of the 'pleadings, depositions, answers to

10  interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

11  demonstrate the absence of a genuine issue of material fact." Reply at 33 (quoting *Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 323 (1986)). Here, Insight has not explained how its PMSJ arguments are

13  relevant to any particular affirmative defense, nor how its PMSJ arguments bar any particular

14  affirmative defense. Finally, Insight has not pointed to evidence that demonstrates an absence of

15  genuine issue of material fact with respect to any particular element of the City's affirmative

16  defenses. Accordingly, Insight is not entitled to summary judgment on the City's affirmative

17  defenses.

18    **E.  Insight is Not Entitled to Summary Judgment on the City's Nuisance Counterclaim.**

19    Insight seeks summary judgment on the City's nuisance claim, arguing that there is no

20  dispute or controversy between the parties. PMSJ at 39–40. According to Insight, it does not dispute

21  that it is operating without a CUP and, therefore, no "actual controversy" exists. PMSJ at 40. It does

22  not appear that Insight concedes that—as contended by the City—that "Insight is currently operating

23  as *a nuisance per se* in violation of the law and is subject to abatement." City Opp. at 32. In fact,

24

25  _____

26

27  [24] Affirmative defenses 1–5 are: (1) legitimate use of zoning powers, (2) statute of limitations, (3) failure to mitigate, (4) failure to exhaust administrative remedies, and (5) failure to present governmental claim. Affirmative defenses 7–10, and

28  12 are: (7) lack of standing, (8) laches, (9) fundamental alteration, (10) benefit, and (12) subsequently discovered defenses.

Insight has maintained that Insight's conduct does *not* constitute a nuisance which is subject to abatement. Plaintiff's Answer ¶ 35. In light of this dispute, Insight has not shown that no controversy exists or that it is otherwise entitled to summary judgment on this nuisance claim.[25]

### CONCLUSION

In light of the foregoing, the Court hereby ORDERS as follows:

1. The City's motion for summary judgment is GRANTED as to Plaintiffs' Unruh claims, and is otherwise DENIED as to all other claims.

2. Insight's motion for partial summary judgment is GRANTED with respect to the reasonable accommodation claims and is otherwise DENIED as to all other claims, including the City's affirmative defenses and counterclaims.

3. The Court will issue an order setting a scheduling conference in a separate order.

IT IS SO ORDERED.

Dated: March 20, 2024

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[25] Similarly, Insight argues that *no* injunctive relief is needed because Insight has stated under oath that it would close if it lost in the litigation. PMSJ at 40. Although if the City prevails, Insight may oppose the specific nature of the injunctive relief sought, Insight points to no basis in law for granting summary judgment on the ground that *no* injunction is needed since Insight has promised to close. Given the nature of the disputes in the litigation, the City is entitled to seek injunctive relief and not just rely on Insight's representations. There appears to be no binding authority suggesting that the City has the burden to show that Insight "will not honor its sworn representation." PMSJ Reply at 24.